Nos. 25-7461, 25-7467, 25-7469, 25-7824, 25-7869

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

GRANT HOUSE, et al.,
*Plaintiffs-Appellees,*

v.

PIPER WHITTY, et al.,
*Objectors-Appellants*

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al.,
*Defendants-Appellees*

On Appeal from the United States District Court
for the Northern District of California, Oakland Division
Case No. 4:20-cv-03919-CW
The Honorable Claudia Wilken

**APPELLANTS' OPENING BRIEF**

Leigh Ernst Friestedt
EQUITY IX, LLC
40 Mercer St., Suite 15
New York, NY 10013
(917) 513-5541
leigh@equityix.com

Jeffrey E. Faucette
SKAGGS FAUCETTE LLP
505 Montgomery St., 11th Floor
San Francisco, CA 94111
(415) 874-3181
jeff@skaggsfaucette.com

*Attorneys for Objectors-Appellants:* Piper Whitty, Ariana Amoroso,
Katherine McCabe Ernst, Scott Iannaccone, Abigail Leight, and
Reid Hinds Macdonald

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES......................................................................................iv

INTRODUCTION.....................................................................................................1

ISSUES PRESENTED ON APPEAL........................................................................4

JURISDICTIONAL STATEMENT...........................................................................4

STATUTORY AND REGULATORY AUTHORITY................................................5

STATEMENT OF THE CASE..................................................................................6

     I.      Procedural History.......................................................................6

     II.    Damages Settlement and Injunctive Relief – Structure and Classes.......................................................................................14

          A.    Damages Classes.............................................................14

          B.    Injunctive Relief Class....................................................17

          C.    Injunctive Relief Structure..............................................18

               1.    Elimination of Scholarship Limits – Replacing with Roster Limits..............................................18

               2.    Designated Student-Athlete...............................19

               3.    Benefits Pool – Shared Revenue....................20

          D.    Injunctive Relief Sub-Classes: Current and Incoming.............21

     III.   Objectors–Appellants.................................................................22

          A.    Current Division I Student-Athletes................................24

          B.    Former Division I Student-Athletes.................................28

          C.    Incoming Division I Student-Athletes..............................30

SUMMARY OF THE ARGUMENT.........................................................................34

i

STANDARD OF REVIEW....................................................................................34

ARGUMENT......................................................................................................35

    I.      The District Court Abused Its Discretion by Continuing an Injunctive Relief that Cannot Stand Alone—It is Expressly Integrated with the Settlement on Appeal..............................................................................35

         A.     The Settlement Expressly Integrates the Injunctive Relief—So Reversal of Any Part Unravels the Whole................................36

         B.     The District Court Abused Its Discretion by Continuing the Injunctive Relief After Staying the Settlement.........................38

    II.     The District Court Abused Its Discretion by Continuing the Injunctive Relief Despite Irreparable Harm and Intra-Class Conflicts................40

         A.     The Injunctive Relief is Not Fair, Reasonable, or Adequate Under Rule 23(e).....................................................................41

         B.     The Injunctive Relief Has Caused Immediate and Irreparable Harm..................................................................................42

         C.     The Injunctive Relief Creates Arbitrary and Unlawful Intra-Class Conflicts....................................................................44

             1.     Sports: The Settlement Favors Football and Men's Basketball at the Expense of All Other Athletes............44

             2.     Gender: The Injunctive Relief Harms Female Student-Athletes and Excacerbates Sex-Based Discrimination...45

             3.     Time: The Injunctive Relief Class is Internally Divided and Lacks Adequate Representation.............................46

             4.     These Structural Conflicts Render the Settlement Unfair Under Rule 23(a)(4).......................................................47

          D.     The DSA Designation Failed to Protect Student-Athletes from Roster Limits and Introduced Arbitrary, Unlawful Conflicts...49

    III.    The District Court Incorrectly Asserted It Lacked Authority to Modify the Settlement When Objectors Requested Amendments...................51

    A.     The District Court's Exclusion of Pro Se Objectors Violated Due Process and Rule 23(e)........................................................53

    B.     The District Court Had Authority to Modify the Settlement Under Rule 60(b) and Long-Standing Equitable Principles.....54

IV.    The Injunctive Relief is Subject to Actively Changing Circumstances – The District Court Retains Authority to Modify It.............................56

    A.     The Injunctive Relief is Not Remedial – It Authorizes Ongoing and Prospective Harm.............................................................56

CONCLUSION.................................................................................................61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agostini v. Felston,*
521 U.S. 203 (1997)................................................................55, 57, 58

*Allen v. Bedolla,*
787 F.3d 1218 (9th Cir. 2015) ................................................49, 54, 55

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)....................................................42, 44, 45, 48, 50

*Ayers v. Thompson,*
358 F.3d 356 (5th Cir. 2004) ...............................................................48

*Bellevue Manor Assocs. v. United States,*
165 F.3d 1249 (9th Cir. 1999) .............................................................58

*Briseño v. Henderson,*
998 F.3d 1014 (9th Cir. 2021) .......................................................35, 42

*Carter v. NCAA,*
No. 3:23-cv-06325-SK (N.D. Cal. Dec. 7, 2023) ................................7

*Commc'n Res. for Indep. Living v. Mobility Works of Cal., LLC,*
No. 18-cv-06012-JSW, 2020 WL 10505224 (N.D. Cal. Mar. 6, 2020)
...............................................................................................................48

*Dennis v. Kellogg Co.,*
697 F.3d 858 (9th Cir. 2012) ...............................................................34

*Devlin v. Scardelletti,*
536 U.S. 1 (2002)..................................................................................39

*Evans v. Jeff D.,*
475 U.S. 717 (1986)..............................................................................53

*Geo Grp., Inc. v. Newsom,*
50 F.4th 745 (9th Cir. 2022) ................................................................34

*Gilmore v. People of the State of Cal.*,
220 F.3d 987 (9th Cir. 2000) ..............................................................60

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ..............................35, 37, 40, 42

*Hesse v. Sprint Corp.*,
598 F.3d 581 (9th Cir. 2010) ..............................................................45

*House v. NCAA*,
No. 4:20-cv-03919 (N.D. Cal. June 15, 2020)..................................6

*Hubbard v. NCAA*,
No. 4:23-cv-01593-SK (N.D. Cal. 2023) .............................................6

*In re Apple Inc. Device Performance Litig.*,
50 F.4th 769 (9th Cir. 2022) .............................................................35

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ......................................................36, 37

*In re Coll. Athlete NIL Litig.*,
No. 20-cv-03919-CW, 2023 WL 7106483 (N.D. Cal. Sep. 22, 2023).6

*In re Google Inc. Street View Elec. Commc'ns Litig.*,
21 F.4th 1102 (9th Cir. 2021) ............................................................37

*In re Syncor ERISA Litig.*,
516 F.3d 1095 (9th Cir. 2008) ...........................................................41

*In re Tableware Antitrust Litig.*,
484 F. Supp. 2d 1078 (N.D. Cal. 2007).......................................50, 53

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016) ...........................................................55

*Koby v. ARS Nat'l Servs, Inc.*,
846 F.3d 1017 (9th Cir. 2017) ...........................................................50

*Kokkonen v. Guardian Life Ins. Co.*,
511 U.S. 375 (1994)...........................................................................56

*NCAA v. Alston*,

594 U.S. 69 (2021)............................................................7

*Nken v. Holder*,
556 U.S. 418 (2009)......................................................38

*Officers for Just. v. Civ. Serv. Comm'n*,
688 F.2d 615 (9th Cir. 1982) ......................................41

*Oliver v. NCAA*,
No. 4:20-cv-04527 (N.D. Cal. July 8, 2020) ......................6

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)..............................42, 44, 45, 47, 48, 50

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992)......................................................55

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ..............................48, 50

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) ..............................34, 35

*United States v. Swift*,
286 U.S. 106 (1932)......................................................54

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)......................................................35

**Statutes**

28 U.S.C. § 1291 ..........................................................5

28 U.S.C. § 1331 ..........................................................4

28 U.S.C. § 1332 ..........................................................4

28 U.S.C. § 1337 ..........................................................4

**Rules**

Fed. R. Civ. P. 23 ........................................................39

Fed. R. Civ. P. 60 ..............................................55, 56

**Other Sources**

Student Compensation and Opportunity through Rights and Enforcement (SCORE) Act, H.R. 4312, 119th Cong. (July 24, 2025) ....................58

Exec. Order No. 14322, 90 C.F.R. 35821 (2025) ........................................58

Exec. Order No. Citation Not Available (April 3, 2026) .............................58

Ross Dellenger, *NCAA Proposing Major Changes to Eligibility Rules, Including Age Limits*, Yahoo Sports (Apr. 8, 2025), https://sports.yahoo.com/college-football/article/ncaa-proposing-major-changes-to-eligibility-rules-including-age-limits-121509806.html ...............................................................................58

## <u>REQUEST FOR ORAL ARGUMENT</u>

Appellants Whitty, et al., respectfully request oral argument.

# INTRODUCTION

On June 6, 2025, the District Court for the Northern District of California approved a landmark antitrust settlement between Division I student-athletes and the National Collegiate Athletic Association (NCAA) and its "Power Five" athletic conferences: the Atlantic Coast Conference (ACC), Big Ten, Big 12, Pac-12, and Southeastern Conference (SEC) (collectively, "Defendants"). 1-WhittyER-12–202. The Second Amended Injunctive Relief Settlement (Injunctive Relief) took immediate effect upon approval of the Fourth Amended Stipulation and Settlement Agreement (Settlement). 1-WhittyER-12–202; 2-WhittyER-359–99. Although the Settlement's $2.6 billion in past-damages payments has been stayed pending appeal, the District Court allowed the Injunctive Relief—an integrated component of the Settlement—to continue. 1-WhittyER-2–11, 29–30; 2-WhittyER-374, 382. This appeal challenges the District Court's decision to overrule objections and continue the Injunctive Relief. 5-WhittyER-821–52.

The District Court abused its discretion by continuing Injunctive Relief that is neither fair, reasonable, nor adequate under Rule 23(e), and that cannot lawfully operate independent of the Settlement to which it is contractually and functionally integrated. 1-WhittyER-12–14.

1

The underlying litigation consolidated decades of antitrust challenges to NCAA rules governing student-athlete eligibility and compensation—specifically, rules that prohibited student-athletes from (1) monetizing their name, image, and likeness (NIL); (2) receiving compensation for their athletic services; and (3) obtaining athletic scholarships beyond NCAA-imposed limits. Class Counsel, Defendants, and the District Court described the Settlement as "extraordinary," reshaping the economic landscape of college sports and unleashing "tens of billions of dollars in new forms of benefits over the next ten years." 2-WhittyER-225–26; 3-WhittyER-510; 4-WhittyER-769. For many student-athletes, however, the Injunctive Relief has produced the opposite result. 2-WhittyER-240–69, 272–308; Addendum 87–88, 91–92.

Since the Injunctive Relief took effect, Division I institutions have implemented sweeping structural changes, including replacing traditional scholarship limits with roster caps and creating a $20.5 million revenue-sharing system that allows universities to pay student-athletes directly. 1-WhittyER-31–, 34, 44–45. These changes have already resulted in the loss of roster positions, the elimination of *Alston* payments, reductions or cancellations of athletic scholarships, the loss of other benefits associated with Division I participation, and, in some cases, the elimination of entire teams. 2-WhittyER-240–69, 272–308. For many student-athletes, the new system has disrupted academic progress, forced

2

unwanted entry into the transfer portal, and eliminated opportunities to participate in college sports altogether. Current and future student-athletes are deprived of the stability and educational opportunities the Injunctive Relief was purportedly designed to protect. 2-WhittyER-240–69, 279–308; Addendum 87–88, 91–92.

The Injunctive Relief imposes forward-looking restraints on millions of student-athletes—without an opportunity to opt out—and binds them to a compensation and roster limit structure that will govern Division I athletics for the next decade. 1-WhittyER-30; 2-WhittyER-402. That structure overwhelmingly concentrates financial benefits in football and men's basketball—receiving over 90% of past-damages and revenue-sharing payments—shifting financial pressure onto the rest of Division I athletics and creating predictable, substantial harms to women's sports and Olympic-sport programs. 2-WhittyER-280–82, 284–86. These harms were raised in objections at the April 7, 2025 final approval hearing, yet the District Court allowed the Injunctive Relief to take immediate effect upon approval of the Settlement and subsequently overruled objections to its continuation. 1-WhittyER-2–11; 2-WhittyER-382; 3-WhittyER-425–536.

The District Court's decision to approve and continue the Injunctive Relief was an abuse of discretion. A class settlement that imposes ongoing, foreseeable harm on absent class members creates fundamental intra-class conflicts, and perpetuates sex-based discrimination without meaningful opt-out rights cannot be

3

deemed "fair, reasonable, and adequate" under Rule 23. Because the District Court failed to apply the required scrutiny and permitted the Injunctive Relief to become operative despite these defects, the approval order must be vacated.

## ISSUES PRESENTED ON APPEAL

1. Whether the District Court committed legal error by treating the Injunctive Relief as severable from the Settlement Agreement.

2. Whether the District Court exceeded its authority under Rule 23(e) by continuing the Injunctive Relief despite evidence of irreparable harm to student-athletes, intra-class conflicts, and sex-based discrimination.

3. Whether the District Court abused its discretion by refusing to modify or stay the Injunctive Relief after objectors presented evidence of ongoing and irreparable harm.

4. Whether the District Court abused its discretion by failing to modify an Injunctive Relief despite pending congressional legislation, recent presidential executive orders, and ongoing NCAA and conference rule changes.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation). Jurisdiction was also proper under 28 U.S.C. § 1332(d), as this is a class action in

4

which the amount in controversy exceeds $5,000,000, and at least one class member is a citizen of a state different from the Defendants.

On June 6, 2025, the District Court granted the final judgment approving the Settlement. 1-WhittyER-12–202. On November 13, 2025, the District Court entered a final order overruling objections to the continuation of the Injunctive Relief Settlement. 1-WhittyER-2–11. Objectors-Appellants: Piper Whitty and Ariana Amoroso filed a timely notice of appeal on November 24, 2025. 5-WhittyER-845–52. Objector-Appellant: Katherine McCabe Ernst filed timely notices of appeal on June 16, 2025, and November 24, 2025. 3-WhittyER-631–41; 5-WhittyER-837–44. Objectors-Appellants: Scott Iannaccone and Abigail Leight filed a timely notice of appeal on November 26, 2025. 5-WhittyER-829–36. Objector-Appellant: Reid Hinds Macdonald filed a timely notice of appeal on December 13, 2025. 5-WhittyER-821–28. These separate Notices of Appeals were filed in accordance with Federal Rule of Appellate Procedure 4(a).

This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291, which provides appellate jurisdiction over the final decision of the District Court.

**STATUTORY AND REGULATORY AUTHORITY**

All relevant statutory and regulatory authorities are included in the Addendum to this brief.

## STATEMENT OF THE CASE

This appeal arises from the District Court's order overruling Appellants' objections and permitting the continuation of the Injunctive Relief component of the Settlement while the damages portion of the Settlement remains stayed on appeal.

### I.    Procedural History

This consolidated litigation began from two separate actions filed in 2020: (1) *House v. NCAA*, No. 4:20-cv-03919 (N.D. Cal. June 15, 2020) (hereinafter *House*); and (2) *Oliver v. NCAA*, No. 4:20-cv-04527 (N.D. Cal. July 8, 2020) (hereinafter *Oliver*). *House* was brought by former Division I student-athletes Grant House (men's swimming) and Sedona Prince (women's basketball). *Oliver* was brought by former Division I football player Tymir Oliver. Plaintiffs alleged the NCAA's rules unlawfully restricted student-athletes from receiving compensation for the commercial use of their NIL, and prohibit the NCAA, conferences, and member schools from sharing third-party revenue derived from such NIL use. 1-WhittyER-127. On July 14, 2021, the District Court consolidated *House* and *Oliver* actions under the caption *In re Coll. Athlete NIL Litig.*, No. 20-cv-03919-CW, 2023 WL 7106483 (N.D. Cal. Sep. 22, 2023).

On April 4, 2023, Chuba Hubbard filed *Hubbard v. NCAA*, No. 4:23-cv-01593-SK (N.D. Cal. 2023), alleging that student-athletes who competed before

*NCAA v. Alston*, 594 U.S. 69 (2021), were unlawfully denied the opportunity to receive academic achievement awards up to $5,980. Pursuant to the Settlement, *Hubbard* was dismissed on the merits with prejudice.

On September 22, 2023, the District Court certified an Injunctive Relief Class and appointed Hagens Berman Sobol Shapiro LLP (Hagens Berman) and Winston & Strawn LLP (Winston & Strawn) as Co-Lead Class Counsel (Class Counsel). 1-WhittyER-131; 4-WhittyER-814–16.

On November 3, 2023, the District Court certified three Damages Classes under Rule 23(b)(3): (1) Football and Men's Basketball, (2) Women's Basketball, and (3) Additional Sports—and reaffirmed certification of the Injunctive Relief Class (collectively, Settlement Classes). 4-WhittyER-811–13. The District Court again appointed Hagens Berman and Winston & Strawn as Co-Lead Class Counsel (Class Counsel) for the Settlement Classes. 1-WhittyER-28, 131; 2-WhittyER-363.

On December 7, 2023, a related action, *Carter v. NCAA*, No. 3:23-cv-06325-SK (N.D. Cal. Dec. 7, 2023) (hereinafter *Carter*), was filed, challenging NCAA rules prohibiting payments for athletic services ("pay-for-play"). The Third Consolidated Amended Complaint incorporated *Carter* into the consolidated action and added DeWayne Carter and Nya Harrison as named Plaintiffs. 4-WhittyER-771.

7

On September 26, 2024, Plaintiffs and Defendants entered into a Stipulation and Settlement Agreement ("Settlement Agreement"), which governs both the Damages Settlement and the Injunctive Relief Settlement. 1-WhittyER-30.

On October 7, 2024, the court granted preliminary approval of the revised Settlement and set a January 31, 2025, deadline for class members to file claims, objections, or opt-out of the Settlement. 4-WhittyER-731–32, 736, 739. There was no ability to opt-out of the future Injunctive Relief. 2-WhittyER-311, 366–67, 391.

On January 30, 2025, Objector-Appellant Katherine McCabe Ernst submitted her first objection letter to the District Court challenging the Settlement and the Injunctive Relief on three independent grounds: (1) violations of Title IX of the Education Amendments Act of 1972 (Title IX) and the Settlement's overly broad Title IX release; (2) inadequate notice and other procedural deficiencies; and (3) inadequate representation arising from conflicts of interest between Class Counsel and the Female Sub-Class. 3-WhittyER-631–41.

On April 7, 2025, the District Court conducted a six-hour final approval hearing attended by Class Counsel, Defendants, and objectors appearing in person and via Zoom. Attorney Leigh Ernst Friestedt, appeared in person on behalf female Division I student-athletes: Charlotte North, Mai Nirundorn, Sarah Brooke Baker, and Katherine McCabe Ernst (collectively, *North et al.*). 3-WhittyER-476–82.

8

On April 18, 2025, the parties submitted a revised Third Amended Settlement Agreement Errata with a redlined version attached. 2-WhittyER-412–21. The revised Settlement divided the Injunctive Relief Settlement Class into two groups: (1) Current Injunctive Relief Settlement Class Members, and (2) Incoming Injunctive Relief Settlement Class Members. 2-WhittyER-415–16.

On April 18, 2025, the District Court reset deadlines and permitted additional objectors to reply to the Amended Settlement by April 22, 2025. 5-WhittyER-988. From April 21–22, 2025, the District Court received over 100 objection letters detailing the irreparable harm caused by the Settlement and Injunctive Relief. 2-WhittyER-405–09; 5-WhittyER-989–93. On April 23, 2025, the District Court issued an order on the motion for final approval and found that the immediate implementation of the roster limits had resulted in, or would cause, harm to a "significant number" of Injunctive Relief Class members. 2-WhittyER-400–01. The District Court concluded that because the Settlement was not "fair and reasonable to a significant number of class members whose roster spots will be or have been taken away because of the immediate implementation of the settlement agreement," it could not approve the Settlement in its current form. 2-WhittyER-402.

On May 7, 2025, parties filed the Fourth Amended Stipulation and Settlement Agreement, which serves as the operative version. 2-WhittyER-359–99.

9

In their supplemental submission supporting final approval, Class Counsel stated that they secured the roster-limit exceptions the district court requested. 2-WhittyER-349, 351–52.

The amended settlement agreement introduced a Designated Student-Athlete (DSA) designation to address concerns about roster limits. 2-WhittyER-350–51. At the discretion of a university, DSA status could be granted to any current or incoming student-athlete who might otherwise be removed from a roster due to the immediate implantation of roster limits. 2-WhittyER-356–57.

On June 6, 2025, the District Court granted final approval of the $2.6 billion class action Settlement and issued its Order of Final Approval and Final Judgment and Dismissal with Prejudice. 1-WhittyER-12–202. Under the terms of the Settlement, the Injunctive Relief that went into effect, including the imposition of roster caps at universities that opted into the Settlement. 1-WhittyER-12–109; 2-WhittyER-382.

On June 16, 2025, *North et al.* filed a Notice of Appeal to the Ninth Circuit Court of Appeals and Katherine McCabe Ernst was a party to that appeal. 5-WhittyER-837–44. On June 18, 2025, the Ninth Circuit assigned Case No. 25-3835 to the *North et al.* appeal. 5-WhittyER-997.

By July 7, 2025, six objector groups had filed separate Notices of Appeal to the Ninth Circuit challenging the district court's approval of the Settlement

10

Agreement and Injunctive Relief. 2-WhittyER-330–32, 335–40, 343–44. The Ninth Circuit assigned Case Nos. 25-3722, 25-3835, 25-4137, 25-4150, 25-4190, and 25-4218.

On July 23, 2025, a "Notice of Your Right to Object" was sent to incoming members of the Injunctive Relief Settlement Class—those who would join a Division I team for the first time in the 2025-26 academic year—informing them of their opportunity to object to the Injunctive Relief and to any Settlement terms relating to it. It then informed them the deadline to file objections was September 22, 2025. 2-WhittyER-311–12, 318–22.

Objector-Appellant Ernst, a current student-athlete at Vanderbilt University and member of the Injunctive Relief Class, submitted an objection letter to the District Court on September 22, 2025. 2-WhittyER-279–87. Six other current and prospective student-athletes also objected to the Settlement and Injunctive Relief: Piper Whitty, Ariana Amoroso, Scott Iannaccone, Abigail Leight, Reid Hinds Macdonald, and Gracelyn Lee Laudermilch. 2-WhittyER-240–69, 272–78, 288–300.

On October 31, 2025, Class Counsel moved to add Miller Moss, a high-profile Division I football quarterback who played at University of Southern California (USC) before transferring to University of Louisville in December 2024 for a fifth year of eligibility, as a Class Representative. 2-WhittyER-238–39. On

11

November 5, 2025, the district court granted the motion and added Mr. Moss as a Class Representative. 2-WhittyER-236–37. Mr. Moss is currently being evaluated as a 2026 NFL Draft prospect and is expected to participate in Louisville's Pro Day on March 24, 2026. https://www.draftnation.com/articles/2026-nfl-prospect-profile-louisville-quarterback-miller-moss.

On November 6, 2025, attorney Leigh Ernst Friestedt, appeared remotely via Zoom for the fairness hearing on behalf of Katherine McCabe Ernst, Ariana Amoroso, and Piper Whitty and objected to the continuation of the Injunctive Relief on four independent grounds: (1) roster-limit concerns; (2) the harm experienced by DSA student-athletes who no longer had a Division I team on which to compete; (3) inadequate representation by Class Counsel and Class Representatives; and (4) Title IX violations and the Settlement's overly broad Title IX release. 2-WhittyER-216–20, 230–32.

On November 13, 2025, the district court overruled objections to the continuation of the Injunctive Relief Settlement. 1-WhittyER-5–8.

On November 24, 2025, Katherine McCabe Ernst filed a timely Notice of Appeal with the Ninth Circuit, which was assigned Case No. 25-7467. 5-WhittyER-837–44.

12

On November 24, 2025, Ariana Amoroso and Piper Whitty filed a timely Notice of Appeal with the Ninth Circuit, which was assigned Case No. 25-7461. 5-WhittyER-845–52.

