**Nos.** 25-7461, 25-7467, 25-7469, 25-7824, 25-7869

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GRANT HOUSE, et al.,
*Plaintiffs-Appellees,*

v.

GRACELYN LEE LAUDERMILCH
*Objector-Appellant*

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al.,
*Defendants-Appellees*

On Appeal from the United States District Court
for the Northern District of California, Oakland Division
Case No. 4:20-cv-03919-CW
The Honorable Claudia Wilken

## REPLY BRIEF OF OBJECTOR-APPELLANT GRACELYN LEE LAUDERMILCH

Gracelyn Lee Laudermilch
209 Crawford Lane
Rome, PA 18837
(570) 637-4508
gllaudermilch@gmail.com

*Pro Se Objector-Appellant:* Gracelyn Lee Laudermilch

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................. ii

INTRODUCTION .............................................................................................1

ARGUMENT .....................................................................................................6

    I.    MY COMPLETED RECRUITING INJURY AND THE EFFECT OF THE CONTINUATION ORDER ESTABLISH STANDING.............6

        A.    My Subsequent Roster Spot Did Not Erase My Completed Recruiting Injury .......................................................................8

        B.    The Continuation Order's Adverse Legal Effect is Redressable ...................................................................................10

    II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY CONTINUING THE IRS WITHOUT ENSURING ADEQUATE REPRESENTATION FOR ATHLETES WHOSE ROSTER OPPORTUNITIES WERE PLACED AT RISK ...............................12

        A.    The IRS Created a Fundamental Conflict Between Athletes Seeking Expanded Compensation and Athletes Seeking to Preserve Roster Opportunities...................................................14

            1.    Appellees Acknowledge That the Roster Limits Were the Price of Expanded Scholarship and Compensation Benefits .......................................................................14

            2.    Remedies Within or Against Schools Do Not Constitute Adequate Representation Within the Class...................18

        B.    The Continuation Order Did Not Identify a Representative Who Shared the Incentive to Protect Roster Opportunities ..............20

CONCLUSION..................................................................................................22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Bedolla,*
    787 F.3d 1218 (9th Cir. 2015) .................................................................... 13

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) ........................................................ 15–16, 18, 20–21

*Cohen v. Brown University,*
    16 F.4th 935 (1st Cir. 2021) ................................................................ 17–18

*Dennis v. Kellogg Co.,*
    697 F.3d 858 (9th Cir. 2012) .................................................................... 13

*In re First Capital Holdings Corp. Financial Products Securities Litigation,*
    33 F.3d 29 (9th Cir. 1994) .......................................................................... 8

*In re Online DVD-Rental Antitrust Litigation,*
    779 F.3d 934 (9th Cir. 2015) .................................................................... 15

*Kim v. Allison,*
    87 F.4th 994 (9th Cir. 2023) ................................................. 15–16, 18, 21

*Knisley v. Network Associates, Inc.,*
    312 F.3d 1123 (9th Cir. 2002) ............................................................ 10–11

*Larson v. Valente,*
    456 U.S. 228 (1982) .................................................................................. 10

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................................... 6

*Matsumoto v. Labrador,*
    122 F.4th 787 (9th Cir. 2024) .................................................................. 10

*Mendia v. Garcia,*

    768 F.3d 1009 (9th Cir. 2014).........................................................................9

*Ortiz v. Fibreboard Corp.,*

    527 U.S. 815 (1999) ....................................................................................15

*Stetson v. Grissom,*

    821 F.3d 1157 (9th Cir. 2016)......................................................................8

**Rules**

Fed. R. Civ. P. 23 ...............................................................4, 6, 11–13, 15–16, 22

**Constitutional Provisions**

U.S. Const. art. III .....................................................................................6–7, 9

**Other Authorities**

Rita Gary, *Op-Ed: College Sports Were Created for Students; We Shouldn't*

    *Forget That,* Track & Field News (July 2026),

    https://trackandfieldnews.com/article/op-ed-college-sports-were-created-for-

    students-we-shouldnt-forget-that/ ..................................................................6