On November 26, 2025, Scott Iannaccone and Abigail Leight filed a timely Notice of Appeal with the Ninth Circuit, which was assigned Case No. 25-7469. 5-WhittyER-829–36.

On December 11, 2025, Gracelyn Lee Laudermilch filed a timely Notice of Appeal with the Ninth Circuit, which was assigned Case No. 25-7824. 5-WhittyER-818–20.

On December 13, 2025, Reid Hinds Macdonald filed a timely Notice of Appeal with the Ninth Circuit, which was assigned Case No. 25-7869. 5-WhittyER-821–28.

On February 4, 2026, the Ninth Circuit granted the motion to consolidate the related appeals Case Nos: 25-7461, 25-7467, 25-7469, 25-7824, 25-7869. (Dkt. No. 26). Attorney Leigh Ernst Friestedt currently represents Appellants: Katherine McCabe Ernst, Ariana Amoroso, Piper Whitty, Scott Iannaccone, Abigail Leight, and Reid Hinds Macdonald. Appellant Gracelyn Lee Laudermilch represents herself pro se.

13

## II.    Damages Settlement and Injunctive Relief – Structure and Classes

The District Court certified two distinct settlement classes: (1) the **Damages Settlement Classes**: Football and Men's Basketball, Women's Basketball, and Additional Sports (collectively, the "Damages Classes"), and (2) the **Injunctive Relief Settlement Class** (the "Injunctive Relief Class"). 2-WhittyER-363. The Damages Classes encompasses all Division I student-athletes from **June 15, 2016**, through **September 15, 2024**. The Injunctive Relief Class includes all Division I student-athletes from **June 15, 2020**, through **June 6, 2035**. 2-WhittyER-366.

These classes have fundamentally different and diverging objectives. The Damages Classes seek to preserve and maximize monetary recovery from the $2.6 billion Gross Settlement Fund to compensate for past harms. By contrast, the Injunctive Relief Class does not seek compensation for prior losses, but instead seeks to halt ongoing and future unlawful conduct—NCAA rules prohibiting student-athletes from monetizing their NIL and athletic services. Members of the Injunctive Relief Class are subject to forward-looking restrictions—including roster limits—for the next ten years, underscoring the materially different and potentially conflicting interests between the classes.

### A.    Damages Classes

On November 3, 2023, the District Court certified three Damages Classes: (1) Football and Men's Basketball, (2) Women's Basketball, and (3) Additional

14

Sports. 4-WhittyER-811–13. The Damages Classes are eligible to receive monetary relief from the **$2.6 billion** Gross Settlement Fund. 2-WhittyER-362, 366–67.

The **Football and Men's Basketball Class** is defined as:

> All student-athletes who have received or will receive full grant-in-aid ("GIA") scholarships and compete on, competed on, or will compete on a Division I men's basketball team or an FBS football team at a college or university that is a member of the **Power Five Conferences** (including Notre Dame), and who have been or will be declared initially eligible for competition in Division I at any time from **June 15, 2016** through **September 15, 2024**.
>
> Class Representatives: Tymir Oliver and DeWayne Carter 1-WhittyER-112; 2-WhittyER-364.

The **Women's Basketball Class** is defined as:

> All student-athletes who have received or will receive full GIA scholarships and compete on, competed on, or will compete on a Division I women's basketball team at a college or university that is a member of the **Power Five Conferences** (including Notre Dame), and who have been or will be declared initially eligible for competition in Division I at any time from **June 15, 2016** through **September 15, 2024**.
>
> Class Representative: Sedona Prince 1-WhittyER-112–13; 2-WhittyER-364–65.

The **Additional Sports Class** is defined as:

> Excluding members of the Football and Men's Basketball Class, this class includes all student-athletes who compete on, competed on, or will compete on a Division

15

I athletic team and who have been or will be declared initially eligible for competition in Division I at any time from **June 15, 2016** through **September 15, 2024**.

Class Representatives: Grant House, Nya Harrison, and Nicholas Solomon
1-WhittyER-112–13; 2-WhittyER-365.

The Damages Classes are eligible to receive monetary relief from the $2.6 billion Gross Settlement Fund, which consists of the (1) NIL Claims Settlement Amount ($1.976 billion), and Additional Compensation Claims Settlement Amount for Athletic Services ($600 million). 2-WhittyER-362, 366–67.

| ($ in millions) Gross Settlement Fund | Settlement Amount |
|---|---|
| NIL Claims | $1,976 |
| Athletic Services | 600 |
| **Total *House* Settlement** | **$2,576** |
| *Alston* Academic - *Hubbard* | $200 |
| | **$2,776** |

| ($ in millions) | NIL | | Athletic Services | | Total | |
|---|---|---|---|---|---|---|
| **Men** | $1,885 | *90%* | $540 | *95%* | **$2,425** | *94%* |
| **Women** | 72 | *5* | 30 | *4%* | 102 | *4%* |
| Other | 19 | *5* | 30 | *1%* | 49 | *2%* |
| **Total** | **$1,976** | | **$600** | | **$2,576** | |

3-WhittyER-633.

As illustrated by the chart above, the allocation of the Gross Settlement Fund overwhelmingly benefits male student-athletes who receive **$2.4 billion (96%)** compared to female student-athletes, who receive only **$102 million (4%)**. The

16

damages calculations were derived from an economic report prepared by Dr. Daniel Rascher. 3-WhittyER-633. Class Counsel instructed the economic experts to exclude Title IX considerations from the damages calculations. 3-WhittyER-639. Appellant Katherine McCabe Ernst challenged this calculation as a violation of Title IX, an issue that is currently pending appeal before the Ninth Circuit. 2-WhittyER-279; Dkt. 41.1 at 59).

### B. Injunctive Relief Class

On September 22, 2023, the District Court certified a single Injunctive Relief Class. 4-WhittyER-814. The Injunctive Relief Class includes all student-athletes who compete on, competed on, or will compete on a Division I team any time from June 15, 2020, through the end of the Injunctive Relief Settlement Term. 1-WhittyER-111–12. The Injunctive Relief Settlement Term lasts for ten (10) academic years from the date of the Final Approval of the Settlement, which occurred on June 6, 2025, and therefore extends through June 6, 2035. 1-WhittyER-30, 112.

Unlike the Damages Classes, the Injunctive Relief Class seeks exclusively forward-looking equitable relief and provides no opt-out rights. The relief does not compensate for past harms, but instead governs alleged ongoing and future conduct for the duration of the ten-year term.

17

The **<u>Injunctive Relief Settlement Class</u>** is defined as:

> All student-athletes who compete on, competed on, or will compete on a Division I athletic team at any time between **June 15, 2020**, and the end of the Injunctive Relief Settlement Term (ten academic years from the date of the Final Approval of the Settlement).

1-WhittyER-111–12. The Injunctive Relief Class was initially defined to include only student-athletes from June 15, 2020, through the date of the judgement (September 22, 2023). 4-WhittyER-815. The class definition was later expanded to include all Division I student-athletes for ten years following final approval of the Settlement.

> <u>Class Representatives</u>: Grant House, DeWayne Carter, Nya Harrison, Sedona Prince, and Nicholas Solomon. 1-WhittyER-112. On November 5, 2026, Miller Moss (fifth-year Division I Football transfer) was added as a Class Representative. 2-WhittyER-236–37.

### C.  <u>Injunctive Relief Structure</u>

The Injunctive Relief imposes three major regulatory changes on Division I athletics: (1) the elimination of scholarship limits, replaced with roster limits, (2) designated student-athlete status, and (3) revenue sharing. 1-WhittyER-31–45.

### 1. Elimination of Scholarship Limits – Replaced with Roster Limits

Pursuant to Section 1 of the Injunctive Relief, all Division I athletic scholarship limits will be eliminated. The Settlement Agreement permits the NCAA to adopt roster limits for Division I sports which are set forth in Appendix B of the

Settlement Agreement. 1-WhittyER-44, 139. Roster limits apply only to schools that opt into the Settlement and elect to provide or facilitate payments of benefits to student-athletes. 1-WhittyER-33. Under this provision, schools are permitted to make unilateral decision to reduce the number of sports offered, the size of team rosters, and/or number of athletic scholarships available to student-athletes of any sport. Athletic conferences also retain the right to unilaterally reduce the number of sports. 1-WhittyER-44.

## 2. **Designated Student-Athlete**

Member Institutions are permitted, at their discretion, to exceed NCAA or conference roster limits with respect to any "Designated Student-Athletes" (DSA) for the duration for the student-athlete's eligibility. 1-WhittyER-44. Each member institution retains discretion to independently determine which student-athletes will be on its rosters, and nothing in the Settlement or NCAA rules restricts a school's ability to remove a student-athlete from the roster due to the implementation if NCAA or conference roster limits. 1-WhittyER-44–45.

A **Designated Student Athlete** is defined as:

> Any student-athlete who a Member Intuition attests was or would have been removed from the Member Institution's 2025-26 roster due to the implementation of roster limits who was either:
>
> (a) certified as eligible to practice for competition at the Member Institution (i.e., on a roster whether as a recruited or walk-on player), during the 2024-25 Academic Years,

19

> prior to April 7, 2025, including student-athletes who transferred, or
>
> (b) a student-athlete initial enrollee at a Division I Member Institution for the 2025-26 Academic Year who, prior to April 7, 2025, was recruited to be, or assured by an institutional staff member they would be, on the Member Institution's roster for the 2025-26 Academic Year.

1-WhittyER-28–29.

### 3. Benefits Pool – Shared Revenue

Pursuant to Article 3 of the Injunctive Relief, the "Benefits Pool" permits schools to distribute additional payments and/or benefits to student-athletes above existing annual scholarships, up to a cap of $20.5 million per school per year (22% of Average Shared Revenue of Power Five schools). 1-WhittyER-34–35. Under the NCAA's 2024 Agreed-Upon Procedures, certain revenue categories contribute to the Benefits Pool available for shared revenue payments to student-athletes. 1-WhittyER-34–39, 75–79.

Each school unilaterally decides whether to participate in the Benefits Pool, and, if so, how much to distribute in benefits to student-athletes. 1-WhittyER-34. Certain categories count against the Benefits Pool, including *Alston* payments and increased athletic scholarships. 1-WhittyER-38–39. For the limited number of schools that have publicly released shared- revenue payment breakdowns, male student-athletes receive more than 90% of the payments, while female student-

20

athletes receive less than 10%, with a disproportionate share allocated to football and men's basketball. 2-WhittyER-280–81, 285–86.

### D.     Injunctive Relief Sub-Classes: Current and Incoming

Following roster limit objections raised at the Final Approval Hearing on April 7, 2025, and over 100 letters submitted to the District Court between April 21-22, 2025, the District Court approved the Fourth Amended Settlement Agreement to bifurcate the Injunctive Relief Class into two separate sub-classes: (1) the Current Injunctive Relief Settlement Class ("Current Injunctive Relief Class"), and (2) the Incoming Injunctive Relief Settlement Class ("Incoming Injunctive Relief Class"). 2-WhittyER-366–67, 415–21.

Members of the **Current Injunctive Relief Class** are defined as "all members of the Injunctive Relief Settlement Class who competed on, or are competing on, a Division I athletic team prior to Final Approval." 2-WhittyER-366. Members of the **Incoming Injunctive Relief Class** are defined as "all members of the Injunctive Relief Settlement Class who will compete for the first time on a Division I athletic team after Final Approval." 2-WhittyER-366–67.

Incoming Injunctive Relief Class members are entitled to receive notice before they first enroll at a Division I member institution or later join, for the first time, a Division I athletic team. 2-WhittyER-380. These members have the right to file a written objection and are not subject to releases contained in the Settlement

until after notice has been provided, an objection has been filed, and the objection has been heard and ruled upon. Incoming Injunctive Relief Class members may object to "any aspect of the settlement contained in this Settlement Agreement." 2-WhittyER-311, 380–81.

## III. Objectors – Appellants

Objectors-Appellants each submitted letters to the District Court objecting to the continuation of the Injunctive Relief. 2-WhittyER-240–69, 272–94. The Objectors-Appellants are: current student-athletes **Katherine McCabe Ernst** (Ernst) and **Reid Hinds Macdonald** (Hinds Macdonald); former student-athletes **Scott Iannaccone** (Iannaccone) and **Abigail Leight** (Leight); and recruited / prospective student-athletes: **Piper Whitty** (Whitty), **Ariana Amoroso** (Amoroso) (collectively, *Whitty et al.*). They have been harmed by the Settlement and Injunctive Relief—the implementation of roster limits, decreased financial support for women's and Olympic sports, and the elimination of participation opportunities resulting from the elimination of Division I teams.

Ernst and Hinds Macdonald are members of the **Current Injunctive Relief Class** and the **Additional Sports Damages Class**. 2-WhittyER-272, 279. Ernst has been a member of the Division I women's lacrosse team at Vanderbilt University (Vanderbilt) since 2022. 2-WhittyER-279. Hinds Macdonald was on the Division I men's lacrosse team at Long Island University (LIU) until his coach informed him

22

by phone, after he had returned home for the summer, that LIU would not grandfather student-athletes, leaving him without a roster spot and requiring him to enter the transfer portal on May 31, 2025. 2-WhittyER-272–73. He is now a member of the Division I men's lacrosse team at Queens University of Charlotte (Queens) with a reduced scholarship.

Iannaccone and Leight were **Current Injunctive Relief Class** members until the Division I swimming and diving program at California Polytechnic State University, San Luis Obispo (Cal Poly), was discontinued on March 7, 2025, and confirmed it would not be reinstated on June 16, 2025, after the approval of the Settlement on June 6, 2025. 2-WhittyER-275, 278.

Whitty and Amoroso were recruited prospective Division I swimmers at Cal Poly and **Incoming Injunctive Relief Class** members until the program was terminated as a result of the Settlement on March 7, 2025. 2-WhittyER-275, 278.

Whitty, Amoroso, Ernst, Iannaccone, Leight, and Hinds Macdonald each filed separate, timely objection letters with the District Court by September 22, 2025. 2-WhittyER-240–69, 272–94. Attorney Leigh Ernst Friestedt (Friestedt) represented Appellants Whitty, Amoroso, and Ernst at the oral hearing on November 7, 2025. 5-WhittyER-821–52. Appellants Iannaccone, Leight, and Hinds Macdonald filed their objection letters pro se and did not request to speak at the hearing. 2-WhittyER-240–69, 272–94.

23

After the District Court overruled the objections to the continuation of the Injunctive Relief on November 13, 2025, Iannaccone, Leight, and Hinds Macdonald retained Friestedt to represent them on appeal. 1-WhittyER-2–11. Appellants subsequently filed four separate, timely Notices of Appeal in the Ninth Circuit: Case No. 25-7461 (Whitty, Amoroso); Case No. 25-7467 (Ernst); Case No. 25-7469 (Iannaccone, Leight); and Case No. 25-7869 (Hinds Macdonald). 5-WhittyER-821–52.

### A.    Current Division I Student-Athletes



**Katherine Ernst**
Women's Lacrosse – Division I
Vanderbilt University (2022-Present)

IWLCA Academic Honor Roll (2024–25)
SEC Spring Honor Roll (2024, 2025)
AAC All-Academic (2023, 2024)

**Katherine Ernst** is a senior on the women's lacrosse team at Vanderbilt. As a draw specialist, her NIL appears prominently at the center of the field to start a game, the second half, and after a goal is scored. All of Vanderbilt's women's lacrosse home games are broadcast live on ESPN+. 2-WhittyER-279–87; 3-WhittyER-631–41.

Ernst received a partial athletic scholarship throughout her four-year collegiate career and received full *Alston* payments of $5,980 during her freshman,

24

sophomore, and junior years. Her *Alston* payment was discontinued her senior year. 2-WhittyER-280. As a result of the Settlement, all female student-athletes at Vanderbilt lost their *Alston* payments for the 2025-26 academic year. 2-WhittyER-279–87; 3-WhittyER-631–41.

Ernst is a member of both the Additional Sports (Damages Class) and Current Injunctive Relief Class. She filed three timely objection letters with the District Court:

- **January 31, 2025**, and **April 15, 2025**—objecting to both the Damages Settlement and the Injunctive Relief; and

- **September 22, 2025**—objecting to the continuation of the Injunctive Relief.

2-WhittyER-279–87, 423; 3-WhittyER-631–41. Her objections raised: (1) Title IX violations (allocating over 90% compensation to male student-athletes and less than 10% to women); (2) an overly broad Title IX release; (3) conflict of interest with Class Counsel; (4) inadequate representation; and (5) inadequate notice and procedural deficiencies. 2-WhittyER-279–87, 423; 3-WhittyER-631–41.

To ensure the Settlement and Injunctive Relief complied with federal law and were fair under Rule 23, Ernst requested the District Court consider the following amendments:

- Require all universities to publicly disclose revenue-sharing payments and comply with Title IX;

25

- Remove the provision requiring *Alston* payments and increased scholarships to count against the Benefits Pool cap; and

- Remove the broad Title IX release language.

3-WhittyER-631–41.

In addition to female student-athletes losing their $5,980 *Alston* payments, women's teams faced additional constraints, including budget reductions, fewer participation opportunities, and decreased travel rosters. 3-WhittyER-631–41.



**Reid Hinds Macdonald**
Men's Lacrosse – Division I
Long Island University (2023-25)
Queens University of Charlotte (2025-Present)

Major: Business

**Reid Hinds Macdonald** was a Division I men's lacrosse player at LIU, where he was recruited and promised a four-year athletic scholarship. 2-WhittyER-272. He turned down other scholarship offers based on LIU's reassurances that the scholarship amount would increase after his freshman year. 2-WhittyER-273–74.

During the 2024–25 academic year, Hinds Macdonald was encouraged by his coach to enter the transfer portal both at Christmas and in the spring. Concerned that transferring would jeopardize his athletic scholarship, he declined to enter the portal.

26

Hinds Macdonald liked LIU, his teammates, Business major, and did not want to transfer. 2-WhittyER-273–74.

From December 2025 thorough May 2025, Hinds MacDonald and his mother contacted the NCAA, the Northern District Courthouse, and the Settlement helpline more than ten times in an effort to understand the Settlement, the objection process, and his rights as a current student-athlete. They received no meaningful assistance: they were repeatedly transferred to the helpline where they left messages, were told that guidance on submitting a letter to a judge would constitute legal advice, and were provided with inaccurate information regarding whether his scholarship was protected if he entered the transfer portal.

After the Spring semester, his head coach called him at home in Canada to inform Hinds Macdonald that his roster position had been cut due to the Settlement, LIU would not grandfather existing student-athletes, and he needed to enter the transfer portal immediately. 2-WhittyER-273–74.

Devastated, Hinds Macdonald entered the portal on May 31, 2025, and ultimately transferred to Queens, where he is now a member of the Division I men's lacrosse team but on a reduced scholarship. As a result of his transfer, he incurred significant expenses relocating, securing housing, and transferring to his new academic program. 2-WhittyER-273–74.

Pursuant to the District Court's direction in its Order Overruling Objections, Hinds Macdonald contacted Class Counsel to inquire about his DSA status, emailing

Mr. Berman on December 9, 2025, and following up with a call three days later. 1-WhittyER-9. Neither communication was answered. LIU never granted Hinds Macdonald DSA status and as a result he uprooted his academic and athletic career to attend another university. 2-WhittyER-272–74.

## B.  Former Division I Student-Athletes



**Scott Iannaccone**
Men's Swimming (Division I / Club)
Cal Poly (2023-Present)

Major: Computer Engineering

**Scott Iannaccone** was a Division I swimmer at Cal Poly where he is majoring in Computer Engineering. In his final season before Cal Poly cut the swimming program due to the Settlement, Iannaccone finished in the top five in the 100-yard backstroke at the 2025 Big West Conference Championships and recorded one of the top five fastest times in Cal Poly history. 2-WhittyER-277–78.

Iannaccone comes from a family of swimmers. His older brother, Ryan, swam at Cal Poly for four years, and his twin sister, Stephanie, currently competes on the Harvard University Division I women's swimming team. 2-WhittyER-277–78.

Although Iannaccone has DSA status, this designation has not prevented him from being harmed. 2-WhittyER-277–78. Iannaccone was encouraged to enter the transfer portal; however, Cal Poly offers a unique academic curriculum based on "Learn by Doing" technical education that cannot be easily transferred to another institution. In losing the opportunity to participate on a Division I team, Iannaccone no longer receives the benefits associated with varsity student-athlete status, including access to locker rooms, weight rooms, and medical services. 2-WhittyER-277.

To continue competing on the club team, he must personally fund travel and equipment expenses and competes with the broader Cal Poly community for limited pool access. Iannaccone will represent Cal Poly at the College Club Swimming Championships from April 10-12 in Greensboro, North Carolina.



**Abigail Leight**
Women's Diving (Division I / Club)
Cal Poly (2024-Present)

Major: Communications & Environmental Studies

**Abigail Leight** was a Division I diver at Cal Poly. She still attends Cal Poly double-majoring in Communications and Environmental Studies. A recruited student-athlete, Leight competed during her freshman year before the program was shut down.

In her letter to the District Court, Leight explained that losing the opportunity to play Division I sports left her "without the community, structure, and opportunities" that she and her teammates relied on both in the classroom and in the pool. "Beyond losing access to the pool, locker rooms, and training facilities, the program's elimination deeply disrupted [her] college experience, athletic development and mental health." 2-WhittyER-275. Leight also detailed how the elimination of the women's team violates Title IX and disproportionately harms Olympic-sport athletes, even as Cal Poly continues to fund men's football and opts into the Settlement to pay male athletes through revenue sharing. 2-WhittyER-275.

## C. Incoming Division I Student-Athletes



**Piper Whitty**
Women's Swimming & Water Polo (Club)
Cal Poly (2025–Present)

Major: Kinesiology

**Piper Whitty** is a dual-sport athlete at Cal Poly, competing in both club swimming and water polo. A freestyle sprinter, Whitty is currently ranked #21 overall

30

in Women's College Club Swimming, #6 in the 100-yard freestyle, and #6 in the 200-yard freestyle. She will represent Cal Poly at the Women's College Club Swimming Championships from April 10-12 in Greensboro, North Carolina.

Whitty was recruited to join Cal Poly's Division I swimming team for the 2025 incoming class, with the opportunity to earn an athletic scholarship after her freshman year. 2-WhittyER-288. On the morning of March 7, 2025, during her senior year of high school, Whitty learned via Instagram that Cal Poly was discontinuing the swimming program. Cal Poly President Armstrong described the decision as "an unfortunate reality given the approved House Settlement." 2-WhittyER-288.

After the program's cancellation, Whitty's mother contacted Class Counsel attorney Jeffrey Kessler via email to express concerns about the Settlement. On May 1, 2025, Mr. Kessler responded that, "there was a right to object to the House Injunctive Settlement, but that deadline [January 31, 2025] had passed." 2-WhittyER-289. Whitty was an Incoming Injunctive Relief Class member and never received notice of the January 31, 2025 deadline.

On September 11 and again on September 22, 2025, after retaining attorney Friestedt, Whitty objected to the continuation of the Injunctive Relief and requested amendments to ensure universities comply with Title IX as Settlement participants. 2-WhittyER-288–300.

31

Despite the program's cancellation, Whitty chose to enroll at Cal Poly. *See* 2-WhittyER-288–94. As a club athlete, she has limited access to the pool and must fund travel, and she lacks access to the medical care, training facilities, locker rooms, and equipment provided to Division I athletes.

During her first week of classes at Cal Poly, Whitty attended a course she was assigned as a recruited student-athlete. When the instructor asked if anyone in the class was not a student-athlete, Whitty was forced to raise her hand and explain that she was a recruit but the team had been cut. She was then told, in front of the class, that the class no longer applied to her since she is not a student-athlete and that she should report to the Mustang Success Center. As a result of losing her varsity-athlete status, she no longer receives priority housing or academic registration preferences. 2-WhittyER-288–94.



**Ariana Amoroso**
Women's Swimming (Club)
Cal Poly (2025–Present)

Major: Liberal Studies

**Ariana Amoroso** was recruited to join Cal Poly's Division I swim team for the 2025 incoming class, with a promised four-year athletic scholarship and an opportunity for an increased award after her freshman year. A standout student-

athlete recognized by the Newport Beach Chamber of Commerce, Amoroso earned League MVP her sophomore year and qualified for CIF Southern Sectional Finals all four years of high school. *See* 2-WhittyER-243. On March 7, 2025, during her senior year of high school, Amoroso learned that Cal Poly was eliminating the varsity swimming program. Cal Poly President Armstrong described the decision as "an unfortunate reality given the approved NCAA House Settlement." 2-WhittyER-244.