## INTRODUCTION

At 4:00 p.m. on October 31, 2024, I called Liberty University ("Liberty") expecting to become a Division I college athlete. Instead, I learned that the roster limits in the Second Amended Injunctive Relief Settlement ("IRS") had jeopardized that dream. I was a high school senior who had turned down other recruiting opportunities and was ready to commit to the school and team I had chosen. But my coach told me that, only hours earlier, Liberty had opted into the IRS, and the new roster limits meant she could no longer accept my commitment. She still wanted me on the team, yet she advised me not to commit. 2-LaudermilchER-0429; *see also* 3-LaudermilchER-0474–75, 615. That phone call introduced me to the IRS not as a new source of compensation, but as an obstacle to joining the Division I team I had worked toward for years.

I do not oppose compensating college athletes. But understanding what happened to me—and to my teammates—requires understanding what the IRS actually does to the athletes it was supposed to protect. Appellees' briefs dwell on what the IRS offers some athletes while saying little about what it costs others. Defendants-Appellees emphasize that athletes may receive a share of Division I athletics revenue "comparable to what professional athletes receive through collective bargaining." ECF 31.1 at 38. Plaintiffs-Appellees likewise stress that the share may be "greater than or equal to" the share professional athletes receive.

1

ECF 29.1 at 20. Yet the very same negotiated package that expands compensation for some class members reduces or eliminates the opportunity for others to compete at all. Both interests are real, but they are not the same. The question this appeal presents is whether the same representatives adequately protected athletes on both sides of that tradeoff, especially those whose primary interest was preserving a roster spot.

Appellees urge the Court not to reach that adequacy question, but their own arguments show why it must. Plaintiffs-Appellees say I lack standing because I ultimately made Liberty's roster, while Defendants-Appellees say my completed injury is not redressable and any future injury is too speculative. ECF 29.1 at 30; ECF 31.1 at 52–53. Counsel for Plaintiffs, Winston & Strawn LLP and Hagens Berman Sobol Shapiro LLP (collectively, "Class Counsel") went further, arguing that "many of the objectors also lack standing because they are not currently on a Division I athletic team and thus not even members of the Injunctive Relief Settlement Class." LaudermilchFER-019. Together, those positions create a catch-22: an incoming athlete may have to object before she knows whether the roster limits will injure her, yet once a roster decision is made, Appellees insist the injury cannot be redressed and that an athlete who was never placed on a roster never had standing to object in the first place. But earning a roster spot later did not erase the recruiting injury I had already suffered, and it did not extinguish my personal stake

2

in seeking review of the district court's November 13, 2025 order ("Continuation Order"), which overruled my objection and allowed the IRS to continue. 1-LaudermilchER-0002–03, 007–10.

Appellees point to my Designated Student-Athlete ("DSA") status as proof that the system worked. It did not. 1-LaudermilchER-0005; *see also* 2-LaudermilchER-0301. DSA status did not even exist until after the district court found that immediate implementation of the roster limits "has resulted or will result in harm" to a significant number of class members and required a modification on that basis. 2-LaudermilchER-0401–03, 349–50. And Liberty could not have designated me without attesting that I "was or would have been removed" from its 2025-26 roster "due to the implementation of roster limits." 1-LaudermilchER-0005, 028–29. DSA status was a response to the harm, not proof that no harm occurred.

Nor did DSA status cure that harm, and my team's experience makes that clear. When I was first recruited, Liberty's women's cross-country roster had thirty-one athletes. By the time I was given a spot, it had fallen to twenty-four, as teammates left in anticipation of cuts and seniors graduated. A time trial reduced it further to seventeen. Of those seventeen, five held DSA status, yet they were forced to compete against one another for two positions. I congratulated one teammate, then turned to cry with another, while others declined the time trial

3

altogether and later trained alone. 2-LaudermilchER-304–05. Plaintiffs-Appellees themselves conceded that DSA status "does not *guarantee* a roster spot"; it merely permits a school to exempt a DSA from the numerical limit. ECF 29.1 at 27; 1-LaudermilchER-044–45.