In May 2025, following the Swim program cancellation, Armstrong's father contacted Class Counsel attorney Jeffrey Kessler via email to express concerns about the Settlement and the loss of her scholarship opportunity. Mr. Kessler advised that Amoroso's situation was outside the scope of the Settlement scholarship protection. 2-WhittyER-243–44. This was not accurate.

Despite the program's cancellation, Amoroso chose to enroll at Cal Poly and compete on the university's club swimming program. As a club athlete, she must fund travel and lacks access to the medical care, training facilities, locker rooms or equipment provided to Division I athletes. Because of these financial barriers, she has been unable to compete in several meets this year. Other repercussions from the cancelled swim program include loss of priority housing and loss of registration priority, which resulted in the loss of access to multiple classes that were at maximum capacity. 2-WhittyER-243.

33

## SUMMARY OF THE ARGUMENT

This appeal challenges the District Court's abuse of discretion in overruling the Appellants' objections and continuing Injunctive Relief that is neither fair, reasonable, nor adequate under Rule 23(e). The Injunctive Relief took immediate effect only upon approval of the Settlement and is expressly conditioned on, and governed by, the Settlement's terms. 2-WhittyER-382. Yet the District Court treated it as severable, failed to conduct the rigorous analysis required by *Amchem* and *Ortiz*, and disregarded objections demonstrating that the Injunctive Relief imposes ongoing harms on absent class members who were inadequately represented. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 625–27 (1977); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852–53 (1999).

The District Court's errors fall into three independent categories: (1) legal error in treating the Injunctive Relief as severable from the Settlement; (2) substantive defects in the Injunctive Relief itself, including structural conflicts and irreparable harm; and (3) procedural defects in the objections and notice process. Each category independently constitutes an abuse of discretion and requires vacatur of the order continuing the Injunctive Relief.

## STANDARD OF REVIEW

A district court's approval of a class action settlement is reviewed for abuse of discretion. *See Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012). A

court abuses its discretion when it: (1) applies the wrong legal standard, (2) relies on clearly erroneous findings of fact, or (3) misapplies the law to the facts. *See Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022); *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009). A failure under any one prong warrants reversal. *See Hinkson*, 585 F.3d at 1251.

Rule 23(e) imposes an independent obligation on district courts to conduct a rigorous inquiry into whether a settlement is fair, reasonable, and adequate to all class members. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *Briseño v. Henderson*, 998 F.3d 1014, 1022, 1025 (9th Cir. 2021). Failure to apply the correct Rule 23(e) framework constitutes legal error and is an abuse of discretion. *See In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 783 (9th Cir. 2022).

## ARGUMENT

### I. The District Court Abused Its Discretion by Continuing an Injunctive Relief that Cannot Stand Alone – It is Expressly Integrated with the Settlement on Appeal

The Settlement is currently on appeal, and the issues raised—inadequate representation, structural conflicts, due process, Title IX, and fundamental fairness defects—go to the heart of Rule 23(e)'s requirement that a class settlement be fair, reasonable, and **adequate as a whole**. *See Hanlon*, 150 F.3d at 1026 ("It is the

35

settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness," meaning the settlement "must stand or fall on its entirety."). If the Settlement is reversed or remanded on any of these grounds, the Injunctive Relief necessarily collapses with it.

### A. The Settlement Expressly Integrates the Injunctive Relief – So Reversal of Any Part Unravels the Whole

The Settlement expressly integrates the Injunctive Relief, and the defects now before the Court—intra-class conflicts, inadequate representation, due process violations, and Title IX disparities—run through both components. These structural flaws are already inflicting irreparable harm on Current and Incoming Injunctive Relief Class Members. The same sex-based disparities reflected in the Damages allocations (96% to men, 4% to women) are replicated in the new revenue-sharing system, where men receive over 90% of payments and women less than 10%. 2-WhittyER-280–81, 284–86. Conflicts likewise divide revenue-generating sports (football and basketball) from all other sports, leaving women and Olympic-sport athletes disproportionately burdened by roster limits and diminished benefits. 2-WhittyER-272–74, 279–87, 301–08, 423. If the Settlement is reversed for any reason, the Injunctive Relief cannot survive. It is expressly integrated into the Settlement cannot stand alone as an independent remedy.

The Ninth Circuit has held that injunctive provisions cannot be severed from a class settlement, even if they might be severable under ordinary contract

principles. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) ("[T]hat a provision is severable does not render it irrelevant to the overall reasonableness of the agreement . . . [A] severable clause simply may not be severed from the court's Rule 23(e) analysis."). Likewise, all forms of relief—monetary, injunctive, or otherwise—must be evaluated together as part of the "total relief" provided by the settlement. *See In re Google Inc. Street View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1112 n.3 (9th Cir. 2021).

The record confirms that the Injunctive Relief is fully integrated into the Settlement and is not a standalone remedy. The Injunctive Relief (1) took effect only upon Settlement approval; (2) is expressly conditioned on and governed by the Settlement's terms; (3) forms a "*complete, and integrated statement*" together with the Settlement and all appendices; (4) incorporates its terms "*as if fully set forth*" in the Settlement, as Appendix A Injunctive Relief; and (5) is subject to the same Releases. 2-WhittyER-311–17, 367, 372, 374, 382, 398. Nothing in the record suggests that the District Court ever found, or could have found, that the Injunctive Relief could operate independently. Treating it as severable contradicts the Settlement's terms, its integration clauses, and Rule 23(e)'s requirement that courts evaluate the fairness of the settlement as a whole, not in isolated parts. *See Hanlon*, 150 F.3d at 1026; *Bluetooth*, 654 F.3d at 948; *Google Street View*, 21 F.4th at 1112 n.3.

37

**B.    The District Court Abused Its Discretion by Continuing the Injunctive Relief After Staying the Settlement**

The District Court stayed the $2.6 billion Damages payments pending appeal, acknowledging the Settlement's validity remains unresolved. 1-WhittyER-2–11, 29–30; 2-WhittyER-374, 398. Once the court stayed the Settlement, it lacked authority to allow the Injunctive Relief—whose legal force derives entirely from the Settlement—to continue. The District Court should have granted a stay of the Injunctive Relief to preserve the status quo pending review of the Settlement's legitimacy. *See Nken v. Holder*, 556 U.S. 418, 429 (2009).

Appellant Laudermilch requested an immediate stay of the roster limit provisions in her September 22, 2025 objection letter. 2-WhittyER-301. She explained that the implementation of the roster limits had already caused, and would continue to cause, "irreparable harm" to Injunctive Relief Class members— student-athletes at her university and across the country who were being cut from their teams despite having been granted DSA status. 2-WhittyER-301, 304–05. Her objection showed that the DSA mechanism was failing in real time and that absent class members were suffering the very concrete injuries the Injunctive Relief purported to prevent. 2-WhittyER-216–20, 230–32. Similarly, Appellants Amoroso, Whitty, Iannaccone, and Leight—each of whom also held DSA status— lost the opportunity to participate in their sport altogether when their university

38

eliminated the entire swimming program as a direct result the Settlement. 2-WhittyER-240–69, 275–94.

Rather than address these harms, the District Court dismissed Laudermilch's request for a stay on the ground that she lacked standing because she personally retained a roster spot. 1-WhittyER-2, 7–8. That reasoning was legally incorrect. If Laudermilch was not on a team, she would not qualify as an Incoming Injunctive Relief Class Member, because the definition requires a student-athlete to "compete" for the first time on a Division I team. 2-WhittyER-366–67. Under the District Court's logic, the very fact that makes a student-athlete a member of the class would simultaneously strip her of standing—leaving **no one** harmed by the roster limits with the ability to challenge them.

A current roster spot does not eliminate the imminent risk of future harm, nor does it deprive a class member of standing to object to a settlement that is actively injuring other members of the class she seeks to represent. Fed. R. Civ. P. 23(e)(5)(A) ("Any class member may object to the proposal if it requires court approval under this subdivision (e)."); *Devlin v. Scardelletti*, 536 U.S. 1, 14 (2002) (holding that nonnamed class members who have timely objected to the class settlement agreement have the power to bring an appeal without first intervening). Laudermilch's objection and oral testimony provided precisely the kind of evidence of ongoing class-wide harm that Rule 23(e) required the court to consider

39

regardless of her individual status. 2-WhittyER-204–35, 301–08. By refusing to issue a stay based on an erroneous standing analysis, the District Court failed to preserve the status quo and allowed the very harms she identified to continue unabated.

Continuing the Injunctive Relief while the Settlement itself is stayed exposes student-athletes to immediate and irreparable harm—exactly the prejudice Rule 23(e) is designed to prevent. And because a class settlement "must stand or fall in its entirety," the Injunctive Relief cannot lawfully proceed while the Settlement's validity remains unresolved. *Hanlon*, 150 F.3d 1011, 1026 (9th Cir. 1998). Therefore, because the Injunctive Relief inflicts independent, ongoing, and irreparable harm by denying current and future student-athletes the opportunity to participate in Division I athletics, the order permitting its continuation must be vacated.

## II.    The District Court Abused Its Discretion by Continuing Injunctive Relief Despite Irreparable Harm and Intra-Class Conflicts

Having allowed the integrated Injunctive Relief to continue while the Settlement itself is stayed and under appellate review, the District Court compounded its error by disregarding the immediate, irreparable harms and structural conflicts the Injunctive Relief imposes on absent class members. Rule 23(e) requires rigorous scrutiny before binding millions of student-athletes to a decade-long regulatory regime—particularly one that cannot lawfully stand alone.

40

Yet the District Court permitted the Injunctive Relief to take effect and remain operative without resolving the fairness, adequacy, and due process defects embedded throughout the Settlement. Because the Injunctive Relief is inseparable from the Settlement and is already inflicting widespread harm, its continuation was an abuse of discretion.

### A. The Injunctive Relief is Not Fair, Reasonable, or Adequate Under Rule 23(e)

Rule 23(e) requires a district court to ensure that a settlement is "fair, reasonable, and adequate" for class members, *especially* absent, unnamed members and those who may not have been properly represented in negotiations. *See In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008) ("The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights."); *Officers for Just. v. Civ. Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) ("The primary concern of [23(e)] is the protection of those class members . . . whose rights may not have been given due regard by the negotiating parties."). Here, that standard is not met because the Injunctive Relief:

- Imposes foreseeable, ongoing harm on absent class members;

- Binds student-athletes to a decade-long compensation and roster-limits regime without an opportunity to opt-out; and

- Was negotiated and approved despite structural conflicts that preclude adequate representation.

41

The District Court did not comprehensively analyze all factors weighing on the fairness of the Settlement, nor did it properly review adequacy of representation under *Amchem* and *Ortiz. See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 627 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999); *Hanlon*, 150 F.3d at 1026; *Briseño,* 998 F.3d 1014 at 1023 (holding *In re Bluetooth*, 654 F.3d at 947, rule that "courts . . . must be particularly vigilant . . . for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations" applies to post-certification settlements). Instead, the court allowed the Injunctive Relief to take immediate effect and later overruled objections to its continuation—even though the record showed that the Injunctive Relief was already causing widespread harm and exacerbating intra-class conflicts. This failure to ensure fairness under Rule 23(e) by comprehensively reviewing all related factors constitutes an abuse of discretion and requires vacatur. *See Hanlon*, 150 F.3d at 1026.

**B.     The Injunctive Relief Has Caused Immediate and Irreparable Harm**

By continuing the Injunctive Relief, the NCAA has already implemented sweeping regulatory changes. 1-WhittyER-31. Division I institutions may now (1) pay student-athletes directly through revenue-sharing up to $20.5 million per school, (2) authorize third-party NIL payments, and (3) replace scholarship limits with roster limits. 1-WhittyER-31–33. These changes impose ongoing burdens on

42

absent class members even though the Settlement—and the adequacy of their representation—remains unresolved on appeal.

The shift from scholarship limits to roster limits, combined with a new revenue-sharing system, has produced immediate, predictable, and irreversible harms, including:

- Loss of roster positions;

- Reductions or cancellations of athletic scholarships;

- Elimination of *Alston* academic-achievement payments;

- Forced transfers;

- Disruption of academic progress; and

- Elimination of entire teams.

2-WhittyER-240–69, 272–94, 301–08.

These harms were raised in objections, yet the District Court allowed the Injunctive Relief to take effect and later overruled objections to its continuation. 1-WhittyER-2–11. They are not incidental or unforeseen—they flow directly from the structural conflicts embedded in the Settlement and Injunctive Relief. 2-WhittyER-401–03. Allowing such harms to continue while the Settlement's validity remains unresolved violates Rule 23(e)'s core protections and exposes absent class members to the very prejudice the Rule is designed to prevent.

43

## C. The Injunctive Relief Creates Arbitrary and Unlawful Intra-Class Conflicts

The Injunctive Relief creates fundamental intra-class conflicts that make adequate representation and due process impossible under Rule 23(a)(4) and the Supreme Court's decisions in *Amchem* and *Ortiz*. *See Amchem Prods.*, 521 U.S. at 627; *Ortiz*, 527 U.S. at 856. These conflicts cut across sports, gender, and time. They pit revenue-generating athletes against non-revenue generating athletes, male athletes against female athletes, and current athletes against future athletes— groups with divergent and materially adverse interests. The District Court's failure to identify and resolve these structural conflicts, and its decision to continue the Injunctive Relief despite them, was an abuse of discretion.

### 1. Sports: The Settlement Favors Football and Men's Basketball at the Expense of All Other Athletes

The Settlement and Injunctive Relief were constructed around a stark divide between revenue-generating sports and the rest of Division I athletics. Football, men's basketball, and women's basketball student-athletes were automatically enrolled in the Damages Class and needed only to update contact information to receive payment. 4-WhittyER-749. All other Division I student-athletes were placed in the "Additional Sports Class" and required to affirmatively opt in to the Settlement through a flawed online portal. 3-WhittyER-425–536. Automatically enrolled athletes received over 95% of the Damages allocation, while non-revenue

44

athletes faced barriers to participate, reduced recoveries, and looming roster caps under the Injunctive Relief.

Under *Amchem* and *Ortiz*, such divergent and materially adverse interests require separate representation. *Amchem Prods.*, 521 U.S. at 627 (settlements must provide "structural assurance of fair and adequate representation for the diverse groups and individuals affected"); *Ortiz*, 527 U.S. at 856 (applying *Amchem* to require subclasses with different counsel when class members have materially different interests). The fact that *Amchem* and *Ortiz* involved pre-certification settlements does not render their rules inapplicable here. Adequate representation is no less important in settlements where a class has been certified. *See, e.g.*, *Hesse v. Sprint Corp.*, 598 F.3d 581, 589 (9th Cir. 2010) (reviewing adequacy of representation under *Amchem* where settlement was reached after certification).

### 2. Gender: The Injunctive Relief Harms Female Student-Athletes and Exacerbates Sex-Based Disparities

The Injunctive Relief's revenue sharing payments replicate the same sex-based inequities embedded in the past Damages allocation: 75% to football, 15% to men's basketball, 5% to women's basketball, and 5% to all other sports. 3-WhittyER-631–41. As a result, more than 90% of future revenue-sharing payments will go to male athletes, while less than 10% will go to women. Appellant Ernst documented this pattern at Vanderbilt and identified numerous other Division I programs where the same disparities exit. 2-WhittyER-279–87.

45

The Settlement's 2024 NCAA Agreed Upon Procedures further deepen these inequities by incentivizing universities to discontinue *Alston* payments—payments that historically benefited female athletes, particularly those on partial or no athletic scholarships. 2-WhittyER-279–87. Eliminating these payments widens the gender gap and shifts institutional resources toward revenue-sport athletes, overwhelmingly male.

These sex-based disparities create a direct and material conflict between male and female class members—one that a single set of class representatives and class counsel cannot adequately represent under *Amchem* and *Ortiz*. The injunctive Relief not only mirrors the gender inequities of the Damages allocation but amplifies them, underscoring the need for separate representation and subclasses to protect the interests of women and Olympic-sport athletes. 2-WhittyER-227.

### 3. Time: The Injunctive Relief Class is Internally Divided and Lacks Adequate Representation

The Injunctive Relief Class itself contains two materially different groups:

- **Current Injunctive Relief Class Members**, who face immediate roster cuts, reduced participation opportunities, and loss of benefits; and

- **Incoming Injunctive Relief Class Members**, who did not receive notice of the Settlement and could only object if they are on a Division I team.

2-WhittyER-366–67.

The notice process deepened these conflicts. Only current student-athletes received the **January 31, 2025** notice; prospective student-athletes received none. After objections detailed the harms caused by the immediate implementation of roster limits, the District Court ordered a second notice on **September 22, 2025**—but only for incoming student-athletes, excluding current student-athletes who may be harmed later in their collegiate careers. 2-WhittyER-311–17; 4-WhittyER-740–56.

This structure ensured that the athletes most affected by the Injunctive Relief—current student-athletes facing imminent cuts—had no meaningful opportunity to object. Meanwhile, future student-athletes, who will bear the long-term consequences of roster limits and revenue sharing disparities, were never adequately represented. Under *Amchem* and *Ortiz*, such temporal divisions create the kind of intra-class conflict that requires subclasses and separate counsel. *Ortiz*, 527 U.S. at 856 ("[I]t is obvious after *Amchem* that a class divided between holders of present and future claims . . . requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.").

### 4. These Structural Conflicts Render the Settlement Unfair Under Rule 23(a)(4)

The Injunctive Relief overwhelmingly concentrates financial benefits in football and men's basketball, while shifting financial and regulatory burdens onto all other sports. Women's sports and Olympic-sport programs bear predictable and

47

disproportionate harms. Current and future student-athletes likewise face divergent and irreconcilable interests that require separate representation. These are precisely the kinds of structural conflicts that *Amchem* and *Ortiz* held cannot be cured by assurances of overall benefit to the class or by post post-hoc judicial oversight. *Amchem Prods.*, 521 U.S. at 625–29; *Ortiz*, 527 U.S. at 852–53.

These same principles apply to a district court's analysis of fairness under 23(e). *See Commc'n Res. for Indep. Living v. Mobility Works of Cal., LLC.*, No. 18-cv-06012-JSW, 2020 WL 10505224, at *2 (N.D. Cal. Mar. 6, 2020) ("[In reviewing 23(e) factors,] the Court must consider whether the class representatives and class counsel have adequately represented the class. This requires the Court to consider the same 'adequacy of representation' questions that are relevant to class certification."); *Ayers v. Thompson*, 358 F.3d 356, 374 (5th Cir. 2004) ("[A]dequacy of representation and adequacy of settlement are different sides of the same question.").

The Ninth Circuit likewise requires rigorous review of settlements to ensure that conflicts of interest do not render the settlement unfair. *See Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) ("[T]here are real dangers in the negotiation of class action settlements of compromising the interests of class members for reasons other than a realistic assessment of usual settlement considerations."); *id.* at 972 n.22 (stating that it is the district court's job to ensure "the inherent tensions

48

among class representation . . . are being adequately policed . . ."); *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) ("[T]he district court has a fiduciary duty to look after the interests of those absent class members."). The District Court failed to conduct that review and instead allowed the Injunctive Relief to proceed despite unresolved, material conflicts. That failure independently requires vacatur.

**D.** **The DSA Designation Failed to Protect Student-Athletes from Roster Limits and Introduced Arbitrary, Unlawful Conflicts**

The Injunctive Relief's "Designated Student-Athlete" (DSA) mechanism was created as a safeguard against the harms caused by the immediate implementation of the roster limits. 2-WhittyER-401–02. In practice, it failed. 2-WhittyER-226, 230–32. The DSA designation is entirely discretionary and left to each institution, with no mandatory protection or uniform criteria. Universities are not required to designate all student-athletes who will be harmed by the roster limits. 1-WhittyER-44. Appellant Hinds Macdonald is such an example—his institution declined to designate him despite the clear impacts on his participation opportunities and pressure to enter the transfer portal. 2-WhittyER-272–74.

This discretionary system produces arbitrary and irrational disparities within the same team and across the same sport. Some athletes receive DSA protections while others—facing identical harms—are excluded. These are not incidental inconsistencies; they are structural defects that flow directly from the amended

49

Injunctive Relief. They create intra-team, intra-sport, and intra-class conflicts that make adequate representation impossible under Rule 23(e).

The DSA mechanism also exacerbates the structural conflicts and inherent dangers of class settlements warned of in *Amchem*, *Ortiz*, and *Staton*. *Amchem*, 521 U.S. at 627; *Ortiz*, 527 U.S. at 856; *Staton*, 327 F.3d at 959. It divides teammates it was meant to protect into unprotected groups, privileges athletes at institutions willing to designate them, and leaves others without recourse despite identical injuries. A class settlement that distributes protections in this arbitrary manner violates due process principles and the Supreme Court's requirement that materially adverse interests receive separate representation. *Amchem Prods.*, 521 U.S. at 627; *Ortiz*, 527 U.S. at 856; *Koby v. ARS Nat'l Servs, Inc.*, 846 F.3d 1017, 1080-81 (9th Cir. 2017) (holding a settlement was invalid under Rule 23(e) where it provided certain class members with no meaningful value yet required them to waive claims in return); *In re Tableware Antitrust Litig.* 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (noting that a settlement cannot "improperly grant preferential treatment to class representatives or segments of the class").

The District Court never addressed these conflicts. Instead, it allowed the Injunctive Relief to proceed—even after objectors demonstrated that the DSA mechanism was failing real time. 2-WhittyER-207–35, 301–08. By ignoring these structural disparities and continuing to enforce a regime that treats similarly

50

situated athletes differently based solely on institutional discretion, the District Court abused its discretion. This failure independently requires vacatur.

## III. The District Court Incorrectly Asserted It Lacked Authority to Modify the Settlement When Objectors Requested Amendments

The District Court's treatment of its own authority was internally inconsistent and legally erroneous. Over the course of the multi-year approval process, the District Court repeatedly exercised authority to direct or approve modifications to the Settlement. 2-WhittyER-401–02; 3-WhittyER-510–12. It requested revisions; approved the Second, Third, and Fourth Amended Stipulations and Settlement Agreements; and approved the Second Amended Injunctive Relief to address concerns the District Court itself identified. 1-WhittyER-12–202; 2-WhittyER-413–21. These actions confirm the District Court both possessed and affirmatively used its authority to require changes to the Settlement.

However, when Appellants requested specific amendments to cure ongoing harm and defects in due process, Title IX compliance, and adequacy of representation—in their September 22, 2025, objection letters and again at the November 6, 2025 fairness hearing—the District Court asserted that it lacked authority to modify the Settlement. 1-WhittyER-2–11; 2-WhittyER-240–69, 279–94. Appellants' requested amendments were narrow and concrete: staying the roster limits; requiring public disclosure of "revenue sharing" payments to ensure compliance with Title IX; deleting overly broad Title IX release language,

51

preventing reductions to the Benefits Pool by incremental scholarships or *Alston* payments; clarifying that DSAs count as "participants" for Title IX purposes; requiring any university that opts into the Settlement to comply with Title IX; prohibiting exclusion of revenue sources that would circumvent Title IX compliance; adopting a grandfathering provision to prevent roster-cut harms; and mandating public disclosure of revenue sharing and DSAs by sport and gender. 2-WhittyER-281–82, 279–94; 297–301. The intent of these proposed amendments was to remedy the Rule 23 deficiencies, ensure compliance with civil rights laws, prevent further discrimination against women, and protect current and future student-athletes' ability to pursue both their educational and athletic opportunities. 2-WhittyER-281–82, 279–94.

The District Court refused to consider Appellants' proposals, asserting it lacked the power to modify the Settlement—even though it had repeatedly exercised that very authority when modifications were requested by the settling parties. This selective approach is the opposite of what Rule 23(e) requires. *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079. A court cannot permit modifications when requested by the settling parties but disclaim authority when objectors seek changes necessary to protect absent class members. The District Court had authority either to modify the Settlement upon acceptance or to advise the parties that it would not approve the Settlement unless it was modified in

response to objections. *See Evans v. Jeff D.*, 475 U.S. 717, 726–27 (1986). What it could not do was ignore the objectors' concerns. *See Allen*, 787 F.3d at 1223–24 (noting that, regardless of whether a settlement is reviewed pre- or post-certification, a district court "must give a reasoned response to all non-frivolous objections"). Rule 23(e) imposes an independent judicial duty to ensure fairness, adequacy, and due process. *Allen*, 787 F.3d at 1223. The District Court's refusal to exercise its authority for objectors was an abuse of discretion.