My objection has never been only about my own roster spot. Fed. R. Civ. P. 23(e)(5)(A) permits an objector to state whether her objection applies "only to the objector, to a specific subset of the class, or to the entire class," and the class notice asked the same question. 4-WhittyER-0754. I object on behalf of my teammates, and all other athletes across the country whose opportunity to compete was diminished or eliminated by roster limits they had no voice in negotiating, and Rule 23(e)(5)(A) entitles me to do so.

Nonetheless, Appellees attribute lost roster-spot opportunities solely to the schools, even while they credit the IRS whenever schools provide compensation and scholarships. ECF 29.1 at 33–37; *see also* ECF 31.1 at 37–41, 45–49. They cannot have it both ways. School discretion may determine which athletes are subject to a roster ceiling, but it does not erase the ceiling or its effects. And if Appellees choose to defend the IRS as a single package, its harms must be weighed alongside its benefits.

This brings the story back to where it began, to the question of who was at the table when the IRS was negotiated and who was not. The district court

4

appointed Class Counsel to represent every settlement class. 1-LaudermilchER-0028, 114. Those classes included athletes seeking compensation, recruits who had to object before knowing whether roster limits would cost them a place, and DSA teammates competing for two positions. 1-LaudermilchER-0028; *see also* 2-LaudermilchER-0304–05. The class notice assured members that Class Counsel represented them all and had negotiated the IRS "on your behalf." 2-LaudermilchER-0316. Yet when I emailed Class Counsel on February 1, 2025, with my objection letter attached, Counsel simply responded: "We are the lawyers representing the athletes who are asking the judge to approve the settlement." 2-LaudermilchER-301–02, 308. That single sentence said everything. Class Counsel was not representing the interests of the entire class, and that concern persists in post-settlement proceedings, where Class Counsel retains exclusive authority to litigate challenges on behalf of the class. LaudermilchFER-015; 1-LaudermilchER-0049; 2-LaudermilchER-0395–96.

And the story is not over. In May 2026, I suffered a physical injury and have remained unable to run since. The roster limits imposed by the IRS have continued to shrink the team around me, and on July 21, 2026, my coaches told me that Liberty will hold another time trial. I still cannot run. With another time trial already scheduled and my injury unresolved, I could be cut before I ever have the chance to compete for my spot. Appellees dismiss that harm as too speculative to

redress, but there is nothing speculative about it. It is imminent. ECF 31.1 at 42–43.

The stakes reach well beyond me. The effects of the IRS will be felt by athletes and college sports nationwide through the 2034-35 academic year unless this conflict is resolved, because the challenged provisions determine whether students like me will have the opportunity to participate in college sports at all.[1] That is why this appeal does not ask the Court to choose participation over compensation—it asks whether Rule 23 permits incoming athletes to be bound by those provisions without separate representation for the athletes whose roster opportunities are placed at risk. The Court should vacate the Continuation Order and remand.

## ARGUMENT

### I. MY COMPLETED RECRUITING INJURY AND THE EFFECT OF THE CONTINUATION ORDER ESTABLISH STANDING

Article III standing requires an injury in fact that is fairly traceable to the challenged conduct and is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Appellees dispute whether I satisfy this standard, raising two separate arguments about standing. First,

---

[1] Rita Gary, *Op-Ed: College Sports Were Created for Students. We Shouldn't Forget That,* Track & Field News (June 24, 2026), https://trackandfieldnews.com/op-ed-college-sports-were-created-for-students-we-shouldnt-forget-that/.

Plaintiffs-Appellees acknowledge that I "had standing to raise objections to continuation," but argue that making Liberty's roster extinguished my challenge. ECF 29.1 at 17, 21–23. Second, Defendants-Appellees argue that my completed recruiting injury lacks redressability because this appeal seeks no damages and any future roster injury remains speculative. ECF 31.1 at 40–44. Neither argument succeeds. My completed injury gave me a concrete stake in objecting; I face imminent harm from roster cuts, and vacating the Continuation Order would alter my legal position under the Fourth Amended Stipulation and Settlement Agreement ("Settlement Agreement"). I therefore have Article III standing to pursue this appeal.