## A. The District Court's Exclusion of Pro Se Objectors Violated Due Process and Rule 23(e)

The District Court's refusal to consider objectors' proposed amendments was compounded by its exclusion of pro se objectors from the renegotiation process. 2-WhittyER-404. After pro se objector Laudermilch filed her first objection letter on January 31, 2025, Class Counsel informed her, "We are the lawyers representing athletes who are asking the judge to **approve the settlement**." 2-WhittyER-301, 308. Laudermilch—and more than 100 other pro se objectors who raised concerns about roster limits—were then excluded from the amendment discussions. *See e.g.*, 5-WhittyER-989–93. Although the District Court instructed Class Counsel, Defense Counsel, and Objectors' Counsel to confer about revisions to address roster limit harms, the court did not include the student-athletes who objected. 2-WhittyER-404.

53

Pro se objectors—the very student-athletes most directly harmed by the Injunctive Relief—were denied participation in the amendment process. This exclusion violated due process and the core protections of Rule 23(e), which exist precisely to safeguard absent and unrepresented class members when their interests diverge from the settling parties. *See Allen*, 787 F.3d at 1223.

The District Court's failure to include pro se objectors in the amendment process was an abuse of discretion. By excluding the class members most affected and vocal about the harms, the court failed to discharge its independent duty under Rule 23(e) to ensure fairness, adequacy, and procedural integrity. That failure constitutes an abuse of discretion and requires vacatur of the order continuing the Injunctive Relief.

### B. The District Court Had Authority to Modify the Settlement Under Rule 60(b) and Long-Standing Equitable Principles

The District Court's assertion that it lacked authority to modify the Settlement is contrary to well-established law. Courts have longstanding equitable power, codified under Fed. R. Civ. P. 60(b)(5), to modify settlement agreements and consent decrees when a change in circumstances makes clear that applying prospective relief would no longer be equitable. *See Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) (discussing the courts' inherent authority to modify settlement obligations under changed conditions); *United States v. Swift*, 286 U.S. 106, 114 (1932) (noting courts may modify injunctions "in adaptation to changed

54

conditions," even if entered by consent); *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384–85 (1992) (finding modification is warranted when compliance becomes unworkable, unforeseen obstacles arise, or enforcement would harm the public interest); *Agostini v. Felston*, 521 U.S. 203, 215 (1997) (restating *Rufo* rule that courts may modify orders when there is a significant change in law or fact).

Here, the District Court expressly retained continuing supervisory authority and was notified of precisely the kind of changed circumstances that warrant modification: irreparable harm caused by roster limits, including failure of the DSA mechanism; sex-based discrimination in violation of Title IX, exacerbated by revenue-sharing payments, the elimination of *Alston* payments, and reduced financial support for women's sports; due process violations relating to inadequate notice and the ability to object; and inadequate representation. 2-WhittyER-279–94, 301–08. These interrelated and escalating circumstances rendered the continued application of the Injunctive Relief not only inequitable but *harmful* to class members and student-athletes nationwide. *See* Rule 60(b)(5) (providing that a court may relieve parties from a final order when "applying it prospectively is no longer equitable").

Accordingly, the District Court had full power to modify the Settlement—or at a minimum direct the parties to renegotiate—to protect absent class members. Moreover, the District Court expressly retained jurisdiction to enforce the

55

Settlement, satisfying *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994), and thereby preserving its authority to act. 1-WhittyER-115.

The District Court's refusal to exercise that authority when objectors requested modifications was an error of law and an abuse of discretion. Having selectively exercised its authority to approve amendments requested by settling parties, the Court could not disclaim that same authority when absent class members requested changes necessary to protect their rights. Combined with its refusal to consider objectors' proposals, its exclusion of pro se objectors from the renegotiation process, and misapplication of Rule 23(e)'s fairness obligations, the District Court's decision constitutes an abuse of discretion and requires vacatur.

**IV.** **The Injunctive Relief is Subject to Actively Changing Circumstances – The District Court Retains Authority to Modify It**

    **A.** **The Injunctive Relief is Not Remedial – It Authorizes Ongoing and Prospective Harm**

The Injunctive Relief is not a stable, fixed remedy. Instead, it functions as a fluid and evolving regulatory framework whose operation depends on—and is already being reshaped by—ongoing NCAA rule changes, pending federal legislation, and direct Executive Branch action taken in response to the Settlement's consequences. 1-WhittyER-31, 45, 52–53; Addendum 2–96. As implemented, the Injunctive Relief is not curing harm but causing it, inflicting immediate and continuing injury on members of the Injunctive Relief class.

56

Addendum 87–88, 91–92. In these circumstances, the District Court has not only the authority but the duty to modify the Injunctive Relief to prevent ongoing harm and to protect absent class members who otherwise lack any means to safeguard their rights. *See Agostini*, 521 U.S. at 215 ("A court errs when it refuses to modify an injunction or consent decree in light of [changed circumstances].").

First, the Injunctive Relief does not function as a remedy. It provides no fixed protection and no enforceable safeguard against future injury. Instead, it is expressly contingent on future NCAA rulemaking. 1-WhittyER-31, 45. The NCAA and its member conferences retain unilateral authority to amend Division I bylaws at any time, including those governing roster limits, revenue-sharing, and NIL compensation. 1-WhittyER-31, 45, 105–07; 4-WhittyER-760. Those prospective rule changes expressly permit universities and conferences to "unilaterally reduce the number of sports, the roster size, and/or number of athletic scholarships available to student-athletes of any sport." 1-WhittyER-31, 45. The Injunctive Relief affirmatively preserved the power to eliminate sports, cut rosters, and withdraw scholarships at will—the very harms Appellants documented before the District Court. 2-WhittyER-272–308. A Settlement that authorizes future injury, rather than preventing it, cannot satisfy Rule 23(e)'s requirement of fairness and the court's duty to protect absent class members.

57

That failure is not theoretical. The NCAA rules have already changed repeatedly since approval of the Settlement, and the NCAA continues to revise them in response to implementation problems and public pressure. Ross Dellenger, *NCAA Proposing Major Changes to Eligibility Rules, Including Age Limits*, Yahoo Sports (Apr. 8, 2025), https://sports.yahoo.com/college-football/article/ncaa-proposing-major-changes-to-eligibility-rules-including-age-limits-121509806.html. A purported remedy that shifts with ongoing NCAA policymaking cannot operate as firm, stable relief. *See Agostini*, 521 U.S at 215, 239; *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1256–57 (9th Cir. 1999) (describing that courts can consider the "broader impact of a sweeping public-litigation-type injunction" when determining whether to modify or vacate the injunction).

Second, Congress is actively considering legislation—the SCORE Act—that would codify, alter, or supersede core components of the Injunctive Relief. *See* Student Compensation and Opportunity through Rights and Enforcement (SCORE) Act, H.R. 4312, 119th Cong. (2025); Addendum 2–86. The Settlement itself anticipates such federal legislation, and Class Counsel committed to using "reasonable efforts to support" proposed legislation implementing or codifying the Injunctive Relief. 1-WhittyER-53.

58

Critically, however, the current version of the SCORE Act contains a provision that would further undermine the civil rights of female student-athletes by permitting universities to delay compliance with Title IX Regulations until July 1, 2027. Addendum 66–67, 104–05. This provision effectively authorizes sex-based discrimination in college athletics during the restructuring period—an extraordinary departure from civil-rights protections. As attorney Friestedt explained to the District Court on November 7, 2025, delaying enforcement of Title IX Regulations would sanction unequal treatment precisely when female student-athletes are already experiencing acute harm from roster limits, the elimination of *Alston* payments, and revenue-sharing disparities. 2-WhittyER-211–15, 229. Although Class Counsel asserted, contrary to the Settlement's legislation support provision, that they did not support the SCORE Act, neither the NCAA nor the conferences disavowed such support or disputed its discriminatory effect of the pending legislation. 2-WhittyER-233.

The prospect that federal legislation may temporarily set aside Title IX compliance underscores why the Injunctive Relief cannot be treated as a settled or protected remedy. A framework that facilitates the suspension of core civil-rights protections is not remedial; it magnifies the risk of ongoing and irreparable harm to absent class members and reinforces the District Court's continuing duty to intervene.

Third, the Executive Branch has already intervened twice in direct response to the Settlement's harmful effects on women's and Olympic sports. On July 2, 2025, the President issued the "*Saving College Sports*" Executive Order, directing federal agencies to protect opportunities for women's and Olympic-sport athletes in light of the Settlement's roster limits and revenue-sharing provisions. *See* Exec. Order No. 14322, 90 C.F.R. 35821 (2025); Addendum 87–90. On April 3, 2026, the President issued a second order—"*Urgent National Action to Save College Sports*"—again identifying the Settlement as a source of immediate harm and directing coordinated federal action to preserve participation opportunities. Addendum 91–96.

These extraordinary interventions confirm that the Injunctive Relief is not operating as a stable or effective remedy. Instead, it is producing immediate, nationally recognized harms to student-athletes—harms that are so severe the Executive Branch has twice acted to mitigate their effects. Addendum 87–96. When ongoing injunctive relief triggers repeated emergency action by the political branches to prevent further damage, it cannot be characterized as remedial. Rather, it underscores the District Court's continuing duty to modify the Injunctive Relief to protect absent class members from escalating and irreparable harm. Because the Injunctive Relief is no longer equitable and the District Court failed to intervene to

60

prevent continuing injury, the order continuing the Injunctive Relief must be vacated.

## CONCLUSION

For the foregoing reasons, the District Court's order to continue the Injunctive Relief should be vacated. If Class Counsel is unable to adequately represent the Injunctive Relief Class, the Court must appoint new counsel.

Date: April 8, 2026

*/s/ Leigh Ernst Friestedt*
Leigh Ernst Friestedt
EQUITY IX, LLC
40 Mercer St., Suite 15
New York, NY 10013
(917) 513-5541
leigh@equityix.com

*/s/ Jeffrey E. Faucette*
Jeffrey E. Faucette
SKAGGS FAUCETTE LLP
505 Montgomery St., 11th Floor
San Francisco, CA 94111
(415) 874-3181
jeff@skaggsfaucette.com

*Attorneys for Objectors-Appellants:* Piper Whitty, Ariana Amoroso, Katherine McCabe Ernst, Scott Iannaccone, Abigail Leight, Ried Hinds Macdonald

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**  25-3722, 25-3835, 25-4137, 25-1450, 25-4190

I am the attorney or self-represented party.

**This brief contains 12,381 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).
I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Leigh Ernst Friestedt   **Date** April 8, 2026

1

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 15. Certificate of Service for Electronic Filing**

**9th Cir. Case Number(s)** 25-3722, 25-3835, 25-4137, 25-4150, 25-4190

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[x] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

> Gracelyn Laudermilch, glaudermilch@gmail.com

**Description of Document(s)** *(required for all documents)***:**

> Opening Brief: Piper Whitty, et al., Objectors–Appellants
> Excerpts of Record – Index Volume, Volumes I–V

**Signature**   s/ Leigh Ernst Friestedt    **Date** April 8, 2026

# ADDENDUM

**<u>Page</u>**

Student Compensation and Opportunity through Rights and
Enforcement (SCORE) Act, H.R. 4312, 119th Cong.
(2025)............................................................................ 001

Exec. Order No. 14322, 90 C.F.R. 35821 (July 24, 2025).................. 087
"Saving College Sports"

Exec. Order No. Not Available (April 3, 2026) ..............…............. 091
"Urgent National Action to Save College Sports"

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688
(1972) ......................................................................... 097

Title IX Regulations (1974) ...................................................... 104



IB

# Union Calendar No. 226

119TH CONGRESS
1ST SESSION

# H. R. 4312

**[Report No. 119–270, Parts I and II]**

To protect the name, image, and likeness rights of student athletes and to promote fair competition with respect to intercollegiate athletics, and for other purposes.

_____

## IN THE HOUSE OF REPRESENTATIVES

JULY 10, 2025

Mr. BILIRAKIS (for himself, Ms. BYNUM, Mr. GUTHRIE, Mr. WALBERG, Mr. JORDAN, Mr. FIGURES, Mrs. MCCLAIN, Mr. FITZGERALD, and Mr. FRY) introduced the following bill; which was referred to the Committee on Education and Workforce, and in addition to the Committee on Energy and Commerce, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned

SEPTEMBER 11, 2025

Deleted sponsor: Mr. MOSKOWITZ (added September 10, 2025; deleted September 11, 2025)

SEPTEMBER 11, 2025

Additional sponsors: Mr. WILLIAMS of Texas, Mr. WESTERMAN, Mr. FLOOD, Mr. CUELLAR, Mr. VICENTE GONZALEZ of Texas, Mr. GOODEN of Texas, Mr. SUOZZI, Mr. CARTER of Georgia, Mr. Haridopolos, Mr. CLINE, Mr. BARR, Mr. GROTHMAN and Ms. PLASKETT

SEPTEMBER 11, 2025

Reported from the Committee on Energy and Commerce with an amendment

[Strike out all after the enacting clause and insert the part printed in italic]

**001**

2

SEPTEMBER 11, 2025

Reported from the Committee on Education and Workforce with an amendment, committed to the Committee of the Whole House on the State of the Union, and ordered to be printed

[Strike out all after the enacting clause and insert the part printed in boldface roman]

[For the text of introduced bill, see copy of bill as introduced on July 10, 2025]

_____

# A BILL

To protect the name, image, and likeness rights of student athletes and to promote fair competition with respect to intercollegiate athletics, and for other purposes.

3

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

*This Act may be cited as the "Student Compensation and Opportunity through Rights and Endorsements Act" or the "SCORE Act".*

**SEC. 2. DEFINITIONS.**

*In this Act:*

*(1) AGENT.—The term "agent" means an individual who receives compensation to represent a student athlete with respect to—*

*(A) a name, image, and likeness agreement; or*

*(B) another agreement for compensation related to the participation of such student athlete on a varsity sports team.*

*(2) ANTITRUST LAWS.—The term "antitrust laws" has the meaning given such term in the 1st section of the Clayton Act (15 U.S.C. 12) and includes section 5 of the Federal Trade Commission Act (15 U.S.C. 45) to the extent that such section 5 applies to unfair methods of competition.*

*(3) ASSOCIATED ENTITY OR INDIVIDUAL.—The term "associated entity or individual" means, with respect to an institution, each of the following:*

4

*(A) An entity that is known or should be known to the employees of the athletic department of such institution to exist, in significant part, for the purpose of—*

*(i) promoting or supporting the varsity sports teams or student athletes of such institution; or*

*(ii) creating or identifying opportunities relating to name, image, and likeness agreements solely for the student athletes of such institution.*

*(B) An individual who is or has been a member, employee, director, officer, owner, or other representative of an entity described in subparagraph (A).*

*(C) An individual who directly or indirectly (including through contributions by an entity affiliated with such individual or an immediate family member of such individual) has contributed more than $50,000 (as adjusted on July 1 each year by the percentage increase (if any), during the preceding 12-month period, in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics) over the lifetime of the individual to the*

**004**

5

athletic programs of such institution or to an entity described in subparagraph (A).

(D) An individual or entity who—

(i) is directed or requested by the employees of the athletic department of such institution to assist in the recruitment or retention of prospective student athletes or student athletes, respectively; or

(ii) otherwise assists in such recruitment or retention.

(E) Any entity (other than a publicly traded corporation) owned, controlled, operated by, or otherwise affiliated with an individual or entity described in subparagraph (A), (B), (C), or (D).

(4) COLLEGE SPORTS REVENUE.—The term "college sports revenue" means any revenue (without regard to ownership or legal title to such revenue) received by an institution with respect to intercollegiate athletics—

(A) from the sale of admission to intercollegiate athletic competitions or any other event involving a varsity sports team, including actual monetary revenue received by or for the benefit of such institution for a suite license (unless such

6

*suite license is associated with philanthropy or any purpose not related to intercollegiate athletic competitions, including a concert);*

*(B) from participation by the varsity sports teams of such institution in intercollegiate athletic competitions held at other institutions, including payments received due to cancellations of such intercollegiate athletic competitions;*

*(C) for radio, television, internet, digital, and e-commerce rights, including revenue relating to media rights distributed by a conference to members of the conference, if applicable;*

*(D) from an interstate intercollegiate athletic association, including any grant, distribution of revenue, reimbursement relating to travel with respect to a championship of such interstate intercollegiate athletic association, and payment for hosting such a championship;*

*(E) generated by a post-season football bowl, including any distribution of revenue by a conference to members of the conference and any other payment related to the participation of such institution in such post-season football bowl, including for ticket sales and reimbursement of expenses;*

7

*(F) from a conference, other than any revenue otherwise described in this paragraph;*

*(G) for sponsorships, licensing agreements, advertisements, royalties, and in-kind products and services as part of a sponsorship agreement; or*

*(H) relating to any additional form of revenue, including fundraising, an interstate intercollegiate athletic association uses with respect to the pool limit of such interstate intercollegiate athletic association.*

*(5) COMPENSATION.—The term "compensation"—*

*(A) means, with respect to a student athlete or a prospective student athlete, any form of payment or remuneration, whether provided through cash, benefits, awards, or any other means, including payments for—*

*(i) licenses relating to, or the use of, name, image, and likeness rights; or*

*(ii) licenses relating to, or the use of, any other Federal or State intellectual or intangible property right; and*

*(B) does not include—*

*(i) grants-in-aid;*

8

*(ii) Federal Pell Grants and other Federal or State grants unrelated to and not awarded with regard to participation in intercollegiate athletics;*

*(iii) health insurance and payments for the costs of health care, including health insurance and payments for the costs of health care wholly or partly self-funded by an institution, conference, or interstate intercollegiate athletic association;*

*(iv) disability and loss-of-value insurance, including disability and loss-of-value insurance that is wholly or partly self-funded by an institution, conference, or interstate intercollegiate athletic association;*

*(v) career counseling, job placement services, and other guidance available to all students at an institution;*

*(vi) payment of hourly wages and benefits for work actually performed (and not for participation in intercollegiate athletics) at a rate commensurate with the going rate in the locality of an institution for similar work;*

**008**

9

(vii) academic awards paid to student athletes by institutions;

(viii) provision of financial literacy or tax education resources and guidance; or

(ix) any program to connect student athletes with employers and facilitate employment opportunities, if—

(I) the financial terms of such employment opportunities are consistent with the terms offered to similarly situated employees who are not student athletes; and

(II) such program is not used to induce a student athlete to attend a particular institution.

(6) CONFERENCE.—The term "conference" means an entity that—

(A) has as members 2 or more institutions;

(B) arranges regular season intercollegiate athletic competitions and championships for such members; and

(C) sets rules with respect to such intercollegiate athletic competitions and championships.

(7) COST OF ATTENDANCE.—The term "cost of attendance" has the meaning given such term in sec-

10

tion 472 of the Higher Education Act of 1965 (20 U.S.C. 1087ll).

(8) GRANT-IN-AID.—The term "grant-in-aid" means a scholarship, grant, stipend, or other form of financial assistance, including the provision of tuition, room, board, books, or funds for fees or personal expenses, that—

(A) is paid or provided by an institution to a student for the undergraduate or graduate course of study of the student; and

(B) is in an amount that does not exceed the cost of attendance at the institution for such student.

(9) IMAGE.—The term "image" means, with respect to a student athlete, a picture or a video that identifies, is linked to, or is reasonably linkable to such student athlete.

(10) INSTITUTION.—The term "institution" has the meaning given the term "institution of higher education" in section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002).

(11) INTERCOLLEGIATE ATHLETIC COMPETITION.—The term "intercollegiate athletic competition" means any contest, game, meet, match, tour-

11

nament, regatta, or other event in which varsity sports teams of more than 1 institution compete.

(12) INTERCOLLEGIATE ATHLETICS.—The term "intercollegiate athletics"—

(A) means the varsity sports teams for which the length of time a student athlete is eligible to participate and the academic standards for participation are established by a conference or an interstate intercollegiate athletic association; and

(B) does not include any recreational, intramural, or club teams.

(13) INTERSTATE INTERCOLLEGIATE ATHLETIC ASSOCIATION.—The term "interstate intercollegiate athletic association" means—

(A) any entity that—

(i) sets common rules, standards, procedures, or guidelines for the administration and regulation of varsity sports teams and intercollegiate athletic competitions;

(ii) is composed of 2 or more institutions or conferences located in more than 1 State; and

(iii) has rules or bylaws prohibiting the provision of prohibited compensation to

011

12

*student athletes and prospective student athletes; and*

*(B) does not include any entity affiliated with professional athletic competitions.*

*(14) LIKENESS.—The term "likeness" means, with respect to a student athlete, a physical or digital depiction or representation that identifies, is linked to, or is reasonably linkable to such student athlete.*

*(15) NAME.—The term "name" means, with respect to a student athlete, the first, middle, or last name, or the nickname or former name, of such student athlete if used in a context that identifies, is linked to, or is reasonably linkable to such student athlete.*

*(16) NAME, IMAGE, AND LIKENESS AGREEMENT.—The term "name, image, and likeness agreement" means a contract or similar agreement under which a student athlete licenses or authorizes, or a contract or similar agreement that otherwise is in relation to, the commercial use of the name, image, or likeness of the student athlete.*

*(17) NAME, IMAGE, AND LIKENESS RIGHTS.—The term "name, image, and likeness rights" means rights recognized under Federal or State law that allow an individual to control and profit from the commercial*

13

use of the name, image, and likeness of such individual, including all rights commonly referred to as "publicity rights".

(18) POOL LIMIT.—The term "pool limit" means a dollar amount based on college sports revenue that—

(A) is calculated and published by an interstate intercollegiate athletic association pursuant to the rules the interstate intercollegiate athletic association establishes under section 6; and

(B) serves as the annual maximum amount that an institution that is a member of such interstate intercollegiate athletic association may provide, in total, to student athletes of such institution, including in the form of a name, image, and likeness agreement or direct payment.

(19) PROHIBITED COMPENSATION.—The term "prohibited compensation" means—

(A) compensation (including an agreement for compensation) to a student athlete from an associated entity or individual of the institution at which the student athlete is enrolled (or to a prospective student athlete from an associated entity or individual of an institution for which

14

*the prospective student athlete is being recruited) for any license or use of the name, image, and likeness rights of such student athlete or prospective student athlete (or any other license or use), unless the license or use is for a valid business purpose related to the promotion or endorsement of goods or services provided to the general public for profit, with compensation at rates and terms commensurate with compensation paid to individuals with name, image, and likeness rights of comparable value who are not student athletes or prospective student athletes with respect to such institution; and*

*(B) compensation to a student athlete (or a prospective student athlete) if such compensation is paid by or on behalf of the institution at which the student athlete is enrolled (or for which the prospective student athlete is being recruited) and results in the exceeding of the pool limit established by the interstate intercollegiate athletic association of which such institution is a member.*

*(20) PROSPECTIVE STUDENT ATHLETE.—The term "prospective student athlete" means an individual who is solicited to enroll at an institution by,*

15

or at the direction of, an employee or an associated entity or individual of the institution in order for such individual to participate in a varsity sports team of such institution.

(21) STATE.—The term "State" means each State of the United States, the District of Columbia, and each commonwealth, territory, or possession of the United States.

(22) STUDENT ATHLETE.—The term "student athlete" means an individual who—

(A) is enrolled or has agreed to enroll at an institution; and

(B) participates in a varsity sports team of such institution.

(23) VARSITY SPORTS TEAM.—The term "varsity sports team" means an entity composed of an individual or group of individuals enrolled at an institution that is organized by such institution for the purpose of participation in intercollegiate athletic competitions.