Considered together, Appellees' theories would impose an impossible burden on every incoming athlete the IRS affects. I received court-approved notice of the IRS and the right to object on July 23, 2025, opening a sixty-day objection period. 2-LaudermilchER-0303–04. Liberty cut its roster only a week later. The next incoming class faces an even tighter window. Those athletes must object by August 11, 2026, in many cases before they have enrolled, joined a team, or learned whether the roster limits will cost them a spot. LaudermilchFER-004, 010. Yet if they stay silent, they release their claims for injunctive or declaratory relief challenging the IRS through June 2035. LaudermilchFER-007. Under Appellees' theory, an athlete must object before the roster limits have injured her, and the

7

moment she can show that injury, Appellees say the objection is too late. Article III does not impose a standing rule that no incoming athlete could ever satisfy.

### A. My Subsequent Roster Spot Did Not Erase My Completed Recruiting Injury

A recruiting injury that is complete before an athlete joins a roster is a cognizable injury independent of whatever roster decision comes later. Plaintiffs-Appellees argue the opposite, asserting that because I ultimately made the roster, I "could not have (and did not) suffer harm from the implementation of roster limits." ECF 29.1 at 22. That argument assumes removal from a final roster is the only cognizable injury, and it is incorrect. Under *Stetson v. Grissom*, an objector seeking appellate review must identify a personal injury independent of her procedural right to object. 821 F.3d 1157, 1163–64 (9th Cir. 2016). The objector in *In re First Capital Holdings Corp. Financial Products Securities Litigation* failed that requirement because she never suffered any loss. She recovered her full investment plus a profit, paid no penalty or fee, and alleged no economic or noneconomic injury. 33 F.3d 29, 30 (9th Cir. 1994). Unlike that objector, I suffered a concrete recruiting loss before Liberty ever set its final roster.

The record confirms that loss. On October 31, 2024, Liberty's coach withdrew my opportunity to commit after Liberty opted into the IRS and became subject to its roster limits, and she later confirmed that the roster limits were the reason for that decision. 2-LaudermilchER-0429; *see also* 3-LaudermilchER-

0474–75, 615. By then I had already declined other Division I opportunities in reliance on Liberty's assurance that I had a place on the team, so the loss was not contingent on anything that happened afterward—it was complete the moment my coach withdrew the commitment I had already surrendered other options to accept. 2-LaudermilchER-429; *see also* 3-LaudermilchER-474–75, 615. Liberty's subsequent decision to grant me DSA status further confirms this timeline because Liberty could designate me only by attesting that I "was or would have been removed" from its 2025–26 roster "due to the implementation of roster limits." 1-LaudermilchER-005, 028–29.

Nor does Liberty's intervening discretion sever traceability. Article III permits causation to run through the decisions of a third party, and the challenged conduct need not be the last link in the causal chain, provided the links are plausible and particular facts show that the conduct was a substantial factor in the third party's action. *Mendia v. Garcia*, 768 F.3d 1009, 1012–14 (9th Cir. 2014). Those facts are present here. My coach expressly attributed the withdrawn commitment to Liberty's decision to opt into the IRS and the roster limits that followed, and Liberty later made the attestation required for DSA status. 2-LaudermilchER-0429; 1-LaudermilchER-0028–29. Although Liberty decided which athletes would be affected, the IRS imposed the constraint that made that decision necessary in the first place. *See* ECF 31.1 at 39–41.