**SEC. 3. PROTECTION OF NAME, IMAGE, AND LIKENESS RIGHTS OF STUDENT ATHLETES.**

(a) RIGHT TO ENTER INTO NAME, IMAGE, AND LIKENESS AGREEMENTS.—

16

*(1) IN GENERAL.—No institution, conference, or interstate intercollegiate athletic association may restrict the ability of a student athlete to enter into a name, image, and likeness agreement.*

*(2) EXCEPTIONS.—*

*(A) PROHIBITED COMPENSATION.—Paragraph (1) does not apply with respect to a name, image, and likeness agreement to the extent such agreement provides prohibited compensation.*

*(B) CODES OF CONDUCT AND CONFLICTING AGREEMENTS.—Notwithstanding paragraph (1), an institution may restrict the ability of a student athlete of such institution (including a prospective student athlete who has agreed to attend such institution) to enter into a name, image, and likeness agreement that—*

*(i) violates the code of conduct of such institution; or*

*(ii) conflicts with the terms of a contract or similar agreement to which such institution is a party.*

*(b) RIGHT TO REPRESENTATION.—Except as provided by this Act, no institution, conference, or interstate intercollegiate athletic association may restrict the ability of a student athlete to obtain an agent.*

17

*(c) RIGHT TO PRIVACY.—Except as provided by this Act, no institution, conference, or interstate intercollegiate athletic association may release information with respect to a name, image, and likeness agreement without the express written consent of any student athlete who is a party to such agreement.*

*(d) RIGHT TO TRANSPARENT AGREEMENTS.—A name, image, and likeness agreement under which a student athlete is provided compensation in an amount greater than $600 shall be considered void from the inception of such agreement if such agreement does not satisfy the following:*

*(1) The agreement is in writing.*

*(2) The agreement contains the following:*

*(A) A description of any services to be rendered under the agreement.*

*(B) The names of the parties to the agreement.*

*(C) The term of the agreement.*

*(D) The amount of compensation to be provided to the student athlete under the agreement.*

*(E) A provision specifying the circumstances or events under which the agreement may be terminated due to non-performance of obligations by the student athlete.*

18

*(F) A provision specifying that the student athlete may terminate the agreement, notwithstanding any other term described in the agreement, beginning on the date that is 6 months after the date on which the student athlete is no longer enrolled at any institution.*

*(G) The signature of the student athlete or, if the student athlete is under the age of 18 years, the signature of the parent or guardian of the student athlete.*

*(e) ACTIONS BY STATES.—In any case in which the attorney general of a State, or an official or agency of a State, has reason to believe that an interest of the residents of such State has been or is threatened or adversely affected by an act or practice in violation of this section, the State, as parens patriae, may bring a civil action on behalf of the residents of the State in an appropriate State court or an appropriate district court of the United States to—*

*(1) enjoin such act or practice;*

*(2) enforce compliance with this section;*

*(3) obtain damages, restitution, or other compensation on behalf of residents of the State; or*

*(4) obtain such other legal and equitable relief as the court may consider to be appropriate.*

19

**SEC. 4. SPORTS AGENT RESPONSIBILITY AND TRUST ACT.**

*The Sports Agent Responsibility and Trust Act (15 U.S.C. 7801 et seq.) is amended—*

*(1) in section 3(a)—*

*(A) by redesignating paragraphs (2) and (3) as paragraphs (4) and (5), respectively; and*

*(B) by inserting after paragraph (1) the following:*

*"(2) charge a student athlete a fee with respect to an endorsement contract that is in an amount that is greater than 5 percent of the amount of the compensation provided to such student athlete under such contract;*

*"(3) enter into an agency contract with a student athlete that does not include a provision specifying that the student athlete may terminate the agency contract, notwithstanding any other term described in the agency contract, beginning on the date that is 6 months after the date on which the student athlete is no longer enrolled at any institution (as defined in section 2 of the SCORE Act);";*

*(2) in section 3(b)(3), by striking "Warning to Student Athlete: If you agree orally or in writing to be represented by an agent now or in the future you may lose your eligibility to compete as a student ath-*

20

lete in your sport." and inserting "Notice to Student Athlete:"; and

(3) by adding at the end the following:

**"SEC. 9. DISCLOSURE AND CONSENT RELATING TO NAME, IMAGE, AND LIKENESS AGREEMENTS.**

"(a) IN GENERAL.—An athlete agent who assists a student athlete with an endorsement contract shall disclose in writing to the student athlete—

"(1) whether the athlete agent is registered with an interstate intercollegiate athletic association (as defined in section 2 of the SCORE Act); and

"(2) if the athlete agent is registered with an interstate intercollegiate athletic association, whether the athlete agent is registered with the interstate intercollegiate athletic association that has as a member the institution (as defined in section 2 of the SCORE Act) at which the student athlete is enrolled.

"(b) CONSENT.—In the case of an athlete agent who is not registered with an interstate intercollegiate athletic association, the athlete agent may only assist a student athlete with an endorsement contract if the student athlete (or, in the case of a student athlete who is under 18 years of age, the parent or guardian of the student athlete) provides to the athlete agent written consent for such assistance after receiving the disclosure under subsection (a).

21

"(c) ENFORCEMENT.—

"(1) IN GENERAL.—If an attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by the engagement of any athlete agent in a practice that violates this section, the attorney general may bring a civil action pursuant to section 5 in the same manner as the attorney general may bring a civil action with respect to a violation of section 3.

"(2) SOLE AUTHORITY.—No individual or entity other than an attorney general of a State may enforce this section.

"(3) NO FEDERAL NOTICE NECESSARY.—Subsections (a)(2), (b), and (d) of section 5 do not apply to an action brought by an attorney general of a State pursuant to this subsection.".

## SEC. 5. REQUIREMENTS APPLICABLE TO CERTAIN INSTITUTIONS.

(a) REQUIREMENTS.—An institution described in subsection (c) shall—

(1) provide comprehensive academic support and career counseling services to student athletes that include life skills development programs with respect to—

22

(A) mental health, including alcohol and substance abuse;

(B) strength and conditioning;

(C) nutrition;

(D) name, image, and likeness rights, including related legal advice;

(E) financial literacy, including taxes;

(F) career readiness and counseling;

(G) the process for transferring between institutions; and

(H) sexual violence prevention;

(2) provide medical and health benefits to student athletes that include—

(A) medical care, including payment of out-of-pocket expenses, for an injury of a student athlete incurred during the involvement of such student athlete in intercollegiate athletics for such institution that is available to the student athlete during the period of enrollment of the student athlete with such institution and a period of at least 3 years following graduation or separation from such institution (unless such separation is due to violation of a code of conduct);

23

*(B) mental health services and support, including mental health educational materials and resources;*

*(C) an administrative structure that provides independent medical care, including with respect to decisions regarding return to play; and*

*(D) a certification of insurance coverage for medical expenses resulting from injuries of student athletes incurred during the involvement of such student athletes in intercollegiate athletics for such institution;*

*(3) maintain a grant-in-aid provided to a student athlete in relation to the involvement of such student athlete in intercollegiate athletics during the period of that grant-in-aid for such institution without regard to—*

*(A) athletic performance;*

*(B) contribution to team success;*

*(C) injury, illness, or physical or mental condition; or*

*(D) receipt of compensation pursuant to a name, image, and likeness agreement;*

*(4) provide a degree completion program—*

24

*(A) for each former student athlete of such institution who received a grant-in-aid from such institution and did not graduate from such institution; and*

*(B) that provides financial aid to such former student athlete in an amount that is based on the average annual grant-in-aid provided to such former student athlete during the period that such former student athlete participated on a varsity sports team of the institution; and*

*(5) establish, not later than July 1, 2027, and thereafter maintain, at least 16 varsity sports teams.*

*(b) COLLABORATION.—An institution may carry out subsection (a) in conjunction with a conference or interstate intercollegiate athletic association.*

*(c) APPLICABILITY.—An institution is described in this subsection if any member of the coaching staff of a varsity sports team of such institution earns more than $250,000 in base salary annually (as adjusted on July 1 each year by the percentage increase (if any), during the preceding 12-month period, in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics).*

25

### SEC. 6. ROLES OF INTERSTATE INTERCOLLEGIATE ATHLETIC ASSOCIATIONS.

(a) AUTHORITY TO ESTABLISH RULES.—An interstate intercollegiate athletic association is authorized to establish and enforce rules with respect to—

(1) requiring a student athlete or prospective student athlete to disclose, in a timely manner, the terms of a name, image, and likeness agreement entered into by such student athlete;

(2) establishing and implementing a process to collect and publicly share aggregated and anonymized data related to the name, image, and likeness agreements of student athletes (without regard to whether such an agreement includes an institution as a party to the agreement);

(3) prohibited compensation, including processes for dispute resolution and penalties, if such rules provide that a student athlete does not lose eligibility to compete in intercollegiate athletic competitions while a process for dispute resolution is ongoing;

(4) setting parameters for the manner in which and the time period during which student athletes and prospective student athletes may be recruited for intercollegiate athletics;

(5) calculating a pool limit, if such rules provide that such pool limit is at least 22 percent of the aver-

26

*age annual college sports revenue of the 70 highest earning (with respect to such revenue) member institutions of such interstate intercollegiate athletic association (or, if such interstate intercollegiate athletic association has fewer than 70 members, the average annual college sports revenue of all members), and monitoring payments of compensation related to such pool limit;*

*(6) setting parameters for the manner in which a student athlete may transfer between institutions, if such rules provide that—*

> *(A) on at least 1 occasion each student athlete may transfer between institutions and be immediately eligible to participate on a varsity sports team of the institution to which the student athlete transfers (if academically eligible to participate); and*

> *(B) an institution to which a student athlete is transferring or is considering transferring shall provide to such student athlete, at the request of such student athlete, in writing and at a reasonable time prior to completion of the transfer, a notice of the previously earned academic credits of such student athlete that such*

27

*institution will accept, including with respect to the program of study of such student athlete;*

*(7) the length of time a student athlete is eligible to participate in intercollegiate athletics and the academic standards to be eligible to participate in intercollegiate athletics;*

*(8) establishing and implementing a process, including a database, with respect to agent registration, including—*

*(A) setting qualifications to be registered as an agent;*

*(B) setting parameters for the ability of member institutions to negotiate with agents who are not registered under such process; and*

*(C) limiting the amount of the compensation under a name, image, and likeness agreement between a student athlete and an institution that may be provided to the agent of such student athlete to not more than 5 percent of such compensation;*

*(9) the membership of, and participation in, such interstate intercollegiate athletic association (including any championships administered by such interstate intercollegiate athletic association), under which such interstate intercollegiate athletic associa-*

28

*tion may establish membership qualifications, remove members, and otherwise regulate participation; and*

*(10) intercollegiate athletic competitions and playing seasons, including rules with respect to season length, maximum number of contests, and student athlete time demands (whether during a playing season or outside of such season).*

(b) REQUIREMENTS.—

*(1) AUTHORITY CONDITIONED ON COMPLIANCE.— An interstate intercollegiate athletic association is only authorized to establish and enforce rules under subsection (a) if such interstate intercollegiate athletic association is in compliance with this subsection and section 3.*

*(2) GOVERNANCE STRUCTURE.—An interstate intercollegiate athletic association (except for an interstate intercollegiate athletic association that is also a conference) shall carry out the following:*

*(A) Ensure that the membership of any board, committee, or other similar body of such interstate intercollegiate athletic association, if tasked with a decision-making role (including a decision-making role with respect to establishing or enforcing a rule under section 6(a)), satisfies the following:*

29

*(i) Not less than 20 percent of the members of the board, committee, or body are individuals who are student athletes or were student athletes at any point during the preceding 10-year period, with—*

*(I) men and women equally represented with respect to such individuals; and*

*(II) each such individual participating in or having participated in a different sport.*

*(ii) Not less than 30 percent of the members of the board, committee, or body represent institutions that are not among the 70 highest earning member institutions of such interstate intercollegiate athletic association with respect to annual college sports revenue.*

*(B) Establish a council to serve as the primary deliberative body of the interstate intercollegiate athletic association and that is—*

*(i) responsible for developing proposals with respect to policy; and*

*(ii) composed of individuals who represent each conference that is a member of*

30

*such interstate intercollegiate athletic association.*

### *SEC. 7. LIABILITY LIMITATION.*

*(a) IN GENERAL.—Adoption of, agreement to, compliance with, or enforcement of any rule, regulation, requirement, standard, or other provision established pursuant to, or in compliance with, section 6 of this Act shall be treated as lawful under the antitrust laws and any similar State provision having the force and effect of law.*

*(b) RULE OF CONSTRUCTION.—Nothing in subsection (a) may be construed to limit or otherwise affect any provision of law, including any provision of Federal or State law or the common law, other than the antitrust laws and any similar State provision having the force and effect of law.*

### *SEC. 8. EMPLOYMENT STANDING.*

*Notwithstanding any other provision of Federal or State law, no individual may be considered an employee of an institution, a conference, or an interstate intercollegiate athletic association based on the participation of such individual on a varsity sports team or in an intercollegiate athletic competition as a student athlete, without regard to the existence of rules or requirements for being a member of such team or for participating in such competition.*

31

**SEC. 9. STUDENT ATHLETIC FEES.**

*(a) TRANSPARENCY REQUIREMENTS.—*

*(1) INFORMATION DISSEMINATION ACTIVITIES.—Section 485(a)(1)(E) of the Higher Education Act of 1965 (20 U.S.C. 1092(a)(1)(E)) is amended by inserting "(including the amount of such fees used to support intercollegiate athletic programs)" after "and fees".*

*(2) DATA REQUIRED.—*

*(A) IN GENERAL.—Section 485(g) of the Higher Education Act of 1965 (20 U.S.C. 1092(g)) is amended—*

*(i) in paragraph (1), by adding at the end the following:*

*"(K) With respect to fees charged to students to support intercollegiate athletic programs—*

*"(i) the total amount of such fees charged to students;*

*"(ii) the uses of such fees with respect to facilities, operating expenses, scholarships, payments to athletes, salaries of coaches and support staff, and any other expenses reported under this paragraph; and*

*"(iii) the percentage of the total cost of such programs covered by such fees."; and*

32

*(ii) in paragraph (3)—*

*(I) by striking the period at the end and inserting "; and";*

*(II) by striking "that all students" and inserting the following: "that—*

*"(A) all students"; and*

*(III) by adding at the end the following:*

*"(B) with respect to the information described in paragraph (1)(K), the institution shall annually publish such information on a publicly available website of the institution not later than October 15 following the end of each fiscal year of the institution.".*

*(B) EFFECTIVE DATE.—The amendments made by subparagraph (A) shall take effect and apply beginning on July 1, 2026.*

*(b) RESTRICTING STUDENT FEES FOR HIGH-MEDIA-RIGHTS-REVENUE INSTITUTIONS.—*

*(1) MEDIA RIGHTS REVENUES.—Section 485(g)(1)(I)(ii) of the Higher Education Act of 1965 (20 U.S.C. 1092(a)(1)(I)(ii)) is amended by striking "broadcast revenues" and inserting "media rights revenues (including revenues from broadcasting, stream-*

33

ing, or digital distribution of intercollegiate athletic events)".

(2) PROGRAM PARTICIPATION AGREEMENTS.—Section 487(a) of the Higher Education Act of 1965 (20 U.S.C. 1094(a)) is amended by adding at the end the following:

"(30) In the case of an institution that, for the most recently completed fiscal year, had annual media rights revenues (as described in section 485(g)(1)(I)(ii)) of $50,000,000 or more, the institution will not, for the fiscal year immediately following such fiscal year, use student fees to support intercollegiate athletic programs, including with respect to facilities, operating expenses (as defined in section 485(g)), scholarships, payments to athletes, salaries of coaches and support staff, and any other expenses reported under section 485(g)(1).".

(3) EFFECTIVE DATE.—The amendments made by this subsection shall take effect and apply beginning on July 1, 2026.

SEC. 10. PREEMPTION.

(a) IN GENERAL.—No State, or political subdivision of a State, may maintain, enforce, prescribe, or continue in effect any law, rule, regulation, requirement, standard, or other provision having the force and effect of law that

34

*conflicts with this Act, including the amendments made by this Act, and that—*

*(1) governs or regulates the compensation, payment, benefits, or employment status of a student athlete (including a prospective student athlete) with respect to participation in intercollegiate athletics, including any law, rule, regulation, requirement, standard, or other provision that—*

*(A) relates to the right of a student athlete to receive compensation or other payments or benefits directly or indirectly from any institution, associated entity or individual, conference, or interstate intercollegiate athletic association; or*

*(B) relates to the length of time a student athlete is eligible to participate in intercollegiate athletics or the academic standards to be eligible to participate in intercollegiate athletics;*

*(2) limits or restricts a right provided to an institution, a conference, or an interstate intercollegiate athletic association under this Act; or*

*(3) requires a release of or license to use the name, image, and likeness rights of any individual participant, or group of participants, in an intercollegiate athletic competition (or an individual spec-*

35

tator or group of spectators at an intercollegiate athletic competition) for purposes of audio-visual, audio, or visual broadcasts or other distributions of such intercollegiate athletic competition.

(b) RULE OF CONSTRUCTION.—Nothing in subsection (a) may be construed to—

(1) relieve any person of liability under a State law of general applicability that does not conflict with this Act, including the amendments made by this Act; or

(2) relieve any person of liability under common law.

### SEC. 11. REPORTS.

(a) FEDERAL TRADE COMMISSION STUDY.—

(1) STUDY.—The Federal Trade Commission shall conduct a study to analyze the impacts of establishing a program, administered by an entity independent of any institution, conference, or interstate intercollegiate athletic association, to develop standards for, certify as compliant with such standards, and otherwise regulate agents who enter into agreements with student athletes, which shall include an analysis of—

(A) options for establishing such a program;

36

(B) potential sources of funding for such a program;

(C) a reasonable timeline for establishing such a program; and

(D) the costs and benefits associated with such a program.

(2) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Federal Trade Commission shall submit to Congress a report on the results of the study conducted under paragraph (1), which shall include legislative recommendations with respect to the establishment and funding of the program described in such paragraph.

(b) COMPLIANCE REPORTING.—

(1) BIENNIAL REPORT.—Not later than 180 days after the date of the enactment of this Act, and every 2 years thereafter, each interstate intercollegiate athletic association shall submit to Congress a report that includes—

(A) a summary of the issues faced by such interstate intercollegiate athletic association relating to compliance with this Act, including the amendments made by this Act;

(B) a summary of the trends among institutions, conferences, and interstate intercollegiate

37

*athletic associations relating to such compliance; and*

*(C) recommendations to improve the health, safety, and educational opportunities of student athletes.*

*(2) COMPTROLLER GENERAL REPORT.—Not later than 5 years after the date of the enactment of this Act, and every 5 years thereafter, the Comptroller General of the United States shall—*

*(A) conduct an investigation with respect to compliance with this Act, including the amendments made by this Act; and*

*(B) submit to Congress a report that includes—*

*(i) a summary of the findings of the investigation conducted under subparagraph (A); and*

*(ii) recommendations to improve the health, safety, and educational opportunities of student athletes.*

*(c) STUDY ON OLYMPIC SPORTS.—*

*(1) IN GENERAL.—The Comptroller General of the United States shall conduct a study—*

38

*(A) to assess the impact of this Act on Olympic Sports, including the funding of Olympic Sports; and*

*(B) to develop recommendations for support of Olympic Sports, given the unique nature of Olympic Sports and intercollegiate athletics in the United States.*

*(2) CONTENTS.—The study conducted under paragraph (1) shall include—*

*(A) a survey of international models of support for Olympic Sports, including models that could be adapted to the unique nature of Olympic Sports and intercollegiate athletics in the United States;*

*(B) the projected scale and magnitude of potential support for Olympic Sports, given historic levels of support provided by institutions;*

*(C) the coordination required to develop and cultivate Olympic Sports at institutions; and*

*(D) an analysis of the trends with respect to roster sizes for Olympic Sports at institutions, with a focus on the top 70 highest earning institutions with respect to average annual college sports revenue.*

39

*(3) REPORT.—Not later than 2 years after the date of the enactment of this Act, the Comptroller General of the United States shall submit to Congress a report on the results of the study conducted under paragraph (1).*

*(4) OLYMPIC SPORTS DEFINED.—In this subsection, the term "Olympic Sports" means the sports officially recognized and contested during the Summer and Winter Olympic Games.*

**SECTION 1. SHORT TITLE.**

**This Act may be cited as the "Student Compensation and Opportunity through Rights and Endorsements Act" or the "SCORE Act".**

**SEC. 2. DEFINITIONS.**

**In this Act:**

**(1) AGENT.—The term "agent" means an individual who receives compensation to represent a student athlete with respect to—**

**(A) a name, image, and likeness agreement; or**

**(B) another agreement for compensation related to the participation**

40

of such student athlete on a varsity sports team.

(2) ANTITRUST LAWS.—The term "antitrust laws" has the meaning given such term in the 1st section of the Clayton Act (15 U.S.C. 12) and includes section 5 of the Federal Trade Commission Act (15 U.S.C. 45) to the extent that such section 5 applies to unfair methods of competition.

(3) ASSOCIATED ENTITY OR INDIVIDUAL.—The term "associated entity or individual" means, with respect to an institution, each of the following:

(A) An entity that is known or should be known to the employees of the athletic department of such institution to exist, in significant part, for the purpose of—

(i) promoting or supporting the varsity sports teams or student athletes of such institution; or

(ii) creating or identifying opportunities relating to name,

image, and likeness agreements solely for the student athletes of such institution.

(B) An individual who is or has been a member, employee, director, officer, owner, or other representative of an entity described in subparagraph (A).

(C) An individual who directly or indirectly (including through contributions by an entity affiliated with such individual or an immediate family member of such individual) has contributed more than $50,000 (as adjusted on July 1 each year by the percentage increase (if any), during the preceding 12-month period, in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics) over the lifetime of the individual to the athletic programs of such institution or to an entity described in subparagraph (A).

(D) An individual or entity who—

42

(i) is directed or requested by the employees of the athletic department of such institution to assist in the recruitment or retention of prospective student athletes or student athletes, respectively; or

(ii) otherwise assists in such recruitment or retention.

(E) Any entity (other than a publicly traded corporation) owned, controlled, operated by, or otherwise affiliated with an individual or entity described in subparagraph (A), (B), (C), or (D).

(4) COLLEGE SPORTS REVENUE.—The term "college sports revenue" means any revenue (without regard to ownership or legal title to such revenue) received by an institution with respect to intercollegiate athletics—

(A) from the sale of admission to intercollegiate athletic competitions or any other event involving a varsity sports team, including actual mone-

43

tary revenue received by or for the benefit of such institution for a suite license (unless such suite license is associated with philanthropy or any purpose not related to intercollegiate athletic competitions, including a concert);

(B) from participation by the varsity sports teams of such institution in intercollegiate athletic competitions held at other institutions, including payments received due to cancellations of such intercollegiate athletic competitions;

(C) for radio, television, internet, digital, and e-commerce rights, including revenue relating to media rights distributed by a conference to members of the conference, if applicable;

(D) from an interstate intercollegiate athletic association, including any grant, distribution of revenue, reimbursement relating to travel with respect to a championship of such

44

interstate intercollegiate athletic association, and payment for hosting such a championship;

(E) generated by a post-season football bowl, including any distribution of revenue by a conference to members of the conference and any other payment related to the participation of such institution in such post-season football bowl, including for ticket sales and reimbursement of expenses;

(F) from a conference, other than any revenue otherwise described in this paragraph;

(G) for sponsorships, licensing agreements, advertisements, royalties, and in-kind products and services as part of a sponsorship agreement; or

(H) relating to any additional form of revenue, including fundraising, an interstate intercollegiate athletic association uses with respect

45

to the pool limit of such interstate intercollegiate athletic association.

(5) COMPENSATION.—The term "compensation"—

(A) means, with respect to a student athlete or a prospective student athlete, any form of payment or remuneration, whether provided through cash, benefits, awards, or any other means, including payments for—

(i) licenses relating to, or the use of, name, image, and likeness rights; or

(ii) licenses relating to, or the use of, any other Federal or State intellectual or intangible property right; and

(B) does not include—

(i) grants-in-aid;

(ii) Federal Pell Grants and other Federal or State grants unrelated to and not awarded with regard to participation in intercollegiate athletics;

46

**(iii) health insurance and payments for the costs of health care, including health insurance and payments for the costs of health care wholly or partly self-funded by an institution, conference, or interstate intercollegiate athletic association;**

**(iv) disability and loss-of-value insurance, including disability and loss-of-value insurance that is wholly or partly self-funded by an institution, conference, or interstate intercollegiate athletic association;**

**(v) career counseling, job placement services, and other guidance available to all students at an institution;**

**(vi) payment of hourly wages and benefits for work actually performed (and not for participation in intercollegiate athletics) at a rate commensurate with the**

47

going rate in the locality of an institution for similar work;

(vii) academic awards paid to student athletes by institutions;

(viii) provision of financial literacy or tax education resources and guidance; or

(ix) any program to connect student athletes with employers and facilitate employment opportunities, if—

(I) the financial terms of such employment opportunities are consistent with the terms offered to similarly situated employees who are not student athletes; and

(II) such program is not used to induce a student athlete to attend a particular institution.