Nothing that occurred afterward undid that harm. Earning a roster spot months later reduced some of the practical consequences of the IRS, but it did not reverse Liberty's initial decision or restore the recruiting opportunities I had already lost. The Continuation Order's finding that I "did not suffer harm" therefore rested on the wrong measuring point, referring to my roster status at the time of decision rather than to the injury as it existed when Liberty withdrew my commitment. 1-LaudermilchER-0008. By the November 6, 2025 hearing, my injury had already occurred, and my subsequent roster spot could not retroactively eliminate that injury for the purposes of standing.

**B.      The Continuation Order's Adverse Legal Effect is Redressable.**

A favorable decision redresses an injury if it is likely to remedy that injury in some material respect; it need not remedy every consequence of the challenged conduct. *Matsumoto v. Labrador*, 122 F.4th 787, 801–02 (9th Cir. 2024) *(citing Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). Defendants-Appellees argue that prospective relief cannot redress my completed recruiting injury because this appeal does not seek damages. ECF 31.1 at 42–44. That argument mistakes what redressability requires.

*Knisley v. Network Associates, Inc.* illustrates what a genuine redressability failure looks like: the objector there had no stake in the settlement fund, so even a reduced fee award could not have benefited him, and a win would not have

changed his position. 312 F.3d 1123, 1126–27 (9th Cir. 2002). My appeal presents the opposite case. Under Section 14, the specified releases do not take effect against an incoming athlete who objects until the district court hears and rules on her objection. 1-LaudermilchER-142–43; 2-LaudermilchER-380, 383; *see also* ECF 29.1 at 11. The Continuation Order supplied that ruling when it overruled my objection and allowed the IRS to continue. 1-LaudermilchER-002–03, 007–10. Vacating the Continuation Order would remove the ruling on which those releases depend and return my objection for reconsideration under Rule 23, including the question of whether athletes whose opportunities for participation were diminished lacked separate representation. Although this cannot restore the recruiting opportunities I lost, it would alter my legal position under the Settlement Agreement, and that is enough.

Defendants-Appellees separately challenge a standing theory based on a future roster cut. I need not rely on that theory (although I continue to face the possibility of a future cut, and do not concede the point) because my standing rests on a completed recruiting injury and on the present legal consequence of the Continuation Order that overruled my objection. That injury existed before the hearing, and because the Settlement Agreement makes the ruling on my objection the condition for the specified releases, vacating that ruling would remove that

11

condition. Nothing in that chain requires predicting whether Liberty will make another roster decision against me in a later season.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION BY CONTINUING THE IRS WITHOUT ENSURING ADEQUATE REPRESENTATION FOR ATHLETES WHOSE ROSTER OPPORTUNITIES WERE PLACED AT RISK

Section 14 gives incoming members of the Injunctive Relief Settlement Class ("IRS Class") sixty days after notice to object to continuation of the IRS. 1-LaudermilchER-142–43. I exercised that right. In support of my objection, I presented evidence that Liberty had reduced its roster and that five DSA athletes later competed for two remaining cross-country positions. 2-LaudermilchER-301–06. That objection required the district court to decide whether the IRS allocated benefits and burdens among athletes with materially different interests, and whether the class representatives and Class Counsel adequately represented those interests. *See* Fed. R. Civ. P. 23(a)(4), (e)(2)(A).

The Continuation Order never made that determination. Instead, it relied on the named Plaintiffs' "overarching common interest" in a more competitive market and greater compensation, on Miller Moss's appointment as a current-athlete representative, on the prior adequacy finding, and on Grant House's declaration that he consulted with Class Counsel. 1-LaudermilchER-004–06. It also invoked school discretion and the absence of any DSA guarantee. 1-LaudermilchER-007–08. What the Continuation Order did not do is address my evidence that five DSA

12

athletes were left to compete for two remaining positions or identify a representative or counsel with an aligned incentive to protect roster opportunities. However sound the reasons it gave may be, they did not answer whether a fundamental conflict divided the class.