(6) CONFERENCE.—The term "conference" means an entity that—

(A) has as members 2 or more institutions;

48

(B) arranges regular season inter-collegiate athletic competitions and championships for such members; and

(C) sets rules with respect to such intercollegiate athletic competitions and championships.

(7) COST OF ATTENDANCE.—The term "cost of attendance" has the meaning given such term in section 472 of the Higher Education Act of 1965 (20 U.S.C. 1087ll).

(8) GRANT-IN-AID.—The term "grant-in-aid" means a scholarship, grant, stipend, or other form of financial assistance, including the provision of tuition, room, board, books, or funds for fees or personal expenses, that—

(A) is paid or provided by an institution to a student for the undergraduate or graduate course of study of the student; and

(B) is in an amount that does not exceed the cost of attendance at the institution for such student.

49

(9) IMAGE.—The term "image" means, with respect to a student athlete, a picture or a video that identifies, is linked to, or is reasonably linkable to such student athlete.

(10) INSTITUTION.—The term "institution" has the meaning given the term "institution of higher education" in section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002).

(11) INTERCOLLEGIATE ATHLETIC COMPETITION.—The term "intercollegiate athletic competition" means any contest, game, meet, match, tournament, regatta, or other event in which varsity sports teams of more than 1 institution compete.

(12) INTERCOLLEGIATE ATHLETICS.—The term "intercollegiate athletics"—

(A) means the varsity sports teams for which the length of time a student athlete is eligible to participate and the academic standards for participation are established by a conference or an interstate intercollegiate athletic association; and

50

(B) does not include any recreational, intramural, or club teams.

(13) INTERSTATE INTERCOLLEGIATE ATHLETIC ASSOCIATION.—The term "interstate intercollegiate athletic association" means—

(A) any entity that—

(i) sets common rules, standards, procedures, or guidelines for the administration and regulation of varsity sports teams and intercollegiate athletic competitions;

(ii) is composed of 2 or more institutions or conferences located in more than 1 State; and

(iii) has rules or bylaws prohibiting the provision of prohibited compensation to student athletes and prospective student athletes; and

(B) does not include any entity affiliated with professional athletic competitions.

51

(14) LIKENESS.—The term "likeness" means, with respect to a student athlete, a physical or digital depiction or representation that identifies, is linked to, or is reasonably linkable to such student athlete.

(15) NAME.—The term "name" means, with respect to a student athlete, the first, middle, or last name, or the nickname or former name, of such student athlete if used in a context that identifies, is linked to, or is reasonably linkable to such student athlete.

(16) NAME, IMAGE, AND LIKENESS AGREEMENT.—The term "name, image, and likeness agreement" means a contract or similar agreement under which a student athlete licenses or authorizes, or a contract or similar agreement that otherwise is in relation to, the commercial use of the name, image, or likeness of the student athlete.

(17) NAME, IMAGE, AND LIKENESS RIGHTS.—The term "name, image, and likeness rights" means rights recognized

52

under Federal or State law that allow an individual to control and profit from the commercial use of the name, image, and likeness of such individual, including all rights commonly referred to as "publicity rights".

(18) POOL LIMIT.—The term "pool limit" means a dollar amount based on college sports revenue that—

(A) is calculated and published by an interstate intercollegiate athletic association pursuant to the rules the interstate intercollegiate athletic association establishes under section 6; and

(B) serves as the annual maximum amount that an institution that is a member of such interstate intercollegiate athletic association may provide, in total, to student athletes of such institution, including in the form of a name, image, and likeness agreement or direct payment.

(19) PROHIBITED COMPENSATION.—The term "prohibited compensation" means—

53

**(A) compensation (including an agreement for compensation) to a student athlete from an associated entity or individual of the institution at which the student athlete is enrolled (or to a prospective student athlete from an associated entity or individual of an institution for which the prospective student athlete is being recruited) for any license or use of the name, image, and likeness rights of such student athlete or prospective student athlete (or any other license or use), unless the license or use is for a valid business purpose related to the promotion or endorsement of goods or services provided to the general public for profit, with compensation at rates and terms commensurate with compensation paid to individuals with name, image, and likeness rights of comparable value who are not student athletes or prospective student athletes with respect to such institution; and**

54

**(B)** compensation to a student athlete (or a prospective student athlete) if such compensation is paid by or on behalf of the institution at which the student athlete is enrolled (or for which the prospective student athlete is being recruited) and results in the exceeding of the pool limit established by the interstate intercollegiate athletic association of which such institution is a member.

(20) PROSPECTIVE STUDENT ATHLETE.— The term "prospective student athlete" means an individual who is solicited to enroll at an institution by, or at the direction of, an employee or an associated entity or individual of the institution in order for such individual to participate in a varsity sports team of such institution.

(21) STATE.—The term "State" means each State of the United States, the District of Columbia, and each commonwealth, territory, or possession of the United States.

55

(22) STUDENT ATHLETE.—The term "student athlete" means an individual who—

(A) is enrolled or has agreed to enroll at an institution; and

(B) participates in a varsity sports team of such institution.

(23) VARSITY SPORTS TEAM.—The term "varsity sports team" means an entity composed of an individual or group of individuals enrolled at an institution that is organized by such institution for the purpose of participation in intercollegiate athletic competitions.

SEC. 3. PROTECTION OF NAME, IMAGE, AND LIKENESS RIGHTS OF STUDENT ATHLETES.

(a) RIGHT TO ENTER INTO NAME, IMAGE, AND LIKENESS AGREEMENTS.—

(1) IN GENERAL.—No institution, conference, or interstate intercollegiate athletic association may restrict the ability of a student athlete to enter into a name, image, and likeness agreement.

(2) EXCEPTIONS.—

56

(A) PROHIBITED COMPENSATION.—Paragraph (1) does not apply with respect to a name, image, and likeness agreement to the extent such agreement provides prohibited compensation.

(B) CODES OF CONDUCT AND CONFLICTING AGREEMENTS.—Notwithstanding paragraph (1), an institution may restrict the ability of a student athlete of such institution (including a prospective student athlete who has agreed to attend such institution) to enter into a name, image, and likeness agreement that—

(i) violates the code of conduct of such institution; or

(ii) conflicts with the terms of a contract or similar agreement to which such institution is a party.

(b) RIGHT TO REPRESENTATION.—Except as provided by this Act, no institution, conference, or interstate intercollegiate athletic

57

association may restrict the ability of a student athlete to obtain an agent.

(c) RIGHT TO PRIVACY.—Except as provided by this Act, no institution, conference, or interstate intercollegiate athletic association may release information with respect to a name, image, and likeness agreement without the express written consent of any student athlete who is a party to such agreement.

(d) RIGHT TO TRANSPARENT AGREEMENTS.— A name, image, and likeness agreement under which a student athlete is provided compensation in an amount greater than $600 shall be considered void from the inception of such agreement if such agreement does not satisfy the following:

(1) The agreement is in writing.

(2) The agreement contains the following:

(A) A description of any services to be rendered under the agreement.

(B) The names of the parties to the agreement.

(C) The term of the agreement.

58

(D) The amount of compensation to be provided to the student athlete under the agreement.

(E) A provision specifying the circumstances or events under which the agreement may be terminated due to non-performance of obligations by the student athlete.

(F) A provision specifying that the student athlete may terminate the agreement, notwithstanding any other term described in the agreement, beginning on the date that is 6 months after the date on which the student athlete is no longer enrolled at any institution.

(G) The signature of the student athlete or, if the student athlete is under the age of 18 years, the signature of the parent or guardian of the student athlete.

(e) ACTIONS BY STATES.—In any case in which the attorney general of a State, or an official or agency of a State, has reason to believe that an interest of the residents of such

59

State has been or is threatened or adversely affected by an act or practice in violation of this section, the State, as parens patriae, may bring a civil action on behalf of the residents of the State in an appropriate State court or an appropriate district court of the United States to—

(1) enjoin such act or practice;

(2) enforce compliance with this section;

(3) obtain damages, restitution, or other compensation on behalf of residents of the State; or

(4) obtain such other legal and equitable relief as the court may consider to be appropriate.

SEC. 4. SPORTS AGENT RESPONSIBILITY AND TRUST ACT.

The Sports Agent Responsibility and Trust Act (15 U.S.C. 7801 et seq.) is amended—

(1) in section 3(b)(3), by striking "Warning to Student Athlete: If you agree orally or in writing to be represented by an agent now or in the future you may lose your eligibility to compete as a stu-

60

dent athlete in your sport." and inserting "Notice to Student Athlete:"; and

(2) by adding at the end the following:

"SEC. 9. DISCLOSURE AND CONSENT RELATING TO NAME, IMAGE, AND LIKENESS AGREEMENTS.

"(a) IN GENERAL.—An athlete agent who assists a student athlete with an endorsement contract shall disclose in writing to the student athlete—

"(1) whether the athlete agent is registered with an interstate intercollegiate athletic association (as defined in section 2 of the SCORE Act); and

"(2) if the athlete agent is registered with an interstate intercollegiate athletic association, whether the athlete agent is registered with the interstate intercollegiate athletic association that has as a member the institution (as defined in section 2 of the SCORE Act) at which the student athlete is enrolled.

"(b) CONSENT.—In the case of an athlete agent who is not registered with an interstate intercollegiate athletic association, the ath-

61

lete agent may only assist a student athlete with an endorsement contract if the student athlete (or, in the case of a student athlete who is under 18 years of age, the parent or guardian of the student athlete) provides to the athlete agent written consent for such assistance after receiving the disclosure under subsection (a).

"(c) ENFORCEMENT.—

"(1) IN GENERAL.—If an attorney general of a State has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by the engagement of any athlete agent in a practice that violates this section, the attorney general may bring a civil action pursuant to section 5 in the same manner as the attorney general may bring a civil action with respect to a violation of section 3.

"(2) SOLE AUTHORITY.—No individual or entity other than an attorney general of a State may enforce this section.

"(3) NO FEDERAL NOTICE NECESSARY.— Subsections (a)(2), (b), and (d) of section

62

5 do not apply to an action brought by an attorney general of a State pursuant to this subsection.".

SEC. 5. REQUIREMENTS APPLICABLE TO CERTAIN INSTITU-
TIONS.

(a) REQUIREMENTS.—An institution described in subsection (c) shall—

(1) provide comprehensive academic support and career counseling services to student athletes that include life skills development programs with respect to—

(A) mental health, including alcohol and substance abuse;

(B) strength and conditioning;

(C) nutrition;

(D) name, image, and likeness rights;

(E) access to legal and tax services provided by entities other than an institution;

(F) financial literacy;

(G) career readiness and counseling;

(H) the process for transferring between institutions; and

63

(I) sexual violence prevention and consequences;

(2) provide medical and health benefits to student athletes that include—

(A) medical care, including payment of out-of-pocket expenses, for an injury of a student athlete incurred during the involvement of such student athlete in intercollegiate athletics for such institution that is available to such student athlete during the period of enrollment of such student athlete with such institution and a period of at least 3 years following graduation or separation from such institution (unless such separation is due to violation of a code of conduct);

(B) mental health services and support, including mental health educational materials and resources;

(C) an administrative structure that provides independent medical care, including with respect to decisions regarding return to play; and

64

**(D) a certification of insurance coverage for medical expenses resulting from injuries of student athletes incurred during the involvement of such student athletes in intercollegiate athletics for such institution;**

**(3) maintain a grant-in-aid provided to a student athlete in relation to the involvement of such student athlete in intercollegiate athletics during the period of that grant-in-aid for such institution without regard to—**

**(A) athletic performance;**

**(B) contribution to team success;**

**(C) injury, illness, or physical or mental condition; or**

**(D) receipt of compensation pursuant to a name, image, and likeness agreement;**

**(4) provide degree completion assistance—**

**(A) for each former student athlete of such institution—**

**(i) who received a grant-in-aid from such institution;**

65

(ii) who was a student athlete at such institution on or after the date of enactment of this Act and who ceased participating as a student athlete for a reason other than a reason described in clause (i) or (ii) of subparagraph (D);

(iii) who has not received a bachelor's degree (or an equivalent degree) from any institution; and

(iv) for whom such institution is the last institution such former student athlete attended;

(B) that makes available to such former student athlete, for the period described in subparagraph (C) and subject to subparagraph (D), financial aid in an annual amount that is equal to the average annual grant-in-aid provided to such former student athlete during the period that such former student athlete was a student athlete at such institution;

66

(C) for the period beginning on the last date of the final period of enrollment during which such former student athlete was a student athlete at such institution and ending on the date that such former student athlete completes a bachelor's degree (or an equivalent degree), not to exceed 7 years; and

(D) that prohibits a former student athlete from receiving the financial aid described in subparagraph (B) if such former student athlete—

(i) fails to meet the institution's academic progress requirements for the degree program; or

(ii) violates the institution's code of conduct; and

(5) establish, not later than July 1, 2027, and thereafter maintain, at least 16 varsity sports teams and, if a recipient of Federal financial assistance, establish and maintain such teams in accordance with section 106.41(c) of title 34, Code of

67

**Federal Regulations (or successor regulations).**

(b) COLLABORATION.—An institution may carry out subsection (a) in conjunction with a conference or interstate intercollegiate athletic association.

(c) APPLICABILITY.—An institution is described in this subsection if such institution reports (as required under section 485(g) of the Higher Education Act of 1965 (20 U.S.C. 1092(g))) having generated not less than $20,000,000 (as adjusted on July 1 each year by the percentage increase (if any), during the preceding 12-month period, in the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics) in total revenue derived by the institution from the institution's intercollegiate athletics activities during the preceding academic year, as determined in accordance with paragraph (1)(I) of section 485(g) of the Higher Education Act of 1965 (20 U.S.C. 1092(g)), as amended by this Act.

(d) PROGRAM PARTICIPATION AGREEMENTS.—Section 487(a) of the Higher Edu-

68

cation Act of 1965 (20 U.S.C. 1094(a)) is amended by adding at the end the following:

"(30) In the case of an institution described in subsection (c) of section 5 of the SCORE Act, the institution will comply with subsection (a) of such section.".

SEC. 6. ROLES OF INTERSTATE INTERCOLLEGIATE ATHLETIC ASSOCIATIONS.

(a) AUTHORITY TO ESTABLISH RULES.—An interstate intercollegiate athletic association is authorized to establish and enforce rules with respect to—

(1) requiring a student athlete or prospective student athlete to disclose, in a timely manner, the terms of a name, image, and likeness agreement entered into by such student athlete;

(2) establishing and implementing a process to collect and publicly share aggregated and anonymized data related to the name, image, and likeness agreements of student athletes (without regard to whether such an agreement includes an institution as a party to the agreement);

69

(3) prohibited compensation, including processes for dispute resolution and penalties, if such rules provide that a student athlete does not lose eligibility to compete in intercollegiate athletic competitions while a process for dispute resolution is ongoing;

(4) setting parameters for the manner in which and the time period during which student athletes and prospective student athletes may be recruited for intercollegiate athletics;

(5) calculating a pool limit, if such rules provide that such pool limit is at least 22 percent of the average annual college sports revenue of the 70 highest earning (with respect to such revenue) member institutions of such interstate intercollegiate athletic association (or, if such interstate intercollegiate athletic association has fewer than 70 members, the average annual college sports revenue of all members), and monitoring payments of compensation related to such pool limit;

70

(6) setting parameters for the manner in which a student athlete may transfer between institutions, if such rules provide that—

(A) on at least 1 occasion each student athlete may transfer between institutions and be immediately eligible to participate on a varsity sports team of the institution to which the student athlete transfers (if academically eligible to participate); and

(B) an institution to which a student athlete is transferring or is considering transferring shall provide to such student athlete, at the request of such student athlete, in writing and at a reasonable time prior to completion of the transfer, a notice of the previously earned academic credits of such student athlete that such institution will accept, including with respect to the program of study of such student athlete;

(7) the length of time a student athlete is eligible to participate in intercolle-

71

giate athletics and the academic standards to be eligible to participate in intercollegiate athletics;

(8) establishing and implementing a process, including a database, with respect to agent registration, including—

(A) setting qualifications to be registered as an agent;

(B) setting parameters for the ability of member institutions to negotiate with agents who are not registered under such process; and

(C) limiting the amount of the compensation under a name, image, and likeness agreement between a student athlete and an institution that may be provided to the agent of such student athlete to not more than 5 percent of such compensation;

(9) the membership of, and participation in, such interstate intercollegiate athletic association (including any championships administered by such interstate intercollegiate athletic association), under which such interstate intercolle-

72

giate athletic association may establish membership qualifications, remove members, and otherwise regulate participation; and

(10) intercollegiate athletic competitions and playing seasons, including rules with respect to season length, maximum number of contests, and student athlete time demands (whether during a playing season or outside of such season).

(b) REQUIREMENTS.—

(1) AUTHORITY CONDITIONED ON COMPLIANCE.—An interstate intercollegiate athletic association is only authorized to establish and enforce rules under subsection (a) if such interstate intercollegiate athletic association is in compliance with this subsection and section 3.

(2) GOVERNANCE STRUCTURE.—An interstate intercollegiate athletic association (except for an interstate intercollegiate athletic association that is also a conference) shall carry out the following:

(A) Ensure that the membership of any board, committee, or other

73

similar body of such interstate inter-collegiate athletic association, if tasked with a decision-making role (including a decision-making role with respect to establishing or enforc-ing a rule under section 6(a)), satis-fies the following:

(i) Not less than 20 percent of the members of the board, com-mittee, or body are individuals who are student athletes or were student athletes at any point dur-ing the preceding 10-year period, with—

(I) men and women equal-ly represented with respect to such individuals; and

(II) each such individual participating in or having participated in a different sport.

(ii) Not less than 30 percent of the members of the board, com-mittee, or body represent institu-tions that are not among the 70

74

highest earning member institutions of such interstate intercollegiate athletic association with respect to annual college sports revenue.

(B) Establish a council to serve as the primary deliberative body of the interstate intercollegiate athletic association and that is—

(i) responsible for developing proposals with respect to policy; and

(ii) composed of individuals who represent each conference that is a member of such interstate intercollegiate athletic association.

SEC. 7. TITLE IX.

Nothing in this Act, or the amendments made by this Act, may be construed to limit or otherwise affect title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.).

SEC. 8. LIABILITY LIMITATION.

(a) IN GENERAL.—Adoption of, agreement to, compliance with, or enforcement of any

75

rule, regulation, requirement, standard, or other provision established pursuant to, or in compliance with, section 6 of this Act shall be treated as lawful under the antitrust laws and any similar State provision having the force and effect of law.

(b) RULE OF CONSTRUCTION.—Nothing in subsection (a) may be construed to limit or otherwise affect any provision of law, including any provision of Federal or State law or the common law, other than the antitrust laws and any similar State provision having the force and effect of law.

SEC. 9. EMPLOYMENT STANDING.

Notwithstanding any other provision of Federal or State law, no individual may be considered an employee of an institution, a conference, or an interstate intercollegiate athletic association based on the participation of such individual on a varsity sports team or in an intercollegiate athletic competition as a student athlete, without regard to the existence of rules or requirements for being a member of such team or for participating in such competition.

76

SEC. 10. STUDENT ATHLETIC FEES.

(a) TRANSPARENCY REQUIREMENTS.—

(1) INFORMATION DISSEMINATION ACTIVI-TIES.—Section 485(a)(1)(E) of the Higher Education Act of 1965 (20 U.S.C. 1092(a)(1)(E)) is amended by inserting "(including the amount of such fees used to support intercollegiate athletic programs)" after "and fees".

(2) DATA REQUIRED.—

(A) IN GENERAL.—Section 485(g) of the Higher Education Act of 1965 (20 U.S.C. 1092(g)) is amended—

(i) in paragraph (1), by adding at the end the following:

"(K) With respect to fees charged to students to support intercollegiate athletic programs—

"(i) the total amount of such fees charged to students;

"(ii) the uses of such fees with respect to facilities, operating ex-penses, scholarships, payments to athletes, salaries of coaches and support staff, and any other ex-

77

penses reported under this paragraph; and

"(iii) the percentage of the total cost of such programs covered by such fees."; and

(ii) in paragraph (3)—

(I) by striking the period at the end and inserting "; and";

(II) by striking "that all students" and inserting the following: "that—

"(A) all students"; and

(III) by adding at the end the following:

"(B) with respect to the information described in paragraph (1)(K), the institution shall annually publish such information on a publicly available website of the institution not later than October 15 following the end of each fiscal year of the institution.".

(B) EFFECTIVE DATE.—The amendments made by subparagraph (A)

78

shall take effect on July 1, 2026, and shall apply with respect to academic year 2026–2027 and each succeeding academic year.

(b) RESTRICTING STUDENT FEES FOR HIGH-MEDIA-RIGHTS-REVENUE INSTITUTIONS.—

(1) MEDIA RIGHTS REVENUES.—Section 485(g)(1)(I)(ii) of the Higher Education Act of 1965 (20 U.S.C. 1092(g)(1)(I)(ii)) is amended by striking "broadcast revenues" and inserting "media rights revenues (including revenues from broadcasting, streaming, or digital distribution of intercollegiate athletic events)".

(2) PROGRAM PARTICIPATION AGREEMENTS.—Section 487(a) of the Higher Education Act of 1965 (20 U.S.C. 1094(a)), as amended by this Act, is further amended by adding at the end the following:

"(31)(A) Beginning in academic year 2028–2029, and each succeeding academic year, the institution will determine the average annual media rights revenue of such institution by averaging the media rights revenues reported under section

79

485(g)(1)(I) for the second and third preceding academic years.

"(B) In the case of an institution with an average annual media rights revenue of $50,000,000 or more, as determined under subparagraph (A) for an academic year, the institution will not, for the first academic year that begins after such academic year, use student fees to support intercollegiate athletic programs (including with respect to facilities, operating expenses (as defined in section 485(g)(5)), scholarships, payments to athletes, salaries of coaches and support staff, and any other expenses reported under section 485(g)(1)).".

SEC. 11. PREEMPTION.

(a) IN GENERAL.—No State, or political subdivision of a State, may maintain, enforce, prescribe, or continue in effect any law, rule, regulation, requirement, standard, or other provision having the force and effect of law that conflicts with this Act, including the amendments made by this Act, and that—

80

(1) governs or regulates the compensation, payment, benefits, or employment status of a student athlete (including a prospective student athlete) with respect to participation in intercollegiate athletics, including any law, rule, regulation, requirement, standard, or other provision that—

(A) relates to the right of a student athlete to receive compensation or other payments or benefits directly or indirectly from any institution, associated entity or individual, conference, or interstate intercollegiate athletic association; or

(B) relates to the length of time a student athlete is eligible to participate in intercollegiate athletics or the academic standards to be eligible to participate in intercollegiate athletics;

(2) limits or restricts a right provided to an institution, a conference, or an interstate intercollegiate athletic association under this Act; or

81

(3) requires a release of or license to use the name, image, and likeness rights of any individual participant, or group of participants, in an intercollegiate athletic competition (or an individual spectator or group of spectators at an intercollegiate athletic competition) for purposes of audio-visual, audio, or visual broadcasts or other distributions of such intercollegiate athletic competition.

(b) RULE OF CONSTRUCTION.—Nothing in subsection (a) may be construed to—

(1) relieve any person of liability under a State law of general applicability that does not conflict with this Act, including the amendments made by this Act; or

(2) relieve any person of liability under common law.

SEC. 12. REPORTS.

(a) FEDERAL TRADE COMMISSION STUDY.—

(1) STUDY.—The Federal Trade Commission shall conduct a study to analyze the impacts of establishing a program, administered by an entity independent of

82

any institution, conference, or interstate intercollegiate athletic association, to develop standards for, certify as compliant with such standards, and otherwise regulate agents who enter into agreements with student athletes, which shall include an analysis of—

 (A) options for establishing such a program;

 (B) potential sources of funding for such a program;

 (C) a reasonable timeline for establishing such a program; and

 (D) the costs and benefits associated with such a program.