That omission matters under the Ninth Circuit's procedural standard for settlement review. A district court must show that it "explored comprehensively all factors" and must give a "reasoned response to all non-frivolous objections." *Allen v. Bedolla*, 787 F.3d 1218, 1223–24 (9th Cir. 2015) (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)). My objection was not a mere disagreement with the IRS's overall value. Rather, it presented post-approval evidence and posed a specific Rule 23 question, namely whether representatives who accepted roster limits as the price of scholarship relief had an aligned incentive to protect the athletes who bore the participation cost. Reciting common benefits, current eligibility, and prior findings did not answer that question.

Section 14 makes reliance on prior adequacy findings especially insufficient here. The provision gives each incoming class a fresh opportunity to object to continuation after receiving notice. 1-LaudermilchER-142–43. That protection would do little work if a finding made before an incoming athlete's experience and evidence existed could automatically dispose of every later objection. At a

13

minimum, then, the Continuation Order had to evaluate whether the new record altered the adequacy analysis. It did not.

### A. The IRS Created a Fundamental Conflict Between Athletes Seeking Expanded Compensation and Athletes Seeking to Preserve Roster Opportunities

#### 1. Appellees Acknowledge That the Roster Limits Were the Price of Expanded Scholarship and Compensation Benefits

Appellees' own descriptions identify the exchange at issue. Defendants-Appellees emphasize that athletes may receive a share of Division I athletics revenue "comparable to what professional athletes receive through collective bargaining," while Plaintiffs-Appellees suggest the percentage may be "greater than or equal to" the professional-athlete share. ECF 31.1 at 28; ECF 29.1 at 12. The district court likewise identified the named Plaintiffs' shared interest as "securing a more competitive market for the labor of Division I student-athletes and in achieving greater compensation for Division I student-athletes via this litigation." 1-LaudermilchER-181; *see also* 1-LaudermilchER-004–05. Plaintiffs-Appellees themselves describe the roster limits as a "direct trade" and a "compromise" for eliminating scholarship limits. ECF 29.1 at 3, 13. I do not oppose those benefits. But the exchange paired compensation for some athletes with roster limits that put other athletes' opportunities to compete at risk, and the named Plaintiffs' interest in that compensation gave them no comparable incentive to protect the roster spot I needed to compete.

14

Rule 23 exists to prevent that mismatch. Rule 23(a)(4) requires the representative parties to "fairly and adequately protect the interests of the class," and Rule 23(e)(2)(A) requires adequate representation by the class representatives and Class Counsel. A conflict defeats adequacy when it is "fundamental to the suit" and "go[es] to the heart of the litigation." *In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 942 (9th Cir. 2015). In *Amchem Products, Inc. v. Windsor*, presently injured and exposure-only claimants shared an interest in compensation but differed over the settlement's "essential allocation decisions." 521 U.S. 591, 625–27 (1997). Presently injured claimants wanted generous immediate payments, while exposure-only claimants needed protection for future injuries. Id. at 626–27. Their common objective did not align their interests in the settlement's terms. *Kim v. Allison* likewise held that a named plaintiff facing arbitration and contractual restrictions had a materially different incentive to settle than class members who might not face those barriers, even though the difference affected only part of the class. 87 F.4th 994, 1000–02 (9th Cir. 2023).

Appellees try to confine *Amchem* and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), to asbestos damages settlements. ECF 29.1 at 48–50. But the principle those cases enforce turns on conflicting incentives in an essential allocation decision, not on the subject matter of the litigation or the label attached to the relief. *Kim* applied *Amchem* well outside the mass-tort setting and held a

15

representative inadequate because her circumstances gave her a materially stronger incentive to settle than other class members, even though the conflict affected only part of the class. *Kim*, 87 F.4th at 1000–01. The same logic applies here, where representatives pursuing expanded compensation could accept roster limits without facing the participation loss those limits imposed on other athletes.

Nor does the Settlement Agreement's aggregate value answer the adequacy of representation. Appellees emphasize billions of dollars in anticipated compensation and call the result "extraordinary." ECF 29.1 at 51–54; ECF 31.1 at 27–31. Although those benefits may bear on overall fairness, Rule 23(a)(4) and Rule 23(e)(2)(A) separately require adequate representation, and *Amchem* rejected the notion that certification is proper merely because a settlement appears fair. 521 U.S. at 621–22. The question is not whether the IRS produces a net benefit for the class as a whole. It is whether the athletes who bore the roster cost had a representative with reason to protect that interest when the exchange was made.