(2) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Federal Trade Commission shall submit to Congress a report on the results of the study conducted under paragraph (1), which shall include legislative recommendations with respect to the establishment and funding of the program described in such paragraph.

(b) COMPLIANCE REPORTING.—

83

**(1) BIENNIAL REPORT.—Not later than 180 days after the date of the enactment of this Act, and every 2 years thereafter, each interstate intercollegiate athletic association shall submit to Congress a report that includes—**

**(A) a summary of the issues faced by such interstate intercollegiate athletic association relating to compliance with this Act, including the amendments made by this Act;**

**(B) a summary of the trends among institutions, conferences, and interstate intercollegiate athletic associations relating to such compliance; and**

**(C) recommendations to improve the health, safety, and educational opportunities of student athletes.**

**(2) COMPTROLLER GENERAL REPORT.— Not later than 5 years after the date of the enactment of this Act, and every 5 years thereafter, the Comptroller General of the United States shall—**

84

(A) conduct an investigation with respect to compliance with this Act, including the amendments made by this Act; and

(B) submit to Congress a report that includes—

(i) a summary of the findings of the investigation conducted under subparagraph (A); and

(ii) recommendations to improve the health, safety, and educational opportunities of student athletes.

(c) STUDY ON OLYMPIC SPORTS.—

(1) IN GENERAL.—The Comptroller General of the United States shall conduct a study—

(A) to assess the impact of this Act on Olympic Sports, including the funding of Olympic Sports; and

(B) to develop recommendations for support of Olympic Sports, given the unique nature of Olympic Sports and intercollegiate athletics in the United States.

85

(2) CONTENTS.—The study conducted under paragraph (1) shall include—

(A) a survey of international models of support for Olympic Sports, including models that could be adapted to the unique nature of Olympic Sports and intercollegiate athletics in the United States;

(B) the projected scale and magnitude of potential support for Olympic Sports, given historic levels of support provided by institutions;

(C) the coordination required to develop and cultivate Olympic Sports at institutions; and

(D) an analysis of the trends with respect to roster sizes for Olympic Sports at institutions, with a focus on the top 70 highest earning institutions with respect to average annual college sports revenue.

(3) REPORT.—Not later than 2 years after the date of the enactment of this Act, the Comptroller General of the United States shall submit to Congress a

86

report on the results of the study conducted under paragraph (1).

(4) OLYMPIC SPORTS DEFINED.—In this subsection, the term "Olympic Sports" means the sports officially recognized and contested during the Summer and Winter Olympic Games.



# Presidential Documents

Executive Order 14322 of July 24, 2025

## Saving College Sports

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose and Policy.* College sports are a uniquely American institution that provide life-changing educational and leadership-development opportunities to more than 500,000 student-athletes through almost $4 billion in scholarships each year. College athletics also provide substantial support to local economies and form an indelible part of family activities, pastimes, and culture in many communities.

While major college football games can draw tens of millions of television viewers and attendees, they feature only a very small sample of the many athletes who benefit from the transformational opportunities that college athletics provide. Sixty-five percent of the 2024 United States Olympic Team members were current or former National Collegiate Athletic Association (NCAA) varsity athletes, and approximately seventy-five percent were collegiate athletes. The 2024 United States Olympic Team earned 126 total medals, leading the overall medal count for the eighth consecutive Summer Olympic Games.

Beyond driving our unrivaled success in international competition, college athletes are more likely to report better outcomes in important respects during college and after graduation. A substantial majority of female executives at the largest American companies participated in sports during adolescence, many at the high school or collegiate level, and examples of business leaders and former Presidents who played college sports are legion. It is no exaggeration to say that America's system of collegiate athletics plays an integral role in forging the leaders that drive our Nation's success.

Yet the future of college sports is under unprecedented threat. Waves of recent litigation against collegiate athletics governing rules have eliminated limits on athlete compensation, pay-for-play recruiting inducements, and transfers between universities, unleashing a sea change that threatens the viability of college sports. While changes providing some increased benefits and flexibility to student-athletes were overdue and should be maintained, the inability to maintain reasonable rules and guardrails is a mortal threat to most college sports.

To illustrate, following a 2021 antitrust ruling from the United States Supreme Court striking down NCAA restrictions, the NCAA changed its rules to permit players to receive compensation for their name, image, and likeness (NIL) from third parties. But guardrails designed to ensure that these were legitimate, market-value NIL payments for endorsements or similar services, rather than simply pay-for-play inducements, were eliminated through litigation. Other limits on player transfers among schools were also taken down through litigation.

This has created an out-of-control, rudderless system in which competing university donors engage in bidding wars for the best players, who can change teams each season. Meanwhile, more than 30 States have passed their own NIL laws in a chaotic race to the bottom, sometimes to gain temporary competitive advantages for their major collegiate teams. As a result, players at some universities will receive more than $50 million per year, mostly for the revenue-generating sports like football. Entering the 2024 season, players on the eventual college football national champion

team were being paid around $20 million annually. By the 2025 season, football players at one university will reportedly be paid $35–40 million, with revenue-sharing included.

This not only reduces competition and parity by creating an oligarchy of teams that can simply buy the best players—including the best players from less-wealthy programs at the end of each season—but the imperative that university donors must devote ever-escalating resources to compete in the revenue-generating sports like football and basketball siphons away the resources necessary to support the panoply of non-revenue sports. Absent guardrails to stop the madness and ensure a reasonable, balanced use of resources across collegiate athletic programs that preserves their educational and developmental benefits, many college sports will soon cease to exist.

A national solution is urgently needed to prevent this situation from deteriorating beyond repair and to protect non-revenue sports, including many women's sports, that comprise the backbone of intercollegiate athletics, drive American superiority at the Olympics and other international competitions, and catalyze hundreds of thousands of student-athletes to fuel American success in myriad ways.

Attempting to create some guardrails and shelter from litigation, colleges have adopted a new regime, deciding to pay athletes directly and simultaneously limit the total number of athletes on their campuses. Given that the new roster limits, by exceeding the scholarship limits they replace, will increase the potential number of scholarships available in many sports, this opportunity must be utilized to strengthen and expand non-revenue sports. Simultaneously, the third-party market of pay-for-play inducements must be eliminated before its insatiable demand for resources dries up support for non-revenue sports. Otherwise, a crucial American asset will be lost.

It is the policy of my Administration that all college sports should be preserved and, where possible, expanded. My Administration will therefore provide the stability, fairness, and balance necessary to protect student-athletes, collegiate athletic scholarships and opportunities, and the special American institution of college sports. It is common sense that college sports are not, and should not be, professional sports, and my Administration will take action accordingly.

**Sec. 2**. *Protecting and Expanding Women's and Non-Revenue Sports and Prohibiting Third-Party Pay-for-Play Payments.* (a) It is the policy of the executive branch that opportunities for scholarships and collegiate athletic competition in women's and non-revenue sports must be preserved and, where possible, expanded, including specifically as follows with respect to the 2025–2026 athletic season and future athletic seasons:

(i) collegiate athletic departments with greater than $125,000,000 in revenue during the 2024–2025 athletic season should provide more scholarship opportunities in non-revenue sports than during the 2024–2025 athletic season and should provide the maximum number of roster spots for non-revenue sports permitted under the applicable collegiate athletic rules;

(ii) college athletic departments with greater than $50,000,000 in revenue during the 2024–2025 athletic season should provide at least as many scholarship opportunities in non-revenue sports as provided during the 2024–2025 athletic season and should provide the maximum number of roster spots for non-revenue sports permitted under the applicable collegiate athletic rules; and

(iii) college athletic departments with $50,000,000 or less in revenue during the 2024–2025 athletic season or that do not have any revenue-generating sports should not disproportionately reduce scholarship opportunities or roster spots for sports based on the revenue that the sport generates.

(b) It is the policy of the executive branch that any revenue-sharing permitted between universities and collegiate athletes should be designed and

implemented in a manner that preserves or expands scholarships and collegiate athletic opportunities in women's and non-revenue sports.

(c) To preserve the critical educational and developmental benefits of collegiate athletics for our Nation, it is the policy of the executive branch that third-party, pay-for-play payments to collegiate athletes are improper and should not be permitted by universities. This policy does not apply to compensation provided to an athlete for the fair market value that the athlete provides to a third party, such as for a brand endorsement.

(d) Within 30 days of the date of this order, the Secretary of Education, in consultation with the Attorney General, the Secretary of Health and Human Services, the Secretary of Education, and the Chairman of the Federal Trade Commission, shall develop a plan to advance the policies set forth in subsections (a)–(c) of this section through all available and appropriate regulatory, enforcement, and litigation mechanisms, including Federal funding decisions, enforcement of Title IX of the Education Amendments Act of 1972, prohibiting unconstitutional actions by States to regulate interstate commerce, and enforcement of other constitutional and statutory protections, and by working with the Congress and State governments, as appropriate.

**Sec. 3**. *Student-Athlete Status.* The Secretary of Labor and the National Labor Relations Board shall determine and implement the appropriate measures with respect to clarifying the status of collegiate athletes, including through guidance, rules, or other appropriate actions, that will maximize the educational benefits and opportunities provided by higher education institutions through athletics.

**Sec. 4**. *Legal Protections for College Athletics from Lawsuits.* (a) The Attorney General and the Chairman of the Federal Trade Commission shall work to stabilize and preserve college athletics through litigation, guidelines, policies, or other actions, as appropriate, by protecting the rights and interests of student-athletes and the long-term availability of collegiate athletic scholarships and opportunities when such elements are unreasonably challenged under antitrust or other legal theories.

(b) Within 60 days of the date of this order, to advance the purposes of subsection (a) of this section, the Attorney General and the Chairman of the Federal Trade Commission shall:

(i) review, and as necessary revise, litigation positions, guidelines, policies, or other actions; and

(ii) develop a plan to implement appropriate future litigation positions, guidelines, policies, or other actions.

**Sec. 5**. *Protecting Development of the United States Olympic Team.* The Assistant to the President for Domestic Policy and the Director of the White House Office of Public Liaison shall consult the United States Olympic and Paralympic Committee and other appropriate organizations of American athletes about safeguarding the integral role and competitive advantage that American collegiate athletics provide in developing athletes to represent our Nation in international athletic competitions.

**Sec. 6**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

**35824**    **Federal Register**/Vol. 90, No. 143/Tuesday, July 29, 2025/Presidential Documents

(d) The costs for publication of this order shall be borne by the Department of Education.

THE WHITE HOUSE,
*July 24, 2025.*

[FR Doc. 2025–14392
Filed 7–28–25; 11:15 am]
Billing code 4000–01–P

PRESIDENTIAL ACTIONS

URGENT NATIONAL ACTION TO SAVE COLLEGE SPORTS

Executive Orders

April 3, 2026

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose and Policy.  America's system of college sports has long provided scholarships and life-changing educational, athletic, and leadership opportunities to millions of America's future leaders and formed an important part of our national fabric.  In July, I signed an Executive Order to protect college sports from endless lawsuits and destabilizing financial obligations that could jeopardize women's and Olympic sports, but it has become clear that more comprehensive executive action is required before college sports are lostforever.  College football is the primary revenue generator for university athletic departments, including revenue to support women's and Olympic sports, and is used by many universities to attract students, donations, and goodwill as millions of Americans gather with families and friends to watch each Saturday.  These factors place enormous pressure on many universities to be competitive in football.  The same dynamic exists for basketball to a lesser degree.  Amid this pressure, the rules governing pay-for-play, eligibility, and other aspects of college athletics have been substantially loosened through a number of judicial rulings.  Additional rules that could institute order and consistency in these systems have been nullified by some State legislatures that are incentivized to advantage their own State's universities in the competitive market for student-athletes by minimizing barriers to recruitment.  This

**091**

chaotic state of affairs has undermined competition, reduced opportunities for student-athletes, and jeopardized support for the current range of college athletics, particularly women's and Olympic sports.  Fair competition cannot occur without a consistent set of rules concerning pay-for-play or player eligibility that cannot be endlessly relitigated in court.  The convergence of enormous pressure to win in football and basketball and the loosening, both by litigation and by State legislation, of consistent rules or limits concerning eligibility, transfers, and pay-for-play schemes has created an out-of-control financial arms race in these sports that is driving universities into debt, threatening to siphon resources from other sports, and damaging student-athletes' educational and graduation opportunities.  The athletics-related financial threats these crucial universities face are substantial: Already, one major athletic program closed fiscal year 2025 with $535 million in athletics-related debt, and another has $437 million in such debt, while others face enormous annual athletics-related deficits.  These financial perils will inevitably siphon funds from universities' educational and research purposes, which could impact their capabilities and responsibilities as Federal contractors and grantees.

Absent a comprehensive national solution, therefore, the escalating financial demands to

THE WHITE HOUSE

WASHINGTON

NEWS    GALLERY    LIVESTREAM    INVESTMENTS    SAVE AMERICA    MOBILE APP    CONTACT

research contractors for the Department of War, important medical research contractors for the Department of Health and Human Services, and important scientific research contractors for the National Science Foundation. The health of the university system is integral to the Federal Government's basic functioning.

Further, without a national solution to protect the future of competition and opportunity in all college sports, it is possible that the largest college football programs will be forced to seek stability through a negotiated solution that may result in the withdrawal of financial and other resources from women's and Olympic sports.

The Congress is strongly encouraged to expeditiously pass legislation that satisfactorily addresses these issues.  But further delay is not an option given what is at stake — the 500,000 annual educational, athletic, and leadership-development opportunities that provide almost $4 billion in scholarships.  This executive action will preserve college sports for future generations.

Sec. 2. Effective Date.  Sections 3 through 6 of this order shall be effective on August 1, 2026.  Agencies shall immediately begin work to ensure that appropriate regulatory or policymaking measures will be in place by the effective date so that the requirements of the operative sections can be implemented as soon after the effective date as possible.

Sec. 3. Definitions.  For the purposes of this order:

(a) "Improper financial activities" means the following actions taken by a federally-funded higher education institution, including its officers, agents, affiliates, or representatives:

(i)  intentionally devising or participating in a fraudulent name, image, and likeness (NIL) scheme;

(ii)  knowingly accepting contributions, financial or otherwise, from persons who intentionally devise or participate in a fraudulent NIL scheme;

(iii) using Federal funds for NIL or revenue-sharing payments or for any type of payment or benefit to a coach, assistant coach, general manager, recruiter, or other person engaged in coaching or managing an athletic team; and

(iv)  tortiously interfering with a contract between a student-athlete and another federally-funded higher education institution, including a scholarship agreement;

(b) "Fraudulent NIL scheme" means a scheme to pay for goods or services, including NIL services, above the actual fair market value of those goods or services in connection with a student-athlete's participation in intercollegiate athletics, including through the use of collectives or similar entities.  The term does not include:

(i)  revenue sharing between a higher education institution and a student-athlete that is consistent with interstate intercollegiate athletic governing body rules; or

(ii) fair market value compensation provided for the NIL rights of a student-athlete by a third-party not affiliated with the athletic department of a higher education institution for a valid business purpose that is related to the promotion or endorsement of goods or services provided to the general public for profit and that is not tied to participation in the athletics program of a particular higher education institution, at rates and terms commensurate with compensation paid to individuals with NIL rights of comparable value who are not student-athletes at the applicable higher education institution;

(c) "Higher education institution" has the meaning given the term "institution of higher education" in section 101 of the Higher Education Act of 1965 (20 U.S.C. 1001), provided that this term only includes an institution that reports (as required under section 485(g) of the Higher Education Act of 1965 (20 U.S.C. 1092(g))) having generated not less than $20,000,000 in total revenue (as adjusted on July 1 each year by the percentage increase, if any, during the preceding 12-month period, in the Consumer Price Index for All Urban Consumers published by the U.S. Bureau of Labor Statistics) derived by the institution from the institution's intercollegiate athletics activities during the preceding academic year, as determined in accordance with paragraph (1)(I) of section 485(g) of the Higher Education Act of 1965 (20 U.S.C. 1092(g)); and

(d) "Interstate intercollegiate athletic governing body" means the entity that sets common rules, standards, procedures, or guidelines for the administration and regulation of varsity sports

teams and intercollegiate athletic competitions, but that is not an intercollegiate athletic conference, provided that the governing body may include persons affiliated with an intercollegiate athletic conference.

Sec. 4. Protecting Women's and Olympic Sports and Preserving Higher Education Financial Responsibility. (a)(i) Agency heads that contract with or provide grants to higher education institutions, shall, as appropriate, evaluate violations of the applicable, lawful, and operative interstate intercollegiate athletic governing body rules in effect as of August 1, 2026, concerning the following, to determine whether they are a cause so serious or compelling in nature to affect the present responsibility of the recipient:

(A) eligibility limits;

(B) transfers between institutions;

(C) revenue-sharing permitted between higher education institutions and student-athletes; and

(D) permissible and improper financial activities.

(ii) The Director of the Office of Management and Budget, in consultation with the Administrator of General Services, shall issue guidance to contracting and grantmaking agencies to ensure compliance with this order and to reinforce the suspension and debarment policy regarding violations of the rules described in subsection 4(a)(i) of this section.

(b) The interstate intercollegiate athletic governing bodyfor higher education institutions should, in consultation with student-athletes and in its discretion, update or clarify itsrules before August 1, 2026, as appropriate, to adequately protect opportunities for scholarships and collegiate athletic competition in women's and Olympic sports and ensure the financial stability of higher education institutions, including by establishing the following, to the extent permitted by lawand applicable court orders:

(i)  age-based eligibility limits to promote fairness, consistency, safety, and opportunities for student-athletes under which:

(A) participation in college athletics is permitted for no more than a five-year period, with limited exceptions for military service, missionary service, and other periods of absence from participation that are in the public interest; and

(B) professional athletes cannot return to college athletics;

(ii)  transfer-related rules that:

(A) provide for the ability to transfer one timeduring the five-year period with immediate playing eligibility, and one additional such time if the student-athlete obtains a four-year degree;

(B) prioritize the academic development, success, graduation, and long-term well-being of student-athletes; and

(C) ensure that the transfer window does not incentivize interference with athletic seasons or the academic year, or otherwise undermine the integrity of participation and competition

094

in college athletics;

(iii) medical care for student-athletes for intercollegiate-athletics-related injuries during their period of enrollment and for a reasonable period of time thereafter;

(iv) the implementation of revenue-sharing between higher education institutions and student-athletes in a manner that preserves or expands scholarships and collegiate athletic opportunities in women's and Olympic sports, including through provisions toprevent revenue-sharing from being allocated in a manner that results in a reduction in scholarships and opportunities in women's and Olympic sports;

(v) a prohibition on the use of Federal funds by higher education institutions for NIL or revenue-sharing payments or coaching or athletic compensation, in accordance with any applicable Federal law and Federal contract terms;

(vi) a prohibition on improper financial activitiesregarding student-athletes, including collectives orother entities or methods used to facilitate third-party, pay-for-play payments; and

(vii) a national student-athlete agent registry and reasonable protections for student-athletes from excessive agent commissions.

(c) To aid contracting and grantmaking agencies'compliance with subsection 4(a) of this section, the Administrator of General Services shall propose, consistent with law, an appropriate, regular collection of information to evaluate compliance with the rules covered by subsection (a)(i)(A)–(D) of this section for completion by appropriate higher education institution officials.

(d) The Secretary of Education shall consider takingappropriate action, including through rulemaking where necessary, to require regular reporting by higher education institutions that includes:

(i) the total number of roster spots by varsity team, as of the day of the first scheduled contest for the team; and

(ii) the total amount of money spent on athletically related student aid or other payments, separately for men's and women's teams overall.

(e) The Chairman of the Federal Trade Commission shall take appropriate action to enforce 15 U.S.C. 45 and 15 U.S.C. 7801–7807 with respect to violations by student-athlete agents and related individuals or entities.

Sec. 5. Legal Actions to Invalidate Certain State Laws. (a) The Attorney General shall take appropriate measures to further meritorious actions to invalidate State laws that conflict with interstate intercollegiate athletic governing body rules and:

(i) discriminate against out-of-state commerce or unduly burden or impede interstate commerce in violation of Article I, Section 8, Clause 3 of the Constitution of the United States;

(ii) impair a contractual relationship in violation of Article I, Section 10, Clause 1 of the

Constitution of the United States; or

(iii) are otherwise invalid under Federal law.

Sec. 6. Consultation. Relevant White House components and executive departments and agencies are encouraged to, as appropriate and consistent with applicable law, consider input from appropriate leaders in collegiate athletics and administration and other experts regarding effective implementation of this order.

Sec. 7. Severability. If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

Sec. 8. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executivedepartment or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) The costs for publication of this order shall be borne by the Department of Education.

DONALD J. TRUMP

THE WHITE HOUSE,

April 3, 2026.

Related

Saving College Sports

Presidential Actions, Executive Orders | July 24, 2025

Fact Sheet: President Donald J. Trump Takes Urgent National Action to Save College Sports

Fact Sheets | April 3, 2026


§ 1655                    TITLE 20—EDUCATION                    Page 1054

court order, may seek to reopen or intervene in the further implementation of such court order, currently in effect, if the time or distance of travel is so great as to risk the health of the student or significantly impinge on his or her educational process.

(Pub. L. 92–318, title VIII, § 804, June 23, 1972, 86 Stat. 372.)

### § 1655. Uniform rules of evidence of racial discrimination

The rules of evidence required to prove that State or local authorities are practicing racial discrimination in assigning students to public schools shall be uniform throughout the United States.

(Pub. L. 92–318, title VIII, § 805, June 23, 1972, 86 Stat. 372.)

### § 1656. Prohibition against official or court orders to achieve racial balance or insure compliance with constitutional standards applicable to entire United States

The proviso of section 407(a) of the Civil Rights Act of 1964 [42 U.S.C. 2000c–6(a)] providing in substance that no court or official of the United States shall be empowered to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards shall apply to all public school pupils and to every public school system, public school and public school board, as defined by title IV [42 U.S.C. 2000c et seq.], under all circumstances and conditions and at all times in every State, district, territory, Commonwealth, or possession of the United States regardless of whether the residence of such public school pupils or the principal offices of such public school system, public school or public school board is situated in the northern, eastern, western, or southern part of the United States.

(Pub. L. 92–318, title VIII, § 806, June 23, 1972, 86 Stat. 373.)

#### Editorial Notes

##### REFERENCES IN TEXT

The Civil Rights Act of 1964, referred to in text, is Pub. L. 88–352, July 2, 1964, 78 Stat. 241. Title IV of the Civil Rights Act of 1964 is classified generally to subchapter IV (§ 2000c et seq.) of chapter 21 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of Title 42 and Tables.

### CHAPTER 38—DISCRIMINATION BASED ON SEX OR BLINDNESS

Sec.
1681.    Sex.
1682.    Federal administrative enforcement; report to Congressional committees.
1683.    Judicial review.
1684.    Blindness or visual impairment; prohibition against discrimination.
1685.    Authority under other laws unaffected.
1686.    Interpretation with respect to living facilities.
1687.    Interpretation of "program or activity".
1688.    Neutrality with respect to abortion.
1689.    Task Force on Sexual Violence in Education.

### § 1681. Sex

#### (a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

##### (1) Classes of educational institutions subject to prohibition

in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

##### (2) Educational institutions commencing planned change in admissions

in regard to admissions to educational institutions, this section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education, whichever is the later;

##### (3) Educational institutions of religious organizations with contrary religious tenets

this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization;

##### (4) Educational institutions training individuals for military services or merchant marine

this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine;

##### (5) Public educational institutions with traditional and continuing admissions policy

in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and continually from its establishment has had a policy of admitting only students of one sex;

**(6) Social fraternities or sororities; voluntary youth service organizations**

this section shall not apply to membership practices—

(A) of a social fraternity or social sorority which is exempt from taxation under section 501(a) of title 26, the active membership of which consists primarily of students in attendance at an institution of higher education, or

(B) of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

**(7) Boy or Girl conferences**

this section shall not apply to—

(A) any program or activity of the American Legion undertaken in connection with the organization or operation of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(B) any program or activity of any secondary school or educational institution specifically for—

(i) the promotion of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(ii) the selection of students to attend any such conference;

**(8) Father-son or mother-daughter activities at educational institutions**

this section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex; and

**(9) Institution of higher education scholarship awards in "beauty" pageants**

this section shall not apply with respect to any scholarship or other financial assistance awarded by an institution of higher education to any individual because such individual has received such award in any pageant in which the attainment of such award is based upon a combination of factors related to the personal appearance, poise, and talent of such individual and in which participation is limited to individuals of one sex only, so long as such pageant is in compliance with other nondiscrimination provisions of Federal law.