They did not. The Continuation Order identified no representative whose own opportunity to join or remain on a team was threatened by the roster limits. 1-LaudermilchER-004–05. A representative focused on expanded competition and compensation could accept those limits without bearing the same risk, and my interests ran in a different direction entirely. I had told the district court that I was "uninterested in pay beyond scholarships" and that my primary interest was the

16

opportunity to compete and obtain the educational benefits of college athletics. 2-LaudermilchER-216–17. Liberty's DSA designation confirmed that the roster limits placed that opportunity at risk. 1-LaudermilchER-005, 028–29. The named Plaintiffs' general compensation interest simply did not align with the participation interest the bargain put in jeopardy.

The district court itself recognized that divergence before final approval. It found that immediate implementation of the roster limits "has resulted or will result in harm" to a "significant number" of class members whose roster spots had been or would be taken away, and that the result was not fair to those athletes "even if other class members may benefit." 2-LaudermilchER-400–03. On that basis, the court refused to approve the agreement as written and required the parties to address the roster-limit harm. 2-LaudermilchER-402–04. The participation interest I asserted was therefore shared by a significant group of class members and was not merely a personal preference.

Plaintiffs-Appellees' reliance on *Cohen v. Brown University* only confirms the difference between a unified class and a divided one. *See* ECF 29.1 at 36–39. In *Cohen*, women athletes shared an interest in restricting Brown's ability to eliminate women's varsity teams, and the record showed no "actual and substantial risk" that protecting one group required sacrificing another's participation opportunities. 16 F.4th 935, 949–51 (1st Cir. 2021). This case is the opposite.

17

Plaintiffs-Appellees identify roster limits as the trade for scholarship relief, the district court found that the trade would harm a significant number of class members even if others benefited, and my recruiting experience showed that risk in operation. ECF 29.1 at 3, 13; 2-LaudermilchER-400–03, 429. *Cohen* therefore does not excuse the absence of a representative aligned with the athletes whose roster opportunities were placed at risk. 16 F.4th at 949–51; *see Amchem*, 521 U.S. at 625–27; *see Kim*, 87 F.4th at 1000–02.

### 2. Remedies Within or Against Schools Do Not Constitute Adequate Representation Within the Class

The DSA modification did not cure the conflict. At final approval hearing, Plaintiffs-Appellees represented that the modification placed affected athletes "in the same position as they would have been in if roster limits were never implemented," and the district court concluded on that basis that it would "negate any harm." 1-LaudermilchER-176–77. Neither assurance has held up. Plaintiffs-Appellees now acknowledge that DSA status "does not guarantee a roster spot," because the designation exempts an athlete from the numerical ceiling while leaving the school free to choose its roster. ECF 29.1 at 14, 27–28; 1-LaudermilchER-044–45. Liberty's experience showed how much room that discretion leaves. Even though Liberty could designate me only by attesting that I "was or would have been removed" from the 2025–26 roster "due to the implementation of roster limits," its roster still fell from thirty-one athletes to

18

twenty-four to seventeen, and five DSA athletes whom the coaches wanted to keep were left competing for two positions. 1-LaudermilchER-005, 028–29; 2-LaudermilchER-303–05. An exemption from the ceiling, in other words, did not necessarily preserve the very opportunity the modification was meant to protect. Nor can Appellees escape that result by crediting the IRS when schools provide compensation and scholarships while dismissing roster losses as wholly independent school decisions. ECF 29.1 at 25–29; *see also* ECF 31.1 at 27–31, 35–39. Whatever role school discretion played, it did not establish that the representatives who accepted the roster-limit bargain shared the interests of athletes at risk of losing a place on a team.