**(b) Preferential or disparate treatment because of imbalance in participation or receipt of Federal benefits; statistical evidence of imbalance**

Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: *Provided*, That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

**(c) "Educational institution" defined**

For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department.

(Pub. L. 92–318, title IX, §901, June 23, 1972, 86 Stat. 373; Pub. L. 93–568, §3(a), Dec. 31, 1974, 88 Stat. 1862; Pub. L. 94–482, title IV, §412(a), Oct. 12, 1976, 90 Stat. 2234; Pub. L. 96–88, title III, §301(a)(1), title V, §507, Oct. 17, 1979, 93 Stat. 677, 692; Pub. L. 99–514, §2, Oct. 22, 1986, 100 Stat. 2095.)

### Editorial Notes

#### REFERENCES IN TEXT

This chapter, referred to in subsecs. (b) and (c), was in the original "this title", meaning title IX of Pub. L. 92–318 which enacted this chapter and amended sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare. For complete classification of title IX to the Code, see Short Title note below and Tables.

#### AMENDMENTS

1986—Subsec. (a)(6)(A). Pub. L. 99–514 substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

1976—Subsec. (a)(6) to (9). Pub. L. 94–482 substituted "this" for "This" in par. (6) and added pars. (7) to (9).

1974—Subsec. (a)(6). Pub. L. 93–568 added par. (6).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1976 AMENDMENT

Pub. L. 94–482, title IV, §412(b), Oct. 12, 1976, 90 Stat. 2234, provided that: "The amendment made by subsection (a) [amending this section] shall take effect upon the date of enactment of this Act [Oct. 12, 1976]."

#### EFFECTIVE DATE OF 1974 AMENDMENT

Pub. L. 93–568, §3(b), Dec. 31, 1974, 88 Stat. 1862, provided that: "The provisions of the amendment made by subsection (a) [amending this section] shall be effective on, and retroactive to, July 1, 1972."

#### SHORT TITLE OF 1988 AMENDMENT

Pub. L. 100–259, §1, Mar. 22, 1988, 102 Stat. 28, provided that: "This Act [enacting sections 1687 and 1688 of this title and section 2000d–4a of Title 42, The Public Health and Welfare, amending sections 706 and 794 of Title 29, Labor, and section 6107 of Title 42, and enacting provisions set out as notes under sections 1687 and 1688 of this title] may be cited as the 'Civil Rights Restoration Act of 1987'."

SHORT TITLE

Pub. L. 107–255, Oct. 29, 2002, 116 Stat. 1734, provided "That title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.; Public Law 92–318) [title IX of Pub. L. 92–318, enacting this chapter and amending sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare] may be cited as the 'Patsy Takemoto Mink Equal Opportunity in Education Act'.''

TRANSFER OF FUNCTIONS

"Secretary" substituted for "Commissioner" in subsec. (a)(2) pursuant to sections 301(a)(1) and 507 of Pub. L. 96–88, which are classified to sections 3441(a)(1) and 3507 of this title and which transferred functions of Commissioner of Education to Secretary of Education.

REGULATIONS; NATURE OF PARTICULAR SPORTS: INTERCOLLEGIATE ATHLETIC ACTIVITIES

Pub. L. 93–380, title VIII, § 844, Aug. 21, 1974, 88 Stat. 612, directed Secretary to prepare and publish, not more than 30 days after Aug. 21, 1974, proposed regulations implementing the provisions of this chapter regarding prohibition of sex discrimination in federally assisted programs, including reasonable regulations for intercollegiate athletic activities considering the nature of the particular sports.

**Executive Documents**

COORDINATION OF IMPLEMENTATION AND ENFORCEMENT OF PROVISIONS

For provisions relating to the coordination of implementation and enforcement of the provisions of this chapter by the Attorney General, see section 1–201(b) of Ex. Ord. No. 12250, Nov. 2, 1980, 45 F.R. 72995, set out under section 2000d–1 of Title 42, The Public Health and Welfare.

EX. ORD. NO. 14021. GUARANTEEING AN EDUCATIONAL ENVIRONMENT FREE FROM DISCRIMINATION ON THE BASIS OF SEX, INCLUDING SEXUAL ORIENTATION OR GENDER IDENTITY

Ex. Ord. No. 14021, Mar. 8, 2021, 86 F.R. 13803, provided:
By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:
SECTION 1. *Policy.* It is the policy of my Administration that all students should be guaranteed an educational environment free from discrimination on the basis of sex, including discrimination in the form of sexual harassment, which encompasses sexual violence, and including discrimination on the basis of sexual orientation or gender identity. For students attending schools and other educational institutions that receive Federal financial assistance, this guarantee is codified, in part, in Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq.*, which prohibits discrimination on the basis of sex in education programs or activities receiving Federal financial assistance.
SEC. 2. *Review of Agency Actions.* (a) Within 100 days of the date of this order [Mar. 8, 2021], the Secretary of Education, in consultation with the Attorney General, shall review all existing regulations, orders, guidance documents, policies, and any other similar agency actions (collectively, agency actions) that are or may be inconsistent with the policy set forth in section 1 of this order, and provide the findings of this review to the Director of the Office of Management and Budget.
(i) As part of the review required under subsection (a) of this section, the Secretary of Education shall review the rule entitled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 85 FR 30026 (May 19, 2020), and any other agency actions taken pursuant to that rule, for consistency with governing law, including Title IX, and with the policy set forth in section 1 of this order.

(ii) As soon as practicable, and as appropriate and consistent with applicable law, the Secretary of Education shall review existing guidance and issue new guidance as needed on the implementation of the rule described in subsection (a)(i) of this section, for consistency with governing law, including Title IX, and with the policy set forth in section 1 of this order.
(iii) The Secretary of Education shall consider suspending, revising, or rescinding—or publishing for notice and comment proposed rules suspending, revising, or rescinding—those agency actions that are inconsistent with the policy set forth in section 1 of this order as soon as practicable and as appropriate and consistent with applicable law, and may issue such requests for information as would facilitate doing so.
(b) The Secretary of Education shall consider taking additional enforcement actions, as appropriate and consistent with applicable law, to enforce the policy set forth in section 1 of this order as well as legal prohibitions on sex discrimination in the form of sexual harassment, which encompasses sexual violence, to the fullest extent permissible under law; to account for intersecting forms of prohibited discrimination that can affect the availability of resources and support for students who have experienced sex discrimination, including discrimination on the basis of race, disability, and national origin; to account for the significant rates at which students who identify as lesbian, gay, bisexual, transgender, and queer (LGBTQ+) are subject to sexual harassment, which encompasses sexual violence; to ensure that educational institutions are providing appropriate support for students who have experienced sex discrimination; and to ensure that their school procedures are fair and equitable for all.
SEC. 3. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:
(i) the authority granted by law to an executive department or agency, or the head thereof; or
(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.
(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.
(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN, JR.

### § 1682. Federal administrative enforcement; report to Congressional committees

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or

part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

(Pub. L. 92–318, title IX, § 902, June 23, 1972, 86 Stat. 374.)

#### Executive Documents

##### DELEGATION OF FUNCTIONS

Functions of President relating to approval of rules, regulations, and orders of general applicability under this section, delegated to Attorney General, see section 1–102 of Ex. Ord. No. 12250, Nov. 2, 1980, 45 F.R. 72995, set out under section 2000d–1 of Title 42, The Public Health and Welfare.

### § 1683. Judicial review

Any department or agency action taken pursuant to section 1682 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of section 701 of that title.

(Pub. L. 92–318, title IX, § 903, June 23, 1972, 86 Stat. 374.)

#### Editorial Notes

##### CODIFICATION

''Section 1682 of this title'', where first appearing, substituted in text for ''section 1002'' as conforming to intent of Congress as Pub. L. 92–318 was enacted without any section 1002 and subsequent text refers to ''section 902'', which is classified to section 1682 of this title.

### § 1684. Blindness or visual impairment; prohibition against discrimination

No person in the United States shall, on the ground of blindness or severely impaired vision, be denied admission in any course of study by a recipient of Federal financial assistance for any education program or activity, but nothing herein shall be construed to require any such institution to provide any special services to such person because of his blindness or visual impairment.

(Pub. L. 92–318, title IX, § 904, June 23, 1972, 86 Stat. 375.)

### § 1685. Authority under other laws unaffected

Nothing in this chapter shall add to or detract from any existing authority with respect to any program or activity under which Federal financial assistance is extended by way of a contract of insurance or guaranty.

(Pub. L. 92–318, title IX, § 905, June 23, 1972, 86 Stat. 375.)

#### Editorial Notes

##### REFERENCES IN TEXT

This chapter, referred to in text, was in the original ''this title'', meaning title IX of Pub. L. 92–318 which enacted this chapter and amended sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare. For complete classification of title IX to the Code, see Short Title note set out under section 1681 of this title and Tables.

### § 1686. Interpretation with respect to living facilities

Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.

(Pub. L. 92–318, title IX, § 907, June 23, 1972, 86 Stat. 375.)

#### Editorial Notes

##### REFERENCES IN TEXT

This chapter, referred to in text, was in the original ''this title'', meaning title IX of Pub. L. 92–318 which enacted this chapter and amended sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare. For complete classification of title IX to the Code, see Short Title note set out under section 1681 of this title and Tables.

This Act, referred to in text, is Pub. L. 92–318, June 23, 1972, 86 Stat. 235, known as the Education Amendments of 1972. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of this title and Tables.

### § 1687. Interpretation of "program or activity"

For the purposes of this chapter, the term ''program or activity'' and ''program'' mean all of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

(2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or

(B) a local educational agency (as defined in section section[1] 7801 of this title), system of vocational education, or other school system;

(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship—

(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

(ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance, except that such term does not include any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization.

(Pub. L. 92–318, title IX, § 908, as added Pub. L. 100–259, § 3(a), Mar. 22, 1988, 102 Stat. 28; amended Pub. L. 103–382, title III, § 391(g), Oct. 20, 1994, 108 Stat. 4023; Pub. L. 107–110, title X, § 1076(j), Jan. 8, 2002, 115 Stat. 2091; Pub. L. 114–95, title IX, § 9215(bb), Dec. 10, 2015, 129 Stat. 2173.)

### Editorial Notes

#### REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this title", meaning title IX of Pub. L. 92–318 which enacted this chapter and amended sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare. For complete classification of title IX to the Code, see Short Title note set out under section 1681 of this title and Tables.

#### AMENDMENTS

2015—Par. (2)(B). Pub. L. 114–95 substituted "section 7801 of this title), system of vocational education, or other school system;" for "7801 of this title), system of vocational education, or other school system;".

2002—Par. (2)(B). Pub. L. 107–110 substituted "7801" for "8801".

1994—Par. (2)(B). Pub. L. 103–382 substituted "section 8801" for "section 2854(a)(10)".

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2015 AMENDMENT

Amendment by Pub. L. 114–95 effective Dec. 10, 2015, except with respect to certain noncompetitive programs and competitive programs, see section 5 of Pub. L. 114–95, set out as a note under section 6301 of this title.

#### EFFECTIVE DATE OF 2002 AMENDMENT

Amendment by Pub. L. 107–110 effective Jan. 8, 2002, except with respect to certain noncompetitive pro-

[1] So in original.

grams and competitive programs, see section 5 of Pub. L. 107–110, set out as an Effective Date note under section 6301 of this title.

#### FINDINGS OF CONGRESS

Pub. L. 100–259, § 2, Mar. 22, 1988, 102 Stat. 28, provided that: "The Congress finds that—

"(1) certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], and title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.]; and

"(2) legislative action is necessary to restore the prior consistent and long-standing executive branch interpretation and broad, institution-wide application of those laws as previously administered."

#### CONSTRUCTION

Pub. L. 100–259, § 7, Mar. 22, 1988, 102 Stat. 31, provided that: "Nothing in the amendments made by this Act [see Short Title of 1988 Amendment note under section 1681 of this title] shall be construed to extend the application of the Acts so amended [Education Amendments of 1972, Pub. L. 92–318, see Short Title of 1972 Amendment, set out as a note under section 1001 of this title, Rehabilitation Act of 1973, 29 U.S.C. 701 et seq., Age Discrimination Act of 1975, 42 U.S.C. 6101 et seq., and Civil Rights Act of 1964, 42 U.S.C. 2000a et seq.] to ultimate beneficiaries of Federal financial assistance excluded from coverage before the enactment of this Act [Mar. 22, 1988]."

#### ABORTION NEUTRALITY

This section not to be construed to force or require any individual or hospital or any other institution, program, or activity receiving Federal funds to perform or pay for an abortion, see section 8 of Pub. L. 100–259, set out as a note under section 1688 of this title.

## § 1688. Neutrality with respect to abortion

Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion. Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion.

(Pub. L. 92–318, title IX, § 909, as added Pub. L. 100–259, § 3(b), Mar. 22, 1988, 102 Stat. 29.)

### Editorial Notes

#### REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this title", meaning title IX of Pub. L. 92–318 which enacted this chapter and amended sections 203 and 213 of Title 29, Labor, and sections 2000c, 2000c–6, 2000c–9, and 2000h–2 of Title 42, The Public Health and Welfare. For complete classification of title IX to the Code, see Short Title note set out under section 1681 of this title and Tables.

### Statutory Notes and Related Subsidiaries

#### CONSTRUCTION

This section not to be construed to extend application of Education Amendments of 1972, Pub. L. 92–318, to ultimate beneficiaries of Federal financial assistance excluded from coverage before Mar. 22, 1988, see section 7 of Pub. L. 100–259, set out as a note under section 1687 of this title.

ABORTION NEUTRALITY

Pub. L. 100–259, § 8, Mar. 22, 1988, 102 Stat. 31, provided that: ''No provision of this Act or any amendment made by this Act [see Short Title of 1988 Amendment note under section 1681 of this title] shall be construed to force or require any individual or hospital or any other institution, program, or activity receiving Federal Funds [sic] to perform or pay for an abortion.''

## § 1689. Task Force on Sexual Violence in Education

### (a) Task Force on Sexual Violence in Education

Not later than September 1, 2022, the Secretary of Education, the Secretary of Health and Human Services, and the Attorney General shall establish a joint interagency task force to be known as the ''Task Force on Sexual Violence in Education'' that shall—

(1) provide pertinent information to the Secretary of Education, the Attorney General, Congress, and the public with respect to campus sexual violence prevention, investigations, and responses, including the creation of consistent, public complaint processes for violations of title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) and section 1092(f) of this title;

(2) provide recommendations to educational institutions for establishing sexual assault prevention and response teams;

(3) develop recommendations for educational institutions on providing survivor resources, including health care, sexual assault kits, sexual assault nurse examiners, culturally responsive and inclusive standards of care, trauma-informed services, and access to confidential advocacy and support services;

(4) develop recommendations in conjunction with student groups for best practices for responses to and prevention of sexual violence and dating violence for educational institutions, taking into consideration an institution's size and resources;

(5) develop recommendations for educational institutions on sex education, as appropriate, training for school staff, and various equitable discipline models;

(6) develop recommendations on culturally responsive and inclusive approaches to supporting survivors, which include consideration of race, ethnicity, national origin, religion, immigrant status, lesbian, gay, bisexual, or transgender (commonly referred to as ''LGBT'') status, ability, disability, socio-economic status, exposure to trauma, and other compounding factors;

(7) solicit periodic input from a diverse group of survivors, trauma specialists, advocates from national, State, and local anti-sexual violence advocacy organizations, institutions of higher education, and other public stakeholders;

(8) assess the Department of Education's ability under section 902 of the Education Amendments of 1972 (20 U.S.C. 1682) to levy intermediate fines for noncompliance with title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) and the advisability of additional remedies for such noncompliance, in addition to the remedies already available under Federal law; and

(9) create a plan described in subsection (c).

### (b) Personnel details

#### (1) Authority to detail

Notwithstanding any other provision of law, the head of a component of any Federal agency for which appropriations are authorized under the Violence Against Women Act of 1994 (34 U.S.C. 13925 et seq.), or any amendments made by that Act, may detail an officer or employee of such component to the Task Force on Sexual Violence in Education or to the Secretary of Education to assist the Task Force with the duties described in subsection (a), as jointly agreed to by the head of such component and the Task Force.

#### (2) Terms of detail

A personnel detail made under paragraph (1) may be made—

(A) for a period of not more than 3 years; and

(B) on a reimbursable or nonreimbursable basis.

### (c) Additional plan

Not later than 90 days after the date on which the Task Force on Sexual Violence in Education is established under subsection (a), the Task Force shall submit to Congress recommendations for recruiting, retaining, and training a highly-qualified workforce employed by the Department of Education to carry out investigation of complaints alleging a violation of title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) or section 1092(f) of this title, and enforcement of such title IX (20 U.S.C. 1681 et seq.) or such section 1092(f) of this title, with respect to sexual violence in education, which shall include—

(1) an assessment to identify gaps or challenges in carrying out such investigation and enforcement, which may include surveying the current investigative workforce to solicit feedback on areas in need of improvement;

(2) an examination of issues of recruiting, retention, and the professional development of the current investigative workforce, including the possibility of providing retention bonuses or other forms of compensation for the purpose of ensuring the Department of Education has the capacity, in both personnel and skills, needed to properly perform its mission and provide adequate oversight of educational institutions;

(3) an assessment of the benefits of outreach and training with both law enforcement agencies and educational institutions with respect to such workforce;

(4) an examination of best practices for making educational institutions aware of the most effective campus sexual violence prevention, investigation, and response practices and identifying areas where more research should be conducted; and

(5) strategies for addressing such other matters as the Secretary of Education considers necessary to sexual violence prevention, investigation, and responses.

### (d) Annual reporting

The Task Force on Sexual Violence in Education shall submit to Congress, and make pub-

§ 1689                  TITLE 20—EDUCATION                  Page 1060

licly available, an annual report of its activities and any update of the plan required under subsection (c), including—

    (1) the number of complaints received regarding sexual violence at educational institutions;

    (2) the number of open investigations of sexual violence at educational institutions;

    (3) the number of such complaints that continued to resolution;

    (4) the number of such complaints resolved using informal resolution;

    (5) the average time to complete such an investigation;

    (6) the number of such investigations initiated based on complaints; and

    (7) the number of such investigations initiated by the Department of Education.

**(e) Definitions**

In this section:

**(1) Educational institution**

The term ''educational institution'' includes an institution of higher education, an elementary school, or a secondary school.

**(2) Elementary school; secondary school**

The terms ''elementary school'' and ''secondary school'' have the meanings given the terms in section 7801 of this title.

**(3) Institution of higher education**

The term ''institution of higher education'' has the meaning given the term in section 1002 of this title.

(Pub. L. 117–103, div. W, title XIII, § 1314, Mar. 15, 2022, 136 Stat. 936.)

### Editorial Notes

#### REFERENCES IN TEXT

The Education Amendments of 1972, referred to in subsecs. (a)(1), (8) and (c), is Pub. L. 92–318, June 23, 1972, 86 Stat. 235. Title IX of the Act, known as the Patsy Takemoto Mink Equal Opportunity in Education Act, is classified principally to this chapter. For complete classification of title IX to the Code, see Short Title note set out under section 1681 of this title and Tables.

The Violence Against Women Act of 1994, referred to in subsec. (b)(1), is title IV of Pub. L. 103–322, Sept. 13, 1994, 108 Stat. 1902. For complete classification of this Act to the Code, see section 40001 of Pub. L. 103–322, set out as a Short Title of 1994 Act note under section 10101 of Title 34, Crime Control and Law Enforcement, and Tables.

Section 7801 of this title, referred to in subsec. (e)(3), was in the original ''section 9101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801)'', and was translated as if it had been a reference to section 8101 of the Elementary and Secondary Education Act of 1965 to reflect the probable intent of Congress and the renumbering of section 9101 of the Act as 8101 by Pub. L. 114–95, § 8001(a)(1).

#### CODIFICATION

Section was enacted as part of the Violence Against Women Act Reauthorization Act of 2022, and also as part of the Consolidated Appropriations Act, 2022, and not as part of title IX of Pub. L. 92–318 which is classified principally to this chapter.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE

Section not effective until Oct. 1 of the first fiscal year beginning after Mar. 15, 2022, see section 4(a) of div. W of Pub. L. 117–103, set out as a note under section 6851 of Title 15, Commerce and Trade.

#### DEFINITIONS

For definitions of terms used in this section, see section 12291 of Title 34, Crime Control and Law Enforcement, as made applicable by section 2(b) of div. W of Pub. L. 117–103, which is set out as a note under section 12291 of Title 34.

## CHAPTER 39—EQUAL EDUCATIONAL OPPORTUNITIES AND TRANSPORTATION OF STUDENTS

SUBCHAPTER I—EQUAL EDUCATIONAL OPPORTUNITIES

PART 1—POLICY AND PURPOSE

Sec.
| | |
|---|---|
| 1701. | Congressional declaration of policy. |
| 1702. | Congressional findings. |

PART 2—UNLAWFUL PRACTICES

| | |
|---|---|
| 1703. | Denial of equal educational opportunity prohibited. |
| 1704. | Balance not required. |
| 1705. | Assignment on neighborhood basis not a denial of equal educational opportunity. |

PART 3—ENFORCEMENT

| | |
|---|---|
| 1706. | Civil actions by individuals denied equal educational opportunities or by Attorney General. |
| 1707. | Population changes without effect, per se, on school population changes. |
| 1708. | Jurisdiction of district courts. |
| 1709. | Intervention by Attorney General. |
| 1710. | Civil actions by Attorney General; notice of violations; certification respecting undertaking appropriate remedial action. |

PART 4—REMEDIES

| | |
|---|---|
| 1712. | Formulating remedies; applicability. |
| 1713. | Priority of remedies. |
| 1714. | Transportation of students. |
| 1715. | District lines. |
| 1716. | Voluntary adoption of remedies. |
| 1717. | Reopening proceedings. |
| 1718. | Limitation on court orders; termination of orders conditioned upon compliance with fifth and fourteenth amendments; statement of basis for termination orders; stay of termination orders. |

PART 5—DEFINITIONS

| | |
|---|---|
| 1720. | Definitions. |

PART 6—MISCELLANEOUS PROVISIONS

| | |
|---|---|
| 1721. | Separability. |

SUBCHAPTER II—ASSIGNMENT AND TRANSPORTATION OF STUDENTS

| | |
|---|---|
| 1751. | Prohibition against assignment or transportation of students to overcome racial imbalance. |
| 1752. | Appeals from Federal district court transfer or transportation orders affecting school attendance areas and achieving balancing of students; postponement of Federal court orders pending exercise of appellate remedy; expiration of section. |
| 1753. | Uniform rules of evidence requirement. |
| 1754. | Provisions respecting transportation of pupils to achieve racial balance and judicial power to insure compliance with constitutional standards applicable to the entire United States. |
| 1755. | Additional priority of remedies after finding of de jure segregation. |

### 34 CFR 106.41

This document is current through the December 26, 2025 issue of the Federal Register, with the exception of the amendments appearing at 90 FR 57698 and 90 FR 58408.

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  Title 34 Education  >  Subtitle B — Regulations of the Offices of the Department of Education  >  Chapter I — Office for Civil Rights, Department of Education  >  Part 106 — Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance  >  Subpart D — Discrimination on the Basis of Sex in Education Programs or Activities Prohibited*

## § 106.41 Athletics.

(a) General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) Separate teams. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(c) Equal opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

34 CFR 106.41

**(8)** Provision of medical and training facilities and services;

**(9)** Provision of housing and dining facilities and services;

**(10)** Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

## Statutory Authority

*Authority Note Applicable to 34 CFR Subtit. B, Ch. I, Pt. 106*

## History

[45 FR 30955, May 9, 1980; *85 FR 30026*, 30579, May 19, 2020; *89 FR 33474*, 33888, Apr. 29, 2024]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS

Copyright © 2026 All rights reserved.

**End of Document**