The Title IX evidence served a narrower purpose than Appellees suggest. I told the district court that Liberty was recalculating participation opportunities in connection with Title IX compliance, and that those decisions were affecting women with DSA status whom their coaches wanted to keep. 2-LaudermilchER-304–05. I do not ask this Court to decide whether Liberty or the IRS violated Title IX, and I recognize that the Settlement Agreement generally preserves Title IX claims arising from a school's implementation of the injunctive relief, apart from claims relating to distribution of the Gross Settlement Fund. 1-LaudermilchER-140–41; ECF 29.1 at 29–32; ECF 31.1 at 44–46. But the possibility of suing a school later answers a different question. It does not show that the participation

interest was adequately represented when the roster-limit bargain was struck, nor that DSA status restored the position that affected athletes would have occupied without the limits. A remedy outside the class is no substitute for aligned representation within it.

### B. The Continuation Order Did Not Identify a Representative Who Shared the Incentive to Protect Roster Opportunities

Miller Moss did not fill that gap. Plaintiffs-Appellees lean on his status as "a current D-I athlete," but the timing of his appointment gives the argument away. The district court appointed Moss on November 5, 2025, which was the day before the continuation hearing and long after the parties had negotiated and won approval of both the IRS and the DSA modification. ECF 29.1 at 55; 2-LaudermilchER-236–39; 1-LaudermilchER-004–06. By then, every decision that mattered to athletes like me had already been made. So while his appointment showed that a currently eligible athlete was present at the hearing, it showed nothing more. It did not show that his own roster opportunity was ever threatened, and it did not show that he had any part in negotiating the roster-limit exchange on behalf of the athletes who faced that risk. A representative who arrives after the "essential allocation decisions" cannot supply the structural protection that was missing when those decisions were made. *See Amchem*, 521 U.S. at 627–28.

Grant House's declaration fares no better. House stated that he consulted with Class Counsel "throughout the settlement process to ensure the classes

w[ould] achieve a fair outcome." 1-LaudermilchER-006. But the question was never whether House was engaged in the process. It was whether anyone at the table had a personal stake in protecting roster opportunities, and the Continuation Order never found that House faced roster loss himself or was charged with protecting the athletes who did. Talking with counsel is not a substitute for a representative who actually shares the interest affected by the disputed terms. *See Amchem*, 521 U.S. at 625–27.

That leaves Plaintiffs-Appellees' promise to add a currently eligible representative each academic year, and it has the same flaw as the first two answers. ECF 29.1 at 55. The promise speaks to eligibility, not alignment with aggrieved class members, because current-athlete status alone says nothing about whether a representative has an incentive to protect athletes whose opportunities are threatened by roster limits. *See Kim*, 87 F.4th at 1000–02. In the end, the Continuation Order identified representatives who supported the IRS and representatives who monitored it, but not one who shared the roster-protection interest at stake.

21

## CONCLUSION

For the foregoing reasons, the Court should vacate the Continuation Order

and remand for reconsideration under Rule 23 with adequate, conflict-free

representation for athletes whose roster opportunities were placed at risk.


Date:  July 29, 2026

 */s/ Gracelyn Lee Laudermilch*
209 Crawford Lane
Rome, PA 18837
(570) 637-4508
gllaudermilch@gmail.com

*Pro Se Objector-Appellant:* Gracelyn Lee Laudermilch

22

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 25-7461, 25-7467, 25-7469, 25-7824, 25-7869

I am the attorney or self-represented party.

**This brief contains 4,872 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Gracelyn Lee Laudermilch   **Date** July 29, 2026

1

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 15. Certificate of Service for Electronic Filing**

**9th Cir. Case Number(s)** 25-7461, 25-7467, 25-7469, 25-7824, 25-7869

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)***:**

Reply Brief of Objector-Appellant Gracelyn Lee Laudermilch (*Pro Se*)

Objector-Appellant's Further Excerpts of Record – Volume 1 of 1

**Signature**   s/ Gracelyn Lee Laudermilch    **Date** July 29, 2